IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

| | | |
|---|---|---|
| MICHAEL BATEMAN, et al., | ) | Case No. 5:10-CV-265-H |
| | ) | |
| Plaintiffs, | ) | **MEMORANDUM OF POINTS AND** |
| | ) | **AUTHORITIES IN OPPOSITION TO** |
| v. | ) | **DEFENDANTS PERDUE AND** |
| | ) | **YOUNG'S MOTION TO DISMISS** |
| BEVERLY PERDUE, et al., | ) | |
| | ) | |
| Defendants. | ) | |

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
DEFENDANTS PERDUE AND YOUNG'S MOTION TO DISMISS

**COME NOW** the Plaintiffs, Michael Bateman, Virgil Green, Forrest Minges, Jr.,

GRNC/FFE, Inc., and Second Amendment Foundation, Inc., by and through undersigned counsel,

and submit their Memorandum of Points and Authorities in Opposition to Defendants Perdue and

Young's Motion to Dismiss.

Dated: September 24, 2010                Respectfully submitted,

/s/ Alan Gura                            /s/ Andrew Tripp
Alan Gura                                N.C. State Bar 34254
Gura & Possessky, PLLC                   atripp@brookspierce.com
101 N. Columbus Street, Suite 405
Alexandria, VA 22314                     BROOKS, PIERCE, MCLENDON,
703.835.9085/Fax 703.997.7665               HUMPHREY & LEONARD, L.L.P.
                                         1600 Wachovia Center
*Counsel for Plaintiffs*                 150 Fayetteville Street
                                         Raleigh, NC 27601
                                         Telephone: 919-839-0300
                                         Facsimile: 919-839-0304

                                         *Local Civil Rule 83.1 Counsel for Plaintiffs*

# TABLE OF CONTENTS

Table of Authorities.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

Preliminary Statement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Statement of Facts.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Summary of Argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    I.     LAWS IMPLICATING FUNDAMENTAL CONSTITUTIONAL RIGHTS
          ARE NOT PRESUMED CONSTITUTIONAL. . . . . . . . . . . . . . . . . . . . . . . . . 5

    II.    LAWS IMPLICATING FUNDAMENTAL CONSTITUTIONAL RIGHTS
          MAY BE FACIALLY OVERBROAD, BUT IN ANY EVENT, THE
          COMPLAINT IS NARROWLY DRAWN.. . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    III.   THE SECOND AMENDMENT SECURES A RIGHT TO CARRY ARMS
          IN PUBLIC.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

    IV.   THE SECOND AMENDMENT SECURES A RIGHT TO PURCHASE
          ARMS AND AMMUNITION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

    V.    SECOND AMENDMENT RIGHTS CANNOT BE SUSPENDED ON
          ACCOUNT OF THE EMERGENCIES SUCH RIGHTS ARE
          DESIGNED TO ALLEVIATE.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

    VI.   THE COMPLAINT ADDRESSES A RIPE CONTROVERSY
          BECAUSE THE CHALLENGED LAWS HAVE BEEN, AND ARE
          REGULARLY IMPLEMENTED AND ENFORCED. . . . . . . . . . . . . . . . . . 19

Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

TABLE OF AUTHORITIES

Cases

*American Legion Post 7* v. *City of Durham*,
    239 F.3d 601 (4th Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Andrews* v. *State*,
    50 Tenn. 165 (1871). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13-15, 17

*Aymette* v. *State*,
    21 Tenn. 154 (1840). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Carey* v. *Population Servs. Int'l*,
    431 U.S. 678 (1977). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Carhart* v. *Gonzales*,
    413 F.3d 791 (8th Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Citizens United* v. *FEC*,
    130 S. Ct. 876 (2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*City of Las Vegas* v. *Moberg*,
    82 N.M. 626, 485 P.2d 737 (N.M. Ct. App. 1971). . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Clark* v. *Jeter*,
    486 U.S. 456 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Crawford* v. *Marion County Election Bd.*,
    553 U.S. 181 (2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*District of Columbia* v. *Heller*,
    128 S. Ct. 2783 (2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

*Doe* v. *Bolton*,
    410 U.S. 179 (1973). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Doe* v. *Duling*,
    782 F.2d 1202 (4th Cir. 1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Epperson* v. *Arkansas*,
    393 U.S. 97 (1968). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

ii

*FEC* v. *Wis. Right to Life, Inc.*,
    551 U.S. 449 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 23

*Griswold* v. *Connecticut*,
    381 U.S. 479 (1965). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*In re Application of McIntyre*,
    552 A.2d 500 (Del. Super. 1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*In re Brickey*,
    8 Idaho 597, 70 P. 609 (1902). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Kellogg* v. *City of Gary*,
    562 N.E.2d 685 (Ind. 1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Laird* v. *Tatum*,
    408 U.S. 1 (1972). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Maryland State Conf. of NAACP Branches* v. *Maryland Dep't of State Police*,
    72 F. Supp. 2d 560 (D. Md. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*McDonald* v. *City of Chicago*,
    130 S. Ct. 3020, 177 L. Ed. 2d 894 (2010) . . . . . . . . . . . . . . . . . . . . . . . . . 7, 9-11, 19

*Muscarello* v. *United States*,
    524 U.S. 125 (1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*New Hampshire Hemp Council, Inc.* v. *Marshall*,
    203 F.3d 1 (1st Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Nunn* v. *State*,
    1 Ga. 243 (1846). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 14

*Parker* v. *District of Columbia*,
    478 F.3d 370 (D.C. Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Peruta* v. *County of San Diego*,
    678 F. Supp. 2d 1046 (S.D. Ca. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Planned Parenthood of Southeastern Pa.* v. *Casey*,
    505 U.S. 833 (1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

iii

*Reliable Consultants, Inc.* v. *Earle*,
   517 F.3d 738 (5th Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Reno* v. *ACLU*,
   521 U.S. 844 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Richmond Med. Ctr. for Women* v. *Herring*,
   570 F.3d 165 (4th Cir. 2009) (en banc). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Richmond Newspapers* v. *Virginia*,
   448 U.S. 555 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Roaden* v. *Kentucky*,
   413 U.S. 496 (1973). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Robertson* v. *Baldwin*,
   165 U.S. 275 (1897). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*S.C. Green Party v. S.C. State Election Comm'n*,
   612 F.3d 752 (4th Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Smith* v. *California*,
   361 U.S. 147 (1959). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*State ex rel. City of Princeton* v. *Buckner*,
   180 W. Va. 457, 377 S.E.2d 139 (1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*State* v. *Chandler*,
   5 La. Ann. 489 (1850). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 15

*State* v. *Delgado*,
   298 Or. 395, 692 P.2d 610 (Or. 1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*State* v. *Kerner*,
   181 N.C. 574, 107 S.E. 222 (1921). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*State* v. *Reid*,
   1 Ala. 612 (1840). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*State* v. *Rosenthal*,
   75 Vt. 295, 55 A. 610 (1903). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Storer* v. *Brown*,
415 U.S. 724 (1974). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 23

*Super Tire Eng'g Co.* v. *McCorkle*,
416 U.S. 115 (1974). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Tattered Cover* v. *City of Thornton*,
44 P.3d 1044 (Colo. 2002).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Town of Castle Rock v. Gonzales*,
545 U.S. 748 (2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*United States* v. *Carolene Products Co.*,
304 U.S. 144 (1938). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*United States* v. *Chalk*,
441 F.2d 1277 (4th Cir. 1971). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*United States* v. *Marzzarella*,
2010 U.S. App. Lexis 15655 (3d Cir. July 29, 2010) . . . . . . . . . . . . . . . . . . . . . . 8, 18

*United States* v. *Salerno*,
481 U.S. 739 (1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7-9

*Virginia* v. *American Booksellers Ass'n*,
484 U.S. 383 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Washington Free Community, Inc.* v. *Wilson*,
334 F. Supp. 77 (D.D.C. 1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Wexler* v. *City of New Orleans*,
267 F. Supp. 2d 559 (E.D. La. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Williams* v. *Morgan*,
478 F.3d 1316 (11th Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Constitutional Provisions

U.S. Const. amend. II.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

U.S. Const. amend. VI.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

U.S. Const. amend. VIII. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

v

Statutes

15 U.S.C. § 7901.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

N.C. Gen. Stat. § 14-288.1(10). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 19

N.C. Gen. Stat. § 14-288.1(2). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

N.C. Gen. Stat. § 14-288.12 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 20

N.C. Gen. Stat. § 14-288.13 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 20

N.C. Gen. Stat. § 14-288.14. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

N.C. Gen. Stat. § 14-288.15 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 20

N.C. Gen. Stat. § 14-288.7. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 20

Other Authorities

THE WRITINGS OF THOMAS JEFFERSON (T.J. Randolph, ed., 1830). . . . . . . . . . . . . . . . . . . 17

Black's Law Dictionary (6th Ed. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Erwin Chemerinsky, FEDERAL JURISDICTION (3d ed. 1999). . . . . . . . . . . . . . . . . . . . . . 23

Executive Order 62, *available at* http://www.governor.state.nc.us/
        /NewsItems/ExecutiveOrderDetail.aspx? newsItemID=1328
            (last visited Sept. 23, 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Norman J. Singer, 2A SUTHERLAND ON
        STATUTORY CONSTRUCTION (7th ed. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

THE AMERICAN STUDENTS' BLACKSTONE (G. Chase ed. 1884). . . . . . . . . . . . . . . . . . . 15

THE FEDERALIST NO. 78(Alexander Hamilton)
        (George W. Carey & James McClellan eds., 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . 6

vi

## MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS PERDUE AND YOUNG'S MOTION TO DISMISS

### PRELIMINARY STATEMENT

Under the provisions challenged by the Complaint, the people of North Carolina lose their fundamental Second Amendment right to bear arms whenever bad weather threatens. Additionally, the mere prospect of foul weather enables every level of North Carolina's government to infringe upon the Second Amendment right to purchase arms and ammunition.

The Second Amendment's very object is to enable individuals to cope with emergencies, especially when the State declares that it may be unable to enforce the law. Laws barring the carrying and sale of arms at precisely those times when individuals most urgently need to access means of self-defense are incompatible with the core of the Second Amendment right. This Court is empowered to, and must, secure the right to keep and bear arms by enjoining enforcement of these provisions. The Complaint plainly states a valid claim for relief.

### STATEMENT OF FACTS

The Court may take judicial notice that North Carolina is frequently beset by hurricanes, tropical storms, and other severe weather events endangering public safety. Episodes of public disorder, too, are naturally inherent in the human condition.

To deal with such problems, North Carolina law provides Defendants with broad powers during a "state of emergency." North Carolina Gen. Stat. § 14-288.1(10) defines a "state of emergency" as

> The condition that exists whenever, during times of public crisis, disaster, rioting, catastrophe, or similar public emergency, public safety authorities are unable to maintain public order or afford adequate protection for lives or property, or whenever the occurrence of any such condition is imminent.

1

A "state of emergency" may be declared by the Governor, or by any municipality or county. Additionally, the chairman of a county board of commissioners may extend the provisions of a state of emergency into his or her county. N.C. Gen. Stat. §§ 14-288.12-15. North Carolina Gen. Stat. § 14-288.7(a) provides, in pertinent part, "it is unlawful for any person to transport or possess off his own premises any dangerous weapon or substance in any area: (1) In which a declared state of emergency exists; or (2) Within the immediate vicinity of which a riot is occurring." Violation of this provision is a Class 1 misdemeanor. N.C. Gen. Stat. § 14-288.7(c). The term "[d]angerous weapon or substance" includes "[a]ny deadly weapon, ammunition . . ." N.C. Gen. Stat. § 14-288.1(2).

Declarations of states of emergency may contain "prohibitions and restrictions . . . (4) Upon the possession, transportation, sale, purchase, storage, and use of dangerous weapons and substances . . ." N.C. Gen. Stat. § 14-288.12(b) (municipal declarations); *accord* N.C. Gen. Stat. §§ 14-288.13(b) (county declarations), 14-288.15(d) (gubernatorial declarations). Violations of such prohibitions and restrictions declared by the Governor are punishable as Class 2 misdemeanors. N.C. Gen. Stat. § 14-288.15(e).Violations of such prohibitions and restrictions declared by a municipality or county are punishable as Class 3 misdemeanors. N.C. Gen. Stat. §§ 14-288.12(e), 14-288.13(d), 14-288.14(e).

States of emergency are frequently declared in North Carolina. Since September 1, 2004, the Governors of North Carolina have declared at least a dozen states of emergency, usually encompassing the entire state. Executive Order 65 (Hurricane Frances, Sept. 1, 2004); Executive Order 68 (Hurricane Ivan, Sept. 16, 2004); Executive Order 70 (Hurricane Jeanne, Sept. 27, 2004); Executive Order 71 (ice and snow, Wake County, Jan. 19, 2005); Executive Order 82

2

(Hurricane Katrina, Sept. 3, 2005); Executive Order 88 (Hurricane Ophelia, Sept. 10, 2005);

Executive Order 94 (Hurricanes Katrina and Ophelia, Nov. 28, 2005); Executive Order 107

(Tropical Storm Ernesto, Aug. 31, 2006); Executive Order 113 (Dare County severe weather,

Nov. 29, 2006); Executive Order 142 (Hyde, Tyrrell, Washington Counties, wildfire, June 6,

2008); Executive Order 144 (Tropical Storm Hanna, Hurricane Ike, Sept. 4, 2008); Executive

Order 47 (winter storm, January 10, 2010). Governors typically delegate their emergency powers

under such declarations to the Secretary of the Department of Crime Control and Public Safety.

Complaint, ¶ 16.

On or about January 30, 2010, Defendant Perdue declared a state of emergency

throughout the entire state of North Carolina for up to thirty days. Defendant Perdue delegated

her emergency powers to Defendant Young. Complaint, ¶ 19.[1] On or about February 5, 2010,

Defendants City of King and Stokes County declared a state of emergency. Defendant City of

King's proclamation forbade the sale or purchase of firearms and ammunition, as well as the

possession of firearms and ammunition off an individual's premises. Complaint, ¶ 20.

Plaintiffs Michael Bateman and Forrest Minges, Jr., reside in Washington and New Bern,

North Carolina, respectively. These towns lie along the coast, and are thus particularly impacted

by hurricanes and tropical storms. Plaintiff Virgil Green resides in an unincorporated area of

Stokes County, just outside the city limits of King. Green must frequently visit and travel through

the City of King. Complaint, ¶¶ 21, 22. Bateman, Green, and Minges have repeatedly been

---

[1]On September 1, less than three weeks after filing her motion to dismiss, Defendant
Perdue declared another such emergency, causing the carrying of firearms to be barred
throughout the entire state three days before the start of the dove hunting season. *See* Executive
Order 62, *available at* http://www.governor.state.nc.us/NewsItems/ExecutiveOrderDetail.aspx?
newsItemID=1328 (last visited Sept. 23, 2010).

3

impacted by declared states of emergency curtailing their ability to possess, buy, and sell firearms and ammunition. During declared states of emergency, Plaintiffs would carry functional handguns in public for self-defense, and would buy and sell guns and ammunition, but refrain from doing so where possible for fear of arrest, prosecution, fine, and imprisonment. Complaint, ¶ 23. Plaintiffs may also be subject to criminal penalties whenever a state of emergency may be declared if at the time of such declaration Plaintiffs possess firearms outside their homes. Complaint, ¶ 24.

Plaintiffs Grass Roots North Carolina/Forum for Firearms Education ("GRNC/FFE") and Second Amendment Foundation ("SAF") have numerous members and supporters throughout North Carolina, including its coastal areas, Stokes County, and the City of King, who are likewise impacted by declared states of emergency. Owing to their missions, the organizational resources of GRNC/FFE and SAF are taxed by inquiries into the impact of declared states of emergency upon the ability to use firearms. Complaint, ¶¶ 25, 26. The individual Plaintiffs, and the members and supporters of GRNC/FFE and SAF, will continue to be subjected to recurring states of emergency which, absent injunctive relief, will continue depriving them of the ability to buy, sell, possess, transport and carry firearms and ammunition. Complaint, ¶ 28.

## SUMMARY OF ARGUMENT

Defendants raise a host of objections to the Complaint, all of which lack merit.

Defendants' claim that state laws restricting the right to arms must be presumed valid contradicts longstanding Supreme Court doctrine that reserves to the courts, not the political branches, the role of safeguarding enumerated constitutional rights. The argument that no law is facially invalid unless it is unconstitutional in all of its possible applications is overstated. Overbreadth is a well-established constitutional doctrine, and it applies in the Second Amendment

4

context as much as it does in the other fields where Defendants' proposed rule has been rejected. In any event, the Complaint fairly construed presents not only a facial challenge, but also as an as-applied challenge to North Carolina's unconstitutional gun laws to the extent they impact self-defense and hunting.

Nor is the Second Amendment right limited to the confines of one's home. The Supreme Court's precedent is clear: the right to bear arms is the right to carry arms in public, for self-defense and for other traditional lawful purposes. And inherent in the right to keep arms is the right to purchase them, just as is the case with all objects specifically imbued with constitutional protection.

The right to arms is designed for emergencies. While firearms often have value as collectors' items, they are elevated to the status of significant constitutional protection because they secure the right to self-defense – and self-defense, by definition, is exercised only during an emergency. The Second Amendment reflects the fact that the individual, not the government, is the ultimate guarantor of personal safety. Banning guns during times of reduced police availability attacks the core of the Second Amendment right.

Finally, the case presents a ripe, valid controversy. Article III standing does not float in and out with the weather. Even during the pendency of this motion, one state of emergency has already been declared. The fact that the laws are triggered repeatedly and persistently is sufficient to make this a classic case where the injury is "capable of repetition, yet evading review."

<u>ARGUMENT</u>

I.     LAWS IMPLICATING FUNDAMENTAL CONSTITUTIONAL RIGHTS ARE NOT
       PRESUMED CONSTITUTIONAL

The notion that courts must presume the constitutionality of legislative enactments, at

least where enumerated, fundamental rights are implicated, is incompatible with the judiciary's

role as an independent check on legislative authority.

> If it be said that the legislative body are themselves the constitutional judges of their own
> powers, and that the construction they put upon them is conclusive upon the other
> departments, it may be answered, that this cannot be the natural presumption, where it is
> not to be collected from any particular provisions in the constitution . . .

THE FEDERALIST NO. 78, at 403-04 (Alexander Hamilton) (George W. Carey & James McClellan

eds., 2001). "The interpretation of the laws is the proper and *peculiar* province of the courts." *Id.*

(emphasis added).

The Supreme Court's approach to fundamental rights has long reflected this

understanding. "There may be narrower scope for operation of the presumption of

constitutionality when legislation appears on its face to be within a specific prohibition of the

Constitution, such as those of the first ten amendments . . ." *United States* v. *Carolene Products*

*Co.*, 304 U.S. 144, 152, n. 4 (1938). Quoting this famous footnote, the Supreme Court recently

added, "[T]he [rational basis] test could not be used to evaluate the extent to which a legislature

may regulate a specific, enumerated right, be it the freedom of speech, the guarantee against

double jeopardy, the right to counsel, *or the right to keep and bear arms*." *District of Columbia*

v. *Heller*, 128 S. Ct. 2783, 2818 n.27 (2008) (citing *Carolene Prods.*) (emphasis added).

*Heller* added that particular types of gun laws might be "presumptively lawful," precisely

because they reflect "longstanding prohibitions" that may fall outside "the full scope of the

Second Amendment." *Heller*, 128 S. Ct. at 2816-17. No such presumptive allowance is made for laws that would be within the Second Amendment's scope.

And finally, removing all doubt as to the presumptive invalidity of nontraditional gun laws, the Supreme Court confirmed that the Second Amendment secures a fundamental right. *McDonald* v. *City of Chicago*, 130 S. Ct. 3020, 177 L. Ed. 2d 894, 921 (2010) (plurality opinion) & 938 (Thomas, J., concurring). "[C]lassifications affecting fundamental rights are given the most exacting scrutiny." *Clark* v. *Jeter*, 486 U.S. 456, 461 (1988) (citation omitted). Under this analysis, the government carries the burden of proving the constitutionality of the challenged law. *Citizens United* v. *FEC*, 130 S. Ct. 876, 898 (2010).[2]

The Court's analysis must begin not with a presumption that whatever gun laws enacted by the legislature are constitutional, but with the presumption that the people's right to keep and bear arms "shall not be infringed." U.S. Const. amend. II.

## II. LAWS IMPLICATING FUNDAMENTAL CONSTITUTIONAL RIGHTS MAY BE FACIALLY OVERBROAD, BUT IN ANY EVENT, THE COMPLAINT IS NARROWLY DRAWN.

Defendants' assertion that Plaintiffs must "establish that no set of circumstances exists under which the Act would be valid," Def. Br. at 3 (quoting *United States* v. *Salerno*, 481 U.S. 739, 745 (1987)), is inapposite for a host of reasons.

First, under Defendants' conception of the rule, *Heller* was wrongly decided in sustaining a facial challenge to three generally-applicable gun laws. After all, the Supreme Court

---

[2]Courts may presume that legislative bodies did not intend to violate the Constitution, by construing legislative language susceptible to more than one meaning in a constitutionally-permissible manner. Norman J. Singer, 2A SUTHERLAND ON STATUTORY CONSTRUCTION § 45.11, at 87 (7th ed. 2008). But the challenged provisions are not ambiguous.

7

acknowledged that some individuals could be denied handguns and other functional firearms, *Heller*, 128 S. Ct. at 2816-17, and the Court even cautioned that Mr. Heller, specifically, might not be entitled to relief: "*Assuming that Heller is not disqualified from the exercise of Second Amendment rights*, the District must permit him to register his handgun and must issue him a license to carry it in the home." *Heller*, 128 S. Ct. at 2822 (emphasis added).[3]

Indeed, under Defendants' formulation, no gun law could ever be declared unconstitutional so long as at least one individual may be identified who is not legally entitled to possess guns under the circumstance described by the provision. This is clearly not the law. More critically, Defendants fail to identify any *particular* situation where the law would operate validly. A general defense of the law is offered, but that is not a defense based on particular circumstances that would fail the *Salerno* standard. And in any event, the police may always disarm dangerous or uncooperative individuals, state of emergency or not, regardless of the challenged provisions.

Of course, *Heller* satisfied *Salerno*, just as Plaintiffs here do, because the challenged laws deprive *the entire population* of constitutional rights, and no conceivable set of circumstances justifies that result.[4] *Salerno* itself recognized that its rule would not apply in a First Amendment context, where an overbreadth doctrine exists. *Salerno*, 481 U.S. at 745.[5] The facial challenges

---

[3]Heller did not apply for a permit to carry his gun in public. *Parker* v. *District of Columbia*, 478 F.3d 370, 400 (D.C. Cir. 2007), *aff'd sub nom, Heller*. The District required a permit to carry handguns inside the home, but had refused to make such permits available.

[4]It is critical to recall that at issue in *Salerno* were the procedural requirements of the Bail Reform Act, which quite unlike the provisions challenged here, does not mandate any particular substantive outcomes in all cases.

[5]Given *Heller*'s heavy emphasis on First Amendment doctrines, the Third Circuit recently held that "the structure of First Amendment doctrine should inform our analysis of the Second Amendment." *United States* v. *Marzzarella*, 2010 U.S. App. Lexis 15655 at *7 n.4 (3d Cir. July

8

sustained in *Heller* and *McDonald* demonstrate that overbreadth applies in Second Amendment analysis as well. Indeed, *McDonald*'s holding that the Second Amendment secures a fundamental right is conclusive on this point, because one prong of the test applicable to fundamental rights is that the challenged provision be narrowly-tailored, leaving no less restrictive alternative. A law that, on its face, is constitutional in only some of its applications fails this test.

Even apart from the realm of fundamental, enumerated rights, *Salerno* is not always controlling. For example, abortion laws are facially invalid where they impose an undue burden on abortion access, not in *all* cases, but "in a large fraction of the cases." *Planned Parenthood of Southeastern Pa.* v. *Casey*, 505 U.S. 833, 895 (1992); *see Richmond Med. Ctr. for Women* v. *Herring*, 570 F.3d 165, 173-74 (4th Cir. 2009) (en banc). The standard for facial invalidity outside areas subject to overbreadth is occasionally, perhaps more accurately described as one exempting statutes having a "plainly legitimate sweep." *Crawford* v. *Marion County Election Bd.*, 553 U.S. 181, 202 (2008) (plurality opinion) (citations omitted).

But even if Defendants were correct that *Salerno* applies to Second Amendment cases, their argument would fail for a more basic reason. The Complaint, fairly construed, poses an as-applied challenge as well as a facial challenge. Bateman, Green, and Minges are interested in carrying arms "for self-defense." Complaint, ¶ 23. Bateman and Minges are "avid hunters." Complaint, ¶ 21. Plaintiffs are concerned about getting caught unawares by a sudden emergency declaration. Complaint, ¶ 24. The members and supporters of the organizational plaintiffs are concerned with self-defense and hunting. Complaint, ¶ 25. The emergency provisions aggrieve Plaintiffs, because they wish to defend themselves and their families. Complaint, ¶ 27.

29, 2010) (Exhibit A).

The allegations are clear: Plaintiffs want to have and carry guns for self-defense and for hunting. Whatever else the challenged provisions curtail, the interests in self-defense and hunting are the ones for which protection is sought.

In sum, *Heller* and *McDonald* are the original facial challenges to laws infringing upon Second Amendment rights. In neither case was the Supreme Court troubled by the fact that the laws, being of general application, could be properly applied against individuals having no business possessing firearms. Simply put, *Salerno* did not pre-empt *Heller* and *McDonald*, and it cannot be invoked to render those decisions dead letters. The government may not deprive everyone of fundamental rights, simply because one individual may be barred from exercising those rights. And in any event, Plaintiffs' purposes in challenging the law are finite and clear.

III.     THE SECOND AMENDMENT SECURES A RIGHT TO CARRY ARMS IN PUBLIC.

Defendants argue that because the Supreme Court has applied the Second Amendment only in the context of gun possession for home self-defense, the right is necessarily restricted to the home. As a corollary, Defendants cite an array of mostly unpublished decisions rejecting Second Amendment claims, for the uncontroversial and quite irrelevant proposition that the Second Amendment does not secure an absolute right in the sense that all gun laws must be invalidated.[6] The argument are unavailing. Although *Heller* does not require invalidating all laws regulating guns in public, "*Heller* does not preclude Second Amendment challenges to laws regulating firearm possession outside of home." *Peruta* v. *County of San Diego*, 678 F. Supp. 2d 1046, 1051 (S.D. Ca. 2010).

---

[6]Plaintiffs do not challenge all gun laws, only the ones noted in the Complaint.

10

*Heller* and *McDonald* repeatedly referred to Second Amendment activities occurring outside the home. "Americans valued the ancient right [to keep and bear arms] . . . for self-defense *and hunting*." *Heller*, 128 S. Ct. at 2801 (emphasis added). "The settlers' dependence on game for food and economic livelihood, moreover, undoubtedly undergirded . . . state constitutional guarantees [of the right to arms]." *McDonald*, 177 L. Ed. 2d at 921 n.27. "No doubt, a citizen who keeps a gun or pistol under judicious precautions, *practices in safe places the use of it*, and in due time teaches his sons to do the same, exercises his individual right." *Heller*, 128 S. Ct. at 2812 (citation omitted) (emphasis added). Describing Second Amendment rights, the Supreme Court invoked Senator Sumner's famous "Bleeding Kansas" speech: "The rifle has ever been the companion of the pioneer and, under God, his tutelary protector against the red man and the beast of the forest." *Heller*, 128 S. Ct. at 2807 (citation omitted).

These constant references to the right to arms outside the home are not accidental. The Second Amendment applies "*most notably* for self-defense within the home," *McDonald*, 177 L. Ed. 2d at 922 (plurality op.) (emphasis added), but not exclusively so. Analysis begins with the constitutional text. The Second Amendment protects the right "to keep and bear arms." U.S. Const. amend. II. This syntax is not unique within the Bill of Rights. For example, the Sixth Amendment guarantees the right to a "speedy and public trial," U.S. Const. amend. VI, while the Eighth Amendment secures individuals from "cruel and unusual" punishment. U.S. Const. amend. VIII. Just as the Sixth Amendment does not sanction secret, speedy trials or public, slow trials, and the Eighth Amendment does not allow the usual practice of torture, the Second Amendment's reference to "keep and bear" refers to two distinct concepts.

11

The Supreme Court confirmed as much, rejecting the argument that "keep and bear arms" was a unitary concept referring only to a right to possess weapons in the context of military duty. "At the time of the founding, as now, to 'bear' meant to 'carry.'" *Heller*, 128 S. Ct. at 2793 (citations omitted). To "bear arms," as used in the Second Amendment, is to "wear, bear, or carry . . . upon the person or in the clothing or in a pocket, for the purpose . . . of being armed and ready for offensive or defensive action in a case of conflict with another person." *Heller*, 128 S. Ct. at 2793 (quoting *Muscarello* v. *United States*, 524 U.S. 125, 143 (1998) (Ginsburg, J., dissenting)); BLACK'S LAW DICTIONARY 214 (6th Ed. 1998)); *see also Heller*, 128 S. Ct. at 2804 ("the Second Amendment right, protecting only individuals' liberty to keep *and carry* arms . . ."), at 2817 ("the right to keep *and carry* arms") (emphasis added). "[B]ear arms means . . . simply the carrying of arms . . ." *Heller*, 128 S. Ct. at 2796.

Having defined the Second Amendment's language as including a right to "carry" guns for self-defense, the Supreme Court helpfully noted several exceptions that prove the rule. Explaining that this right is "not unlimited," in that there is no right to "carry any weapon whatsoever in any manner whatsoever and for whatever purpose," *Heller*, 128 S. Ct. at 2816 (citations omitted), the Court confirmed that there is a right to carry at least some weapons, in some manner, for some purpose. The Court then listed as "presumptively lawful," *id.*, at 2817 n.26, "laws forbidding the carrying of firearms in sensitive places," *id.*, at 2817, confirming both that such "presumptions" may be overcome in appropriate circumstances, and that carrying bans are *not* presumptively lawful in non-sensitive places.

*Heller*'s dissenters acknowledged that the decision protected the public carrying of arms:

> Given the presumption that most citizens are law abiding, and the reality that the need to defend oneself may suddenly arise in a host of locations outside the home, I fear that the District's policy choice may well be just the first of an unknown number of dominoes to be knocked off the table.

*Heller*, 128 S. Ct. at 2846 (Stevens, J., dissenting).

In upholding the right to carry a handgun under the Second Amendment, *Heller* broke no new ground. As early as 1846, Georgia's Supreme Court, applying the Second Amendment, quashed an indictment for the carrying of a handgun that failed to allege whether the handgun was being carried in a constitutionally-protected manner. *Nunn* v. *State*, 1 Ga. 243, 251 (1846); *see also In re Brickey*, 8 Idaho 597, 70 P. 609 (1902) (Second Amendment right to carry handgun). Numerous state constitutional right to arms provisions have likewise been interpreted as securing the right to carry a gun in public, albeit often, to be sure, subject to some regulation. *See, e.g. Kellogg* v. *City of Gary*, 562 N.E.2d 685 (Ind. 1990); *State ex rel. City of Princeton* v. *Buckner*, 180 W. Va. 457, 377 S.E.2d 139 (1988); *City of Las Vegas* v. *Moberg*, 82 N.M. 626, 485 P.2d 737 (N.M. Ct. App. 1971); *State* v. *Rosenthal*, 75 Vt. 295, 55 A. 610 (1903) (striking down ban on concealed carry); *Andrews* v. *State*, 50 Tenn. 165 (1871); *see also State* v. *Delgado*, 298 Or. 395, 692 P.2d 610 (Or. 1984) (right to carry a switchblade knife).

The right to bear arms is not abrogated by recognition of its well-established regulation. To the contrary, precedent approving of the government's ability to regulate the carrying of handguns confirms the general rule to which it establishes exceptions. Traditionally, "the right of the people to keep and bear arms (Article 2) is not infringed by laws prohibiting the carrying of *concealed* weapons . . . ." *Robertson* v. *Baldwin*, 165 U.S. 275, 281-82 (1897) (emphasis added).

13

But more recently, the Supreme Court has suggested that such bans are only "presumptively" constitutional. *Heller*, 128 S. Ct. at 2817 n.26 (emphasis added). Surveying the history of concealed carry prohibitions, it appears time and again that such laws have always been upheld as mere regulations of the manner in which arms are carried – with the understanding that a complete ban on the carrying of handguns is unconstitutional.

*Heller* discussed, with approval, four state supreme court opinions that referenced this conditional rule. *See Heller*, 128 S. Ct. at 2818 (discussing *Nunn*, *supra*, 1 Ga. 243; *Andrews*, *supra*, 50 Tenn. 165; and *State* v. *Reid*, 1 Ala. 612, 616-17 (1840)) and 128 S. Ct. at 2809 (citing *State* v. *Chandler*, 5 La. Ann. 489, 490 (1850)). In *Reid*, upholding a ban on the carrying of concealed weapons, Alabama's high court explained:

> We do not desire to be understood as maintaining, that in regulating the manner of bearing arms, the authority of the Legislature has no other limit than its own discretion. A statute which, under the pretence of regulating, amounts to a destruction of the right, or which requires arms to be so borne as to render them wholly useless for the purpose of defense, would be clearly unconstitutional. But a law which is merely intended to promote personal security, and to put down lawless aggression and violence, and to this end prohibits the wearing of certain weapons in such a manner as is calculated to exert an unhappy influence upon the moral feelings of the wearer, by making him less regardful of the personal security of others, does not come in collision with the Constitution.

*Reid*, 1 Ala. at 616-17.

The *Nunn* court followed *Reid*, and quashed an indictment for publicly carrying a pistol for failing to specify how the weapon was carried:

> so far as the act . . . seeks to suppress the practice of carrying certain weapons *secretly*, that it is valid, inasmuch as it does not deprive the citizen of his *natural* right of self-defence, or of his constitutional right to keep and bear arms. But that so much of it, as contains a prohibition against bearing arms *openly*, is in conflict with the Constitution, and *void*.

*Nunn*, 1 Ga. at 251 (emphasis original).

14

*Andrews* presaged *Heller* by finding that a revolver was a protected arm under the state constitution's Second Amendment analog. It therefore struck down as unconstitutional the application of a ban on the carrying of weapons to a man carrying a revolver, declaring:

> If the Legislature think proper, they may by a proper law regulate the carrying of this weapon publicly, or abroad, in such a manner as may be deemed most conducive to the public peace, and the protection and safety of the community from lawless violence. We only hold that, as to this weapon, the prohibition is too broad to be sustained.

*Andrews*, 165 Tenn. at 187-88.[7]

> Finally, in *Chandler,*

> the Louisiana Supreme Court held that citizens had a right to carry arms openly: "This is the right guaranteed by the Constitution of the United States, and which is calculated to incite men to a manly and noble defence of themselves, if necessary, and of their country, without any tendency to secret advantages and unmanly assassinations."

*Heller*, 128 S. Ct. at 2809 (quoting *Chandler*, 5 La. Ann. at 490).

The legal treatises relied upon by the *Heller* court explained the rule succinctly. For supporting the notion that concealed carrying may be banned, *Heller* further cites to THE AMERICAN STUDENTS' BLACKSTONE, 84 n.11 (G. Chase ed. 1884). *Heller*, 128 S. Ct. at 2816. Here is what that source provides:

> [I]t is generally held that statutes prohibiting the carrying of *concealed* weapons are not in conflict with these constitutional provisions, since they merely forbid the carrying of arms in a particular manner, which is likely to lead to breaches of the peace and provoke to the commission of crime, rather than contribute to public or personal defence. In some States, however, a contrary doctrine is maintained.

AMERICAN STUDENTS' BLACKSTONE, 84 n.11 (emphasis original). This understanding survives.

---

[7]*Andrews* appeared to abrogate in large part *Aymette* v. *State*, 21 Tenn. 154 (1840), upholding the prohibition on the concealed carry of daggers. But even *Aymette*, which found a state right to bear arms limited by a military purpose, deduced from that interpretation that the right to bear arms protected the open carrying of arms. *Aymette*, 21 Tenn. at 160-61.

15

*See, e.g. In re Application of McIntyre*, 552 A.2d 500, 501 n.1 (Del. Super. 1988) ("[T]he right to keep and bear arms' does not of necessity require that such arms may be kept concealed.").

It is important, then, to recall that (1) the Supreme Court's definition of "bear arms" as that language is used in the Second Amendment includes the concealed carrying of handguns: "wear, bear, or carry . . . *in the clothing or in a pocket . . .*" *Heller*, 128 S. Ct. at 2793 (citations omitted) (emphasis added); (2) the legality of bans on concealed carrying is only "presumptive," *Heller*, 128 S. Ct. at 2817 n.26; and (3) the cases supporting concealed carry prohibition explain that no abrogation of the right to carry arms is effected because open carrying is still permitted.

North Carolina requires a permit to carry a concealed handgun, but not to carry a handgun openly. *State* v. *Kerner*, 181 N.C. 574, 107 S.E. 222 (1921). Plaintiffs make no claim to a right to carry handguns in a particular manner, but seek to carry guns only consistent with state law in the absence of the unconstitutional restrictions. Their right to do so is secured by the Second Amendment.

IV.    THE SECOND AMENDMENT SECURES A RIGHT TO PURCHASE ARMS AND
       AMMUNITION.

"[T]he Court has acknowledged that certain unarticulated rights are implicit in enumerated guarantees . . . fundamental rights, even though not expressly guaranteed, have been recognized by the Court as indispensable to the enjoyment of rights explicitly defined." *Richmond Newspapers v. Virginia*, 448 U.S. 555, 579-80 (1980). Accordingly, the right to have and use a constitutionally-protected article includes the right to buy, sell, trade, and display such articles. For example, "[t]he setting of the bookstore or the commercial theater [are] each presumptively under the protection of the First Amendment." *Roaden* v. *Kentucky*, 413 U.S. 496, 504 (1973).

16

> [I]t . . . requires no elaboration that the free publication and dissemination of books and other forms of the printed word furnish very familiar applications of these constitutionally protected freedoms. It is of course no matter that the dissemination takes place under commercial auspices.

*Smith* v. *California*, 361 U.S. 147, 150 (1959) (citations omitted); *Virginia* v. *American Booksellers Ass'n,* 484 U.S. 383, 393 (1988) (Booksellers have standing to assert First Amendment rights of bookbuyers.). "When a person buys a book at a bookstore, he engages in activity protected by the First Amendment because he is exercising his right to read and receive ideas and information." *Tattered Cover* v. *City of Thornton*, 44 P.3d 1044, 1052 (Colo. 2002); *Wexler* v. *City of New Orleans*, 267 F. Supp. 2d 559 (E.D. La. 2005) (enjoining ban on sidewalk book sales); *Washington Free Community, Inc.* v. *Wilson*, 334 F. Supp. 77 (D.D.C. 1971) (enjoining ban on newspaper sales in parks).

Likewise, the sale of contraceptives is protected by the right to make family planning decisions, *Carey* v. *Population Servs. Int'l*, 431 U.S. 678 (1977); *Griswold* v. *Connecticut*, 381 U.S. 479 (1965), and even the sale of sex toys has been held protected by the recently-recognized right to engage in consensual intimate relationships. *Reliable Consultants, Inc.* v. *Earle*, 517 F.3d 738 (5th Cir. 2008); *but see Williams* v. *Morgan*, 478 F.3d 1316 (11th Cir. 2007).

It follows that the people have the right to buy and sell the arms and ammunition whose keeping and bearing is protected by the Second Amendment. "The right to keep arms, necessarily involves the right to purchase them, to keep them in a state of efficiency for use, and to purchase and provide ammunition suitable for such arms, and to keep them in repair." *Andrews*, 50 Tenn. at 178. This is in keeping with longstanding tradition. "Our citizens have always been free to make, vend and export arms. It is the constant occupations and livelihood of some of them." 3 THE

Writings of Thomas Jefferson 230 (T.J. Randolph, ed., 1830). As the Third Circuit recently

held, a complete ban on commerce in arms would run afoul of the Second Amendment. "If there

were somehow a categorical exception for these restrictions [on gun sales], it would follow that

there would be no constitutional defect in prohibiting the commercial sale of firearms.

Such a result would be untenable under *Heller*." *Marzzarella*, 2010 U.S. App. Lexis 15655 at *15

n.8.[8]

V.     SECOND AMENDMENT RIGHTS CANNOT BE SUSPENDED ON ACCOUNT OF
       THE EMERGENCIES SUCH RIGHTS ARE DESIGNED TO ALLEVIATE.

       Defendants ably argue that the they should have an emergency power to impose curfews,

a point not disputed by Plaintiffs. Yet it seems unlikely that courts would uphold, or that

Defendants would impose, a curfew on the entire state lasting a full month or more. And it is one

thing to impose a curfew, quite another to disarm individuals in the absence of a curfew; or to

punish individuals who are caught by happenstance during a curfew for their possession of arms

(because the carrying of arms is a normal activity); or to prevent individuals from arming

themselves at home, regardless of whether a curfew is imposed.

       Law-abiding citizens do not seek arms during times of crisis because they wish to wreak

havoc. They seek arms for "the core lawful purpose of self-defense." *Heller*, 128 S. Ct. at 2818.

       As the most important early American edition of Blackstone's Commentaries (by the law
       professor and former Antifederalist St. George Tucker) made clear in the notes to the
       description of the arms right, Americans understood the "right of self-preservation" as
       permitting a citizen to "repe[l] force by force" when "the intervention of society in his
       behalf, may be too late to prevent an injury."

---

[8]Congress has also recognized a right to purchase arms and ammunition. The Protection of
Lawful Commerce in Arms Act, immunizing the gun industry from abusive tort claims, was
enacted "[t]o preserve a citizen's access to a supply of firearms and ammunition for all lawful
purposes," pursuant to Section 5 of the Fourteenth Amendment. 15 U.S.C. § 7901(b)(2) & (3).

18

*Heller*, 128 S. Ct. at 2799 (citations omitted); *McDonald*, 177 L. Ed. 2d at 921 n.27.

North Carolina's definition of a "state of emergency" aptly describes situations where "the intervention of society [on a person's] behalf, may be too late to prevent an injury." It disarms individuals whenever "public safety authorities are unable to maintain public order or afford adequate protection for lives or property, or whenever the occurrence of any such condition is imminent." N.C. Gen. Stat. § 14-288.1(10). Defendants correctly add that "[d]uring the tense and rapidly evolving circumstances attendant to emergency situations, the threat of armed mayhem and social unrest is greatly enhanced." Def. Br. at 7. That is a precise description of why an individual's Second Amendment interests are at their apex during emergencies.

Plaintiffs are not seeking to overturn laws barring armed mayhem and the fomenting of social unrest. They seek only to defend themselves against these evils, at precisely those times during which the State, not ordinarily obligated to provide any police protection, *Town of Castle Rock v. Gonzales*, 545 U.S. 748 (2005), expressly declares that it cannot provide even its voluntary protection.

The challenged laws squarely defy the Second Amendment's guarantee, and accordingly, cannot stand. *Heller*, 128 S. Ct. at 2818 (Functional firearm ban "makes it impossible for citizens to use [firearms] for the core lawful purpose of self-defense and is hence unconstitutional.").

VI.     THE COMPLAINT ADDRESSES A RIPE CONTROVERSY BECAUSE THE
         CHALLENGED LAWS HAVE BEEN, AND ARE REGULARLY IMPLEMENTED
         AND ENFORCED.

Defendants argue that the challenge to the enabling provisions are not ripe, because "[n]o .

. . specific prohibition or restriction [enacted pursuant to the provisions] is currently in effect (or,

for that matter, even threatened)." Def. Br. at 17. The enabling provisions, according to

Defendants, do not "purport to dictate the content of such regulations . . . [t]hus, there is currently no tangible prohibition or restriction before this Court." Def. Br. at 15. "[T]his Court cannot meaningfully assess the constitutional validity of a prohibition or regulation involving firearms during a state of emergency without knowing the precise language and scope of the regulation at issue." Def. Br. at 16. Curiously, this argument is not advanced in defense of the automatic carrying prohibition, N.C. Gen. Stat. § 14-288.7

The argument is factually and legally erroneous.

There exists no mystery as to what exactly the challenged provisions do. They authorize "prohibitions and restrictions . . .(4) Upon the possession, transportation, sale, purchase, storage, and use of dangerous weapons and substances . . ." N.C. Gen. Stat. § 14-288.12(b) (municipal declarations); accord N.C. Gen. Stat. §§ 14-288.13(b) (county declarations), 14-288.15(d) (gubernatorial declarations). The challenge is to application of this provision as against arms protected by the Second Amendment.[9]

Defendant City of King invoked Section 14-288.12(b) to declare, "There shall be no sale or purchase of any type of firearm or ammunition, or possession of such items . . . off owner's own premises." Exhibit B; Complaint, ¶ 20. While in theory, future invocations of this provision might contain different restrictions, that prospect is irrelevant considering (1) that the provision authorizes prohibitions, which have been enacted, and (2) that Plaintiffs challenge the entire concept that their right to keep and bear arms for a lawful purpose can be suspended during a

---

[9]To the extent this provision reaches materials that would not qualify as "arms" under the Second Amendment, e.g. certain types of explosives, it is not challenged.

time of emergency. The Court need not wonder what the legislation reaches. The legislation is plain on its face, and it was just applied against Plaintiffs in unmistakable terms.

Standing exists where Plaintiffs can point to "a threat of specific future harm." *Laird* v. *Tatum*, 408 U.S. 1, 14 (1972). That is not difficult to do in this case. Earlier this year, Defendant King banned the sale, carrying, and possession of guns and ammunition. State law authorizes Defendant King, and every level of government throughout North Carolina, to do so again.

Defendants' citations to cases such as *Doe* v. *Duling*, 782 F.2d 1202 (4th Cir. 1986), are unavailing. In *Doe*, the Fourth Circuit rejected the credibility of the prosecutorial threat in declining to hear a challenge to Virginia's ancient bans on fornication and cohabitation, the last recorded convictions for which had occurred in 1849 and 1883, respectively. In contrast, in this case, the law's last recorded application occurred on February 5, 2010. And perhaps unlike Virginia's 1986 defense of its fornication and cohabitation laws, Defendants today argue at length that their restrictions are constitutional and advance the public's interests. Indeed, in a different part of the same brief, Defendants invoke precedent upholding invocation of these laws to impose a curfew in 1971. Def. Br. at 10-11 (citing *United States* v. *Chalk*, 441 F.2d 1277 (4th Cir. 1971)).

As a general rule, however, pre-enforcement challenges are permitted where the statutes being challenged are "not moribund." *Doe* v. *Bolton*, 410 U.S. 179, 188 (1973). As recently as 1968, the Supreme Court let a teacher challenge Arkansas' "monkey law," notwithstanding the possibility that "the statute is presently more of a curiosity than a vital fact of life." *Epperson* v. *Arkansas*, 393 U.S. 97, 102 (1968).

If anything, "[t]here may be a trend in favor of . . . a practical approach" to standing, where "courts are content with any realistic inferences that show a likelihood of prosecution." *New Hampshire Hemp Council, Inc.* v. *Marshall*, 203 F.3d 1, 5 (1st Cir. 2000); *Maryland State Conf. of NAACP Branches* v. *Maryland Dep't of State Police*, 72 F. Supp. 2d 560, 565 (D. Md. 1999) ("[P]laintiffs' likelihood of injury depends only on their status as a member of a minority group and their need to travel on I-95.").

To this end, courts routinely allow challenges to statutes immediately upon their effective date. *See, e.g., Reno* v. *ACLU*, 521 U.S. 844, 861 (1997) ("[I]mmediately after the President signed the statute, 20 plaintiffs filed suit against the Attorney General of the United States and the Department of Justice.") (footnote omitted); *Carhart* v. *Gonzales*, 413 F.3d 791, 792 (8th Cir. 2005) ("The day the President signed the Act into law, plaintiffs filed suit."), *rev'd on other grounds*, 550 U.S. 124 (2007). Simply put, the government is not permitted one or several "free" applications under a new law. The enabling provisions, however, are not new. They have been invoked for decades, and as recently as seven months ago.

Nor does the fact that the "emergency" in King has passed pose any problem. The Supreme Court has long recognized the concept that cases are not moot if they are "capable of repetition, yet evading review." *Storer* v. *Brown*, 415 U.S. 724, 737 n.8 (1974); *S.C. Green Party* v. *S.C. State Election Comm'n*, 612 F.3d 752, 754 n.1 (4th Cir. 2010). "The exception applies where (1) the challenged action is in its duration too short to be fully litigated prior to cessation or expiration, and (2) there is a reasonable expectation that the same complaining party will be subject to the same action again." *FEC* v. *Wis. Right to Life, Inc.*, 551 U.S. 449, 462 (2007)

(citation and internal quotation marks omitted). The doctrine applies in both facial and as-applied challenges. *Id.* at 463; *Storer*, 415 U.S. at 737 n.8.

"Our cases find the same controversy sufficiently likely to recur when a party has a reasonable expectation that it will again be subjected to the alleged illegality, or will be subject to the threat of prosecution under the challenged law." *WRTL*, 551 U.S. at 463 (citations and internal quotation marks omitted). Both factors are easily satisfied here. There is no question that future emergencies will arise, and the enabling statutes will again be invoked.[10] Defendants' strenuous defense of firearms restrictions during emergencies, and insistence that there is no constitutional impediment to such laws, signal that Plaintiffs will be prosecuted for violations. "[T]he challenged governmental activity in the present case is not contingent, has not evaporated or disappeared, and, by its continuing and brooding presence, casts what may well be a substantial adverse effect on the interests of the petitioning parties." *Super Tire Eng'g Co.* v. *McCorkle*, 416 U.S. 115, 122 (1974).

---

[10]Even if the dispute related to the enactment of a law, rather than its implementation, "the mere amendment or repeal of a challenged ordinance does not automatically moot a challenge to that ordinance." *American Legion Post 7* v. *City of Durham*, 239 F.3d 601, 605 (4th Cir. 2001). "[C]ases will not be dismissed as moot if the Court believes there is a likelihood of reenactment of a substantially similar law if the lawsuit is dismissed." *Id.*, at 606 (quoting Erwin Chemerinsky, FEDERAL JURISDICTION 139 (3d ed. 1999)).

23

<u>CONCLUSION</u>

The Complaint plainly spells out a simple, but serious, constitutional violation.

Defendants' motion should be denied.

Dated: September 24, 2010

Respectfully submitted,

/s/ Alan Gura

Alan Gura
Gura & Possessky, PLLC
101 N. Columbus Street, Suite 405
Alexandria, VA 22314
703.835.9085/Fax 703.997.7665

*Counsel for Plaintiffs*

/s/ Andrew Tripp

N.C. State Bar 34254
atripp@brookspierce.com

BROOKS, PIERCE, MCLENDON,
  HUMPHREY & LEONARD, L.L.P.
1600 Wachovia Center
150 Fayetteville Street
Raleigh, NC 27601
Telephone: 919-839-0300
Facsimile: 919-839-0304

*Local Civil Rule 83.1 Counsel for Plaintiffs*

24

CERTIFICATE OF SERVICE

       I hereby certify that on this the 24th day of September, 2010, I electronically filed the foregoing Memorandum with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following:

Andrew T. Tripp
Kearns Davis
Brooks, Pierce, McLendon
   Humphrey & Leonard, L.L.P.
P.O. Box 1800
Raleigh, NC 27602

Walter W. Pitt, Jr.
Kevin G. Williams
Bell, Davis & Pitt
P.O. Box 21029
Winston-Salem, NC 27120

Henry W. Jones, Jr.
Lori P. Jones
Jordan Price Wall Gray Jones &
   Carlton, PLLC
1951 Clark Avenue
P.O. Box 10669
Raleigh, NC 27605

Mark A. Davis
Special Deputy Attorney General
North Carolina Dept. of Justice
P. O. Box 629
Raleigh, NC 27602

/s/Alan Gura_____
Counsel for Plaintiffs