IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:10-CV-00265-H

| | |
|---|---|
| MICHAEL BATEMAN, VIRGIL GREEN, FORREST MINGES, JR., GRNC/FFE, INC., and SECOND AMENDMENT FOUNDATION, INC., <br><br> *Plaintiff*s, <br><br> v. <br><br> BEVERLY PERDUE, REUBEN F. YOUNG, STOKES COUNTY, and CITY OF KING, <br><br> *Defendants*. | **REPLY BRIEF IN SUPPORT OF THE STATE DEFENDANTS' MOTION TO DISMISS** |

## **INTRODUCTION**

In their Response Brief, Plaintiffs do not mask the extraordinary nature of the relief they seek. They demand a sweeping declaration that the right to possess a gun during a state of emergency is absolute and cannot be regulated by the State *at all* – no matter how the exercise of that right may impair the governmental interest in preventing armed mayhem during emergency conditions.

There is not a shred of support in the Second Amendment case law for their position. Indeed, to the contrary, Plaintiffs are advocating for a result that is directly inconsistent with the Supreme Court's decision in *District of Columbia v. Heller*, __ U.S. __, 128 S. Ct. 2783 (2008). While Plaintiffs embrace *Heller* as recognizing a Second Amendment right to possess a gun in one's home, they ignore the unambiguous language used by the *Heller* Court to make clear that the right existing under the Second Amendment to carry a weapon is not absolute.

# ARGUMENT

## I. PLAINTIFFS CANNOT SHOW THAT N.C. GEN. STAT. § 14-288.7 IS FACIALLY UNCONSTITUTIONAL.

### A. PLAINTIFFS COMPLETELY IGNORE THE STRONG GOVERNMENTAL INTEREST IN REGULATING THE POSSESSION OF FIREARMS OUTSIDE OF THE HOME.

Plaintiffs' Response Brief is most notable for its refusal to even acknowledge the substantial governmental interest in placing restrictions on the carrying of guns in public. Guns are designed to injure or kill, and possession of a gun poses a real risk of death or serious bodily harm to others – that is, in fact, the very purpose of a gun. Consequently, the State's interest in imposing appropriate restrictions on the carrying of guns outside of one's premises is even stronger than the State's well-recognized interests in establishing reasonable limits on First Amendment and other constitutional rights, the exercise of which carry far less potential for death and destruction.

While *Heller* notes some similarities between the First Amendment and the Second Amendment, there is one major and obvious difference between the two. Unlike even the most hateful and offensive speech, guns are capable of inflicting violent bodily injury and death. In order to protect citizens from the risks of gun-related violence, States must be given reasonable latitude to set limits on the carrying of firearms in public, and this governmental interest is at its greatest during a state of emergency.

### B. PLAINTIFFS SEEK AN UNLIMITED RIGHT TO CARRY FIREARMS DESPITE THE LIMITED NATURE OF THE RIGHT RECOGNIZED BY THE SUPREME COURT IN *HELLER*.

Plaintiffs are quite clear in their Response Brief as to the extraordinary position they are asserting in this lawsuit. They boldly proclaim that they are "challeng[ing] the entire concept that their right to keep and bear arms for a lawful purpose can be suspended during a time of emergency."

-2-

Case 5:10-cv-00265-H   Document 43   Filed 10/11/10   Page 2 of 20

(Resp Br at 20-21) Such an unprecedented view of the breadth of the Second Amendment is completely lacking in legal support.

Courts construing *Heller* (including the Fourth Circuit) have discerned its holding to be a very limited one – namely, an articulation of the right to self-defense in one's home. (*See* State Defs.' Br. at 4-5) Notably, Plaintiffs make no attempt in their Response Brief to argue that either N.C. GEN. STAT. § 14-288.7 or the "Authorizing Statutes" (N.C. GEN. STAT. §§ 14-288.12(b)(4);14-288.13(b);14-288.14(a); and 14-288.15(d)) infringe on the right to possess firearms in one's home for any purpose.

Plaintiffs' failure to cite any cases holding that a Second Amendment right exists to possess firearms off of one's premises during a state of emergency is not surprising because no such cases exist. Instead, Plaintiffs are asking this Court to go where no court in this nation has gone before – to take the constitutional leap of transforming the right to possess firearms in one's home into an unfettered right to carry them anywhere, and under any circumstances, during a declared state of emergency.

*Heller* makes clear that, even under non-emergency circumstances, sensitive places (such as, for example, government buildings and schools) exist where the Second Amendment does not confer a right to carry a gun. *Heller*, 128 S.Ct. at 2816-17. Such places are deemed sensitive because they are either essential to maintaining the public safety or because they house particularly vulnerable populations. In a state of emergency, the number of such sensitive areas necessarily increases and, indeed, the question of which additional locations qualify as "sensitive" will vary depending on the particular emergency circumstances at issue. It is unclear how Plaintiffs can seriously maintain their argument to the contrary, which is that the very existence of such sensitive places (and the State's

corresponding right to regulate the possession of firearms in those areas) somehow evaporates during a state of emergency. The dangers inherent in bringing a gun into a government building, to use merely one of many possible examples, do not cease when a state of emergency is declared; to the contrary, such dangers are enhanced. Plaintiffs' argument is really an attack on the notion that there can *ever* be special places warranting a restriction on the ability to possess a gun – whether during an emergency or otherwise – despite the clear holding to the contrary in *Heller*.

As the Fourth Circuit has recognized, "[t]he Constitution protects against anarchy as well as tyranny." *United States v. Chalk*, 441 F.2d 1277, 1281 (4th Cir.), *cert. denied*, 404 U.S. 943 (1971). However, Plaintiffs' view of the Second Amendment is one that truly invites anarchy in the form of a government that is constitutionally barred from taking even basic commonsense steps during an emergency to restrict the carrying of guns in order to minimize the likelihood of armed violence. Similarly, Plaintiffs' argument contemplates a scenario in which the defense of persons and property is provided not by trained officers charged by law with the protection of the public but, rather, by armed vigilantes operating under principles of martial law. Rather than restore order, such a scenario would inevitably lead to a new infection of lawlessness that would only exacerbate the conditions that threaten the citizenry.

Plaintiffs' Response Brief is based on the fallacious premise that any law that carries with it even the remote possibility of potentially limiting the right of self-defense through the use of a firearm is inherently unconstitutional on its face. Such an argument, if accepted, would mean that there is an absolute right to carry a gun anywhere at any time (even in non-emergency circumstances) if the motive in doing so is to defend against a potential threat to one's safety. Thus, while Plaintiffs claim they are not challenging all gun laws in this lawsuit, the logic of their argument would call into

question the legality of *any* restriction on the possession of firearms, even those restrictions limiting the possession of firearms in sensitive areas under non-emergency circumstances.

A similar argument was rejected in *United States v. Marzzarella*, 2010 U.S. App. LEXIS 15655 (3rd Cir. July 29, 2010), a case cited in Plaintiffs' Response Brief. The defendant in that case argued that the statute under which he was indicted – which banned the possession of guns bearing an obliterated serial number – unlawfully intruded on his Second Amendment right of self-defense by preventing him from possessing a handgun in his home. In rejecting this argument, the court stated the following:

> [I]t cannot be the case that possession of a firearm in the home for self-defense is a protected form of possession *under all circumstances*. By this rationale, any type of firearm possessed in the home would be protected merely because it could be used for self-defense. Possession of machine guns or short-barreled shotguns – or any other dangerous and unusual weapon – so long as they were kept in the home, would then fall within the Second Amendment.

*Id*. at * 23 (emphasis added). Thus, *Marzzarella* demonstrates that even in the *home* (where *Heller* makes clear that Second Amendment rights apply most strongly), the right to possess a gun for self-defense purposes is not absolute.

It is also important to note that virtually all of the illustrative examples set out in *Heller* of "presumptively lawful" types of firearms regulations, *see Heller*, 128 S.Ct. at 2816-17 & n.26, could be challenged under Plaintiffs' premise that the right of self-defense is absolute. For example, why should someone with a felony conviction not be allowed to possess a weapon for self-defense purposes given the fact that such persons can face a life-threatening emergency just as easily as non-felons? And why should someone entering a government building not be allowed to carry a weapon purely for self-defense purposes in the event he encounters an emergency situation there?

-5-

The obvious answer to these questions is that there are many circumstances in which the governmental interest in restricting an individual's possession of guns outweighs the interest of the individual in carrying a gun (even if the individual subjectively believes a gun is necessary to defend himself). In a state of emergency, those circumstances do not disappear; rather, they become even more prevalent and exigent.

The State has an undeniably strong interest in preventing the occurrence of armed confrontations. That interest is most acute at a time when law enforcement officers are focused on caring for accident victims, undertaking rescue missions, repairing lines of communication, securing escape routes, and performing the many other tasks necessary to maintain public safety during emergencies.[1] It is not at all uncommon during a declared state of emergency for the loss of electrical power to plunge cities into darkness, for wind, rain, and floodwater to drive people from their homes, for roads to be severed, and for communications to be disrupted. It does not take a vivid imagination to envision the mayhem that is likely to ensue if armed persons are allowed to roam the streets during such circumstances.

Moreover, every minute that a police officer has to spend ensuring that an armed person is not intent on causing violence is a minute the officer cannot spend on responding to injuries, fires, floods, and other crises associated with an emergency. In addition, a strong societal interest exists in ensuring that workers tending to the injured and homeless during an emergency (particularly in

---

[1] Contrary to the insinuation in Plaintiffs' Response Brief, governmental officials during a state of emergency do not throw up their hands and abandon efforts to keep the peace. To the contrary, those officials work tirelessly to fully restore order as soon as humanly possible. Also, by statute, the Governor has the express authority to call out the State militia (which includes the North Carolina National Guard) when necessary to protect the safety of persons and property, to suppress riots and insurrections, and to provide disaster relief. *See* N.C. GEN. STAT. § 127A-16.

-6-

Case 5:10-cv-00265-H   Document 43   Filed 10/11/10   Page 6 of 20

sensitive areas such as hospitals, police or fire stations, and public shelters) are not threatened by firearms. It is also worthy of mention that when people are seeking safety from advancing storms, the public highways that carry emergency vehicles, refugees, food, and emergency supplies become among the most sensitive of areas. In such circumstances, the public should not have to trust its safety and well-being to the good intentions of armed individuals.

The placing of restrictions on the possession of guns outside of one's premises during a state of emergency is also consistent with the obvious governmental interest in having people stay in their homes, to the extent possible, until the emergency is abated. By minimizing the presence of persons and vehicles on public areas and roadways, rescue personnel are able to concentrate on expeditiously assisting the injured and remedying damage to roads, bridges, and power lines.

Plaintiffs do not even attempt to dispute the increased likelihood of vigilante action, gun-related violence, and diversion of precious police resources that would exist during an emergency absent the State's ability to establish restrictions on firearms. In fact, Plaintiffs admit that "the threat of armed mayhem and social unrest is greatly enhanced" during emergency situations. (Resp. Br. at 19) However, Plaintiffs appear to overlook the fact that such "armed" mayhem can exist only when the participants are carrying guns.

Pages 10-12 of the State Defendants' original brief discussed the deference courts have given to governments regarding the temporary restriction of constitutional rights during emergency circumstances. As noted therein, many of the same core governmental interests that justify the imposition of a curfew during an emergency apply equally (if not more so) with regard to a restriction on firearms.

In their Response Brief, Plaintiffs concede the legitimacy of the government's "emergency power to impose curfews" (Resp. Br. at 18), a power that, by its very nature, involves a temporary suppression of conduct that is normally constitutionally protected. Yet, paradoxically, they argue that these very same emergency powers do not include the ability to restrict the possession of guns during the same type of emergency. However, it makes no sense to concede, on the one hand, that the State can constitutionally prevent you from leaving your home *at all* during an emergency yet to argue, on the other hand, that the State cannot constitutionally prevent you from carrying a gun off your property during such an emergency.

The position Plaintiffs are espousing (a position of their own invention) is that the rights protected by the Second Amendment stand alone as being immune from governmental regulation during emergencies because such rights are "fundamental." However, this argument fails to recognize the fact that other constitutional rights temporarily restricted during an emergency also qualify as fundamental. *See Smith v. Avino*, 91 F.3d 105, 109 (11th Cir. 1996) ( "In an emergency situation, *fundamental* rights such as the right of travel and free speech may be temporarily limited or suspended.") (emphasis added). Surely, Plaintiffs are not contending that Second Amendment rights are "more fundamental" than free speech rights under the First Amendment.

Furthermore, the Fourth Circuit – like courts in other circuits – has held that the right to travel (the right most obviously restricted during a curfew) is a fundamental right. *See Wood v. Mills*, 528 F.2d 321, 323 (4th Cir. 1975) (right to travel – like right to vote, procreate and have access to criminal process – is a *fundamental* right) (emphasis added); *League of United Latin American Citizens v. Bredesen*, 500 F.3d 523, 535 (6th Cir. 2007) (recognizing "*fundamental* right to travel" held by citizens) (emphasis added).

-8-

Case 5:10-cv-00265-H   Document 43   Filed 10/11/10   Page 8 of 20

Thus, characterizing rights under the Second Amendment as fundamental does not make them absolute, and, therefore, such rights remain subject to limitation in appropriate circumstances – including states of emergency. Indeed, the most basic rejection of Plaintiffs' argument on this issue comes from *Heller* itself in which the Supreme Court lumped Second Amendment rights together with other constitutional rights, holding that "*[l]ike most rights*, the right secured by the Second Amendment is not unlimited." *Heller*, 128 S. Ct. at 2816 (emphasis added). This language from *Heller* aptly rejects Plaintiffs' contention.

Finally, Plaintiffs' assertion that they are "law-abiding" people who do not seek guns in order to wreak havoc does not change the analysis. The vast majority of the persons who visit governmental buildings and schools are law-abiding as well. However, they (like everyone else) nonetheless have no constitutional right to carry firearms when they enter these buildings because there cannot be two sets of laws – one for law abiding citizens and one for lawbreakers. Law enforcement officers and other governmental employees are not able, and should not be expected, to intuitively distinguish between armed well-intentioned citizens and armed criminals. *See Menotti v. City of Seattle*, 409 F.3d 1113, 1134 (9th Cir. 2005) (during large demonstration marked by chaotic violence, it was not realistic to expect police "to be able to distinguish, minute by minute" between those with peaceful, as opposed to violent, intentions). The Constitution does not require – as Plaintiffs appear to be suggesting – that, when passing gun control laws, States must assume that all of their citizens are law-abiding. Indeed, were that assumption valid, there would be no need for such laws.[2]

---

[2] Plaintiffs' argument that N.C. GEN. STAT. § 14-288.7 also unconstitutionally restricts the right to purchase guns and ammunition during a state of emergency fails for all of these same reasons. Because, as the State Defendants have shown, Plaintiffs cannot succeed on their facial

C.  **PLAINTIFF'S REMAINING ARGUMENTS LACK MERIT.**

Plaintiffs also make several additional arguments that are inconsistent with their basic contention that under no circumstances can the government impose restrictions on firearms during a state of emergency. As shown below, these arguments also fail.

1.  **The *Salerno* Standard Applies to Plaintiffs' Claims in this Action**.

In their original brief, the State Defendants demonstrated the applicability of *United States v. Salerno*, 481 U.S. 739 (1987), in which the Supreme Court held that a claimant asserting a facial challenge to a statute must show that no circumstances exist in which the law could operate constitutionally. Plaintiffs' argument that *Salerno* is not applicable in the Second Amendment context is belied by the fact that, in the aftermath of *Heller*, a number of courts have expressly cited the *Salerno* test in analyzing analogous Second Amendment challenges. *See United States v. Seay*, __ F.3d __, 2010 U.S. App. LEXIS 18738 at *7 (8th Cir. Sept. 8, 2010); *United States v. Smith*, 2010 U.S. Dist. LEXIS 98511 at *43 (S.D. W. Va. Sept. 20, 2010); *United States v. Whisnant*, 2008 U.S. Dist. LEXIS 76460 at *10-11 (E.D. Tenn. Sept. 30, 2008) (unpublished), *aff'd*, 2010 U.S. App. LEXIS 16843 (6th Cir. 2010) (unpublished); *District of Columbia v. Lewis*, 2008 D.C. Super. LEXIS 4 at *15-17 (Nov. 17, 2008) (unpublished).

Moreover, while Plaintiffs insinuate that *Salerno* is no longer good law, the Fourth Circuit has applied the *Salerno* test on a number of occasions (one of which was as recently as three months ago) in analyzing facial statutory challenges brought under a myriad of constitutional theories. *See*, *e.g.*, *H.B. Rowe Co., Inc. v. Tippett*, __ F.3d __, 2010 U.S. App. LEXIS 15141 at *63 (4th Cir. July

---

challenge regarding the ability to *possess* a gun during a state of emergency, the same logic would bar a facial challenge regarding the right to *purchase* a gun during emergency circumstances.

22, 2010) (Equal Protection Clause); *West Virginia v. United States DHHS*, 289 F.3d 281, 292 (4th Cir. 2002) (Tenth Amendment); *Jordan by Jordan v. Jackson*, 15 F.3d 333, 343-44 (4th Cir. 1994) (Due Process Clause).

Plaintiffs then claim that, under the State Defendants' argument, "*Heller* was wrongly decided in sustaining a facial challenge to three generally-applicable gun laws." (Pls.' Br. at 7) However, this assertion fails to recognize that, in *Heller,* the Supreme Court did *not* facially invalidate the three statutes being challenged. *See Lewis*, 2008 D.C. Super. LEXIS 4 at * 19 ("[T]he remedy ordered by the Supreme Court in *Heller* itself indicates quite unambiguously that the Supreme Court did not view any of the District's gun control laws as facially invalid."). Rather, the Court in *Heller* analyzed the plaintiff's claim as an as-applied challenge. As such, instead of ruling that the laws at issue be wholly invalidated – as would have been the case with regard to a successful facial challenge – the only relief ordered by the Court was simply that the plaintiff be allowed to register his handgun (unless he was determined to be subject to any disqualification).

### 2. The Overbreadth Doctrine Does Not Apply to the Second Amendment Claims Plaintiffs Have Asserted Here.

In apparent recognition of the fact that they cannot satisfy the *Salerno* test, Plaintiffs then ask this Court to apply the overbreadth doctrine. In cases where an overbreadth analysis is appropriate, a court compares the constitutionally permissible applications of the statute being attacked with the impermissible applications of the statute. *See Giovani Carandola, Ltd. v. Fox*, 470 F.3d 1074, 1081 (4th Cir. 2006).

However, the contexts in which the overbreadth doctrine can be invoked are extremely limited, and the Supreme Court has made clear its "well-founded reticence" to the prospect of

extending the overbreadth doctrine beyond the "limited settings" where it currently applies. *Sabri v. United States* 541 U.S. 600, 609 (2004). The applicability of the overbreadth doctrine in the Second Amendment context is nowhere even discussed – much less endorsed – in *Heller*.

Plaintiffs fail to cite any case in which a court has actually applied the overbreadth doctrine to a Second Amendment claim. They also omit mention of several instances in which courts have either held the doctrine inapplicable in the Second Amendment context or have expressed grave doubts about the doctrine's application to such cases. *See Whisnant*, 2008 U.S. Dist. LEXIS 76460 at * 9-10 (refusing to apply overbreadth doctrine in Second Amendment context); *Lewis*, 2008 D.C. Super. LEXIS 4 at * 17-19 (despite certain comparisons in *Heller* between First Amendment and Second Amendment, underlying rationale for application of overbreadth doctrine in First Amendment context is "simply absent" from Second Amendment context; "[N]othing in [*Heller*] establishes, or even remotely suggests, that the Court intended by its references to the First Amendment to signal its approval of the extension of the doctrine to the Second Amendment context."). *See also United States v. Masciandaro*, 648 F. Supp. 2d 779, 793-94 (E.D. Va. 2009) (noting lack of clarity regarding permissibility of employing overbreadth doctrine outside First Amendment cases; "And even assuming, *arguendo*, that facial overbreadth challenges *are* permissible in the Second Amendment context, it appears more doubtful still that such challenges are appropriate with respect to firearms laws *not affecting the home*.") (emphasis in original).

There is also another major obstacle to application of the overbreadth doctrine here. In situations where the doctrine applies, courts are able to engage in an overbreadth analysis by comparing the reach of the law being challenged with the contours of the constitutional right being asserted (based on the Supreme Court's jurisprudence interpreting that particular constitutional

-12-

right). With regard to Second Amendment rights, however, all that the Supreme Court has held as of the present date is that there is a constitutional right to possess a gun for purposes of self-defense in one's home. Accordingly, there is presently no way for any court to meaningfully apply the overbreadth doctrine to a law (such as N.C. GEN. STAT. § 14-288.7) that regulates firearms *outside the home*.[3]

## II. PLAINTIFFS' CHALLENGE TO THE AUTHORIZING STATUTES SHOULD ALSO BE DISMISSED.

Because the Authorizing Statutes provide statutory authority for local governments to enact ordinances containing restrictions on firearms, Plaintiffs claim their challenge to these statutes is ripe because there is "no mystery" as to what they do. (Resp. Br. at 20) But what Plaintiffs ignore is the fact that the Authorizing Statutes do not control what those restrictions actually are. Moreover, the authorization to enact such ordinances is merely permissive (rather than mandatory). Thus, the decision whether to enact these types of ordinances at all and, if so, what restrictions to put in them is reserved for the local government on a case-by-case basis in connection with a particular state of emergency.

Therefore, the only way the Authorizing Statutes themselves could be held unconstitutional would be if this Court was to rule that the right to possess a gun during a state of emergency is absolute and cannot be restricted in *any* fashion. Under that scenario, by doing nothing more than

---

[3] Notably, the Supreme Court has made clear that a determination that a statute is unconstitutionally overbroad is "strong medicine" to be used "sparingly and only as a last resort." *Broadrick v. Oklahoma,* 413 U.S. 601, 613 (1973). Moreover, even in cases where the overbreadth doctrine does apply, a statute found to be overbroad should still be upheld where it is reasonably susceptible to a limiting construction by the court. *See Virginia v. American Booksellers Ass'n, Inc.*, 484 U.S. 383, 397 (1988). However, where, as here, the overbreadth doctrine does not even apply, a court has no need to engage in the process of seeking a limiting construction.

-13-

simply enabling other entities to use their own judgment regarding necessary restrictions on firearms during an emergency, the General Assembly has somehow violated the Second Amendment. While this is precisely what Plaintiffs ask this Court to hold, for the reasons set out herein, they are not entitled to such a ruling.

It cannot be overemphasized that their argument is in direct conflict with *Heller*. Do Plaintiffs mean, for example, that a local government's emergency ordinance prohibiting the possession of guns in a government building would violate the Second Amendment? Or an ordinance outlawing the carrying of firearms by felons or the mentally ill? Or an ordinance imposing conditions and qualifications on the commercial sale of guns? All of these are illustrative examples given by the Supreme Court in *Heller* of restrictions that do not violate the Second Amendment. *Heller* 128 S. Ct. at 2816-17. They are also examples of restrictions that could be contained in an ordinance enacted by virtue of the Authorizing Statutes. Thus, arguing that these sorts of restrictions would be unconstitutional is tantamount to arguing that this portion of *Heller* should be overruled.

In apparent recognition of the fact that this argument – to put it mildly – lacks a solid legal foundation, Plaintiffs then switch gears and set up various straw men consisting of arguments that the State Defendants are not actually making. First, they argue that even laws that are seldom enforced can still be challenged despite their unlikelihood of ever actually being invoked by a government to prosecute an offender. However, the State Defendants are not arguing that Plaintiffs' challenge to the Authorizing Statutes is unripe because those statutes are unlikely to be enforced. Rather, their challenge is unripe for the entirely separate reason that there are no substantive restrictions on firearm possession actually contained in the Authorizing Statutes for the Plaintiffs to attack and, therefore, there is currently no justiciable controversy before this Court as to that claim.

Second, Plaintiffs invoke a common response to a mootness argument, asserting that cases are not moot if they are capable of repetition, yet evading review. However, the State Defendants are not currently asserting a mootness defense with regard to Plaintiffs' challenge to the Authorizing Statutes.

Third, Plaintiffs note that a new law can be the subject of a pre-enforcement challenge before the law's effective date. However, that concept likewise has nothing to do with the present case.

Finally, Plaintiffs mention the City of King ordinance as an example of a local ordinance previously enacted pursuant to authority granted by the Authorizing Statutes. However, once again, they merely reference the City of King ordinance for illustrative purposes without alleging any actual attempt by Plaintiffs – past or present – to ask this Court, or any other court, to have the constitutionality of that specific ordinance actually adjudicated.[4]

Plaintiffs made a tactical decision not to challenge any one specific ordinance passed pursuant to the Authorizing Statutes and to instead simply bring a broad facial challenge to the Authorizing Statutes themselves. Notably, while Plaintiffs apparently believe the City of King's ordinance is an example of a prior ordinance that went too far, they admit that "in theory, future invocations of [the Authorizing Statutes] might contain different restrictions[.]" (Resp. Br. at 20) This admission perfectly encapsulates the lack of ripeness of their facial challenge to the Authorizing Statutes. There is simply no way of knowing what future ordinances will be passed pursuant to the

---

[4] Plaintiffs also fail to mention that the City of King's ordinance was only in effect for three days. (*See* Ex A) This raises yet another deficiency with Plaintiffs' arguments – their failure to take into account the wide variances in potential duration of states of emergency. Under their sweeping argument, a restriction on firearm possession off of one's premises during a state of emergency is *per se* unconstitutional regardless of whether the restriction lasts three weeks, three days, or three hours.

-15-

Case 5:10-cv-00265-H   Document 43   Filed 10/11/10   Page 15 of 20

Authorizing Statutes and whether the provisions contained therein will be in any way unconstitutional.

If a future ordinance is enacted that Plaintiffs (or anyone else possessing standing) believe to be in excess of constitutional limits, they will be free to file a lawsuit against the entity that enacted it containing a direct challenge to the ordinance's constitutionality. But that is a far cry from what Plaintiffs have done here – that is, seeking the total invalidation of enabling legislation simply because some future local government *might* use that legislation as authority to pass an unconstitutional ordinance. If Plaintiffs' argument was correct, then *any* state law authorizing the future enactment of local ordinances on a particular subject could be struck down simply by virtue of a showing that some subset – however small – of those future ordinances might cross a constitutional line.

## III. PLAINTIFFS HAVE NOT ASSERTED AN AS-APPLIED CHALLENGE TO THE NORTH CAROLINA STATUTES AT ISSUE.

While Plaintiffs make a half-hearted attempt to argue that they have also asserted an as-applied challenge in this action in addition to their facial challenge, the Complaint reflects otherwise. "An as-applied challenge requires that the application of the [statute], by its own terms, infringe[s] constitutional freedoms *in the circumstances of the particular case*." *Lowery v. United States*, __ A.2d __, 2010 D.C. App. LEXIS 511 at * 11 (Sept. 9, 2010) (emphasis added) (quoting *United States v. Christian Echoes Nat'l Ministry, Inc.*, 404 U.S. 561, 565 (1972)).

Here, there are no "circumstances of [a] particular case" as to which an as-applied challenge could exist. Plaintiffs have made no meaningful attempt to separate themselves from hundreds of thousands of other North Carolina citizens.

The absence of an as-applied claim is confirmed by the Prayer for Relief contained in the Complaint. In this Prayer for Relief, Plaintiffs seek a broad order permanently enjoining Defendants from enforcing N.C. GEN. STAT. § 14-288.7 and the Authorizing Statutes *at all* – meaning that Defendants would be barred from enforcing these laws under any circumstances and against anyone. (Compl. at 8) Such a request for relief is the hallmark of a facial (rather than an as-applied) challenge.

Indeed, the assertion of a properly pled as-applied challenge would have been inconsistent with the position being advanced by Plaintiffs in this case. As their Response Brief makes abundantly clear, this lawsuit is a "challenge [to] the *entire concept* that their right to keep and bear arms for a lawful purpose can be suspended during a time of emergency." (Resp. Br. at 20-21) (emphasis added) It is difficult to conceive of a statement more emblematic of a purely facial challenge.

The decision in *United States v. Seay*, __ F.3d __, 2010 U.S. App. LEXIS. 18738 (8th Cir. Sept. 8, 2010), is instructive. In that case, the defendant argued that a statute prohibiting him from possessing firearms based on his status as a user of controlled substances violated his individual Second Amendment right under *Heller* to keep and bear arms. In characterizing his claim, the Eighth Circuit stated the following: "This is not an as-applied challenge; rather, [defendant] argues that [the statute] is unconstitutional *in all instances*." *Id*. at *7 (emphasis added).

The same is true here. Plaintiffs have left no doubt that they are seeking a ruling that any North Carolina statutes interfering in any way with their right to possess a gun during a state of emergency are unconstitutional in any and all circumstances.

-17-

This same principle was applied in *United States v. Yanez-Vasquez*, 2010 U.S. Dist. LEXIS 8166 (D. Kan. Jan. 28, 2010). The defendant in that case asserted that he had a Second Amendment right to possess a firearm such that a statute prohibiting illegal aliens like him from doing so was unconstitutional, both facially and as-applied to him. The court held that his claim should be analyzed solely as a facial challenge, explaining as follows: "Although defendant frames his [Second Amendment] argument in part as an as-applied challenge, defendant does not allege any facts which distinguish him from other[s] . . . such that the statute might be constitutionally applied to them but not to him." *Id*. at *3, 3-4.

Here, as in *Yanez-Vasquez*, Plaintiffs argue that the statutes at issue are incapable of operating constitutionally. Rather than alleging a particular set of circumstances uniquely applicable to Plaintiffs themselves, Plaintiffs seek instead to establish the broad proposition that *no one's* right to possess a firearm can be restricted in any way during a state of emergency. As such, their claims are purely facial ones.

## **CONCLUSION**

For all of these reasons, the State Defendants respectfully submit that their Motion to Dismiss should be granted and that this action should be dismissed.

Respectfully submitted, this the 11th day of October, 2010.

        ROY COOPER
        Attorney General

        /s/Mark A. Davis
        Mark A. Davis
        Special Deputy Attorney General
        Attorney for The State Defendants
        N.C. Department of Justice
        Post Office Box 629
        Raleigh, NC  27602
        E-mail:  mdavis@ncdoj.gov
        Telephone:  (919) 716-6900
        Facsimile:  (919) 716-6763
        State Bar No. 18142

## CERTIFICATE OF SERVICE

I hereby certify that on this day, October 11, 2010, I electronically filed the foregoing **REPLY BRIEF IN SUPPORT OF THE STATE DEFENDANTS' MOTION TO DISMISS** with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Alan Gura
Gura & Possessky, PLLC
101 N. Columbus Street, Suite 405
Alexandria, VA 22314

Andrew T. Tripp
Kearns Davis
Brooks, Pierce, McLendon
 Humphrey & Leonard, L.L.P.
P.O. Box 1800
Raleigh, NC 27602

Walter W. Pitt, Jr.
Kevin G. Williams
Bell, Davis & Pitt
P.O. Box 21029
Winston-Salem, NC 27120

Henry W. Jones, Jr.
Lori P. Jones
Jordan Price Wall Gray Jones &
 Carlton, PLLC
1951 Clark Avenue
P.O. Box 10669
Raleigh, NC 27605

/s/Mark A. Davis
Mark A. Davis
Special Deputy Attorney General