IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

| | | |
|---|---|---|
| MICHAEL BATEMAN, et al., | ) | Case No. 5:10-CV-265-H |
| | ) | |
| Plaintiffs, | ) | **MEMORANDUM OF POINTS AND** |
| | ) | **AUTHORITIES IN SUPPORT OF** |
| v. | ) | **PLAINTIFFS' MOTION FOR** |
| | ) | **SUMMARY JUDGMENT** |
| BEVERLY PERDUE, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

**COME NOW** the Plaintiffs, Michael Bateman, Virgil Green, Forrest Minges, Jr.,

GRNC/FFE, Inc., and Second Amendment Foundation, Inc., by and through undersigned

counsel, and submit their Memorandum of Points and Authorities in Support of their Motion for

Summary Judgment.

Dated: November 8, 2010                    Respectfully submitted,

/s/ Alan Gura                              /s/ Andrew Tripp
Alan Gura                                  N.C. State Bar 34254
Gura & Possessky, PLLC                     atripp@brookspierce.com
101 N. Columbus Street, Suite 405
Alexandria, VA 22314                       Andrew Tripp
703.835.9085/Fax 703.997.7665             Kearns Davis
                                           BROOKS, PIERCE, MCLENDON,
                                              HUMPHREY & LEONARD, L.L.P.
                                           1600 Wachovia Center
                                           150 Fayetteville Street
*Counsel for Plaintiffs*                   Raleigh, NC 27601
                                           Telephone: 919-839-0300
                                           Facsimile: 919-839-0304

                                           *Local Civil Rule 83.1 Counsel for Plaintiffs*

# TABLE OF CONTENTS

Table of Authorities. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  ii

Preliminary Statement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Statement of Facts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Summary of Argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

I.      THE SECOND AMENDMENT SECURES A RIGHT TO CARRY
        ARMS IN PUBLIC FOR SELF DEFENSE AND FOR HUNTING. . . . . . . . . . . 6

II.     THE SECOND AMENDMENT SECURES A RIGHT TO PURCHASE
        ARMS AND AMMUNITION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

III.    THE SECOND AMENDMENT SECURES ACCESS TO THE MEANS
        OF SELF-DEFENSE DURING TIMES OF PUBLIC EMERGENCY. . . . . . . . 13

IV.     NORTH CAROLINA'S PROHIBITION OF SECOND AMENDMENT
        RIGHTS DURING TIMES OF PUBLIC EMERGENCY IS
        UNCONSTITUTIONAL. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

        A.      The Challenged Laws Are In Conflict with the
                Constitutional Guaranty. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

        B.      The Challenged Laws Fail Constitutional Scrutiny. . . . . . . . . . . . . . . . 14

Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

TABLE OF AUTHORITIES

Cases

*Andrews* v. *State*,
    50 Tenn. 165 (1871)................................................... 8-10, 12

*Ashcroft* v. *ACLU*,
    542 U.S. 656 (2004)....................................................... 16

*Aymette* v. *State*,
    21 Tenn. 154 (1840)....................................................... 10

*Carey* v. *Population Servs. Int'l*,
    431 U.S. 678 (1977)....................................................... 12

*Citizens United* v. *FEC*,
    130 S. Ct. 876 (2010)..................................................... 16

*City of Las Vegas* v. *Moberg*,
    82 N.M. 626, 485 P.2d 737 (N.M. Ct. App. 1971). ............................. 8

*Clark* v. *Jeter*,
    486 U.S. 456 (1988) ...................................................... 16

*District of Columbia* v. *Heller*,
    128 S. Ct. 2783 (2008)................................................ passim

*Griswold* v. *Connecticut*,
    381 U.S. 479 (1965)....................................................... 12

*In re Application of McIntyre*,
    552 A.2d 500 (Del. Super. 1988)........................................... 11

*In re Brickey*,
    8 Idaho 597, 70 P. 609 (1902)............................................... 8

*Kellogg* v. *City of Gary*,
    562 N.E.2d 685 (Ind. 1990)................................................. 8

*McDonald* v. *City of Chicago*,
    130 S. Ct. 3020 (2010) .................................................. 6, 15

ii

*Muscarello* v. *United States*,
    524 U.S. 125 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Nunn* v. *State*,
    1 Ga. 243 (1846). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8-10

*Parker* v. *District of Columbia*,
    478 F.3d 370 (D.C. Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Peruta* v. *County of San Diego*,
    678 F. Supp. 2d 1046 (S.D. Ca. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Reliable Consultants, Inc.* v. *Earle*,
    517 F.3d 738 (5th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Richmond Newspapers* v. *Virginia*,
    448 U.S. 555 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Roaden* v. *Kentucky*,
    413 U.S. 496 (1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Robertson* v. *Baldwin*,
    165 U.S. 275 (1897) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Smith* v. *California*,
    361 U.S. 147 (1959) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*State ex rel. City of Princeton* v. *Buckner*,
    180 W. Va. 457, 377 S.E.2d 139 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*State* v. *Chandler*,
    5 La. Ann. 489 (1850). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 10

*State* v. *Delgado*,
    298 Or. 395, 692 P.2d 610 (Or. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*State* v. *Kerner*,
    181 N.C. 574, 107 S.E. 222 (1921). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*State* v. *Reid*,
    1 Ala. 612 (1840) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

iii

*State* v. *Rosenthal*,
      75 Vt. 295, 55 A. 610 (1903). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Tattered Cover* v. *City of Thornton*,
      44 P.3d 1044 (Colo. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*United States* v. *Engstrum*,
      609 F. Supp. 2d 1227 (D. Utah 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*United States* v. *Marzzarella*,
      614 F.3d 85 (3d Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 15

*Virginia* v. *American Booksellers Ass'n*,
      484 U.S. 383 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Ward* v. *Rock Against Racism*,
      491 U.S. 781 (1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Washington Free Community, Inc.* v. *Wilson*,
      334 F. Supp. 77 (D.D.C. 1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Wexler* v. *City of New Orleans*,
      267 F. Supp. 2d 559 (E.D. La. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Williams* v. *Morgan*,
      478 F.3d 1316 (11th Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12


Constitutional Provisions

U.S. Const. amend. II. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

U.S. Const. amend. VI. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

U.S. Const. amend. VIII. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6


Statutes

15 U.S.C. § 7901. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

N.C. Gen. Stat. § 14-288.1(10). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 14

N.C. Gen. Stat. § 14-288.12 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

N.C. Gen. Stat. § 14-288.13 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

N.C. Gen. Stat. § 14-288.14 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

N.C. Gen. Stat. § 14-288.15 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

N.C. Gen. Stat. § 14-288.17 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Other Authorities

BLACK'S LAW DICTIONARY (6th Ed. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

St. George Tucker, BLACKSTONE'S COMMENTARIES (1803) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

THE AMERICAN STUDENTS' BLACKSTONE (G. Chase ed. 1884) . . . . . . . . . . . . . . . . . . . . . . . 10, 11

THE WRITINGS OF THOMAS JEFFERSON (T.J. Randolph, ed., 1830) . . . . . . . . . . . . . . . . . . . . . . . 13

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
## PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

### PRELIMINARY STATEMENT

The right to keep and bear arms is never more needed than during times of public disorder. Yet it is exactly when people most urgently need their arms that Defendants would seek to infringe upon this fundamental right.

However else the State may regulate arms, generally criminalizing the bearing of arms, or the sale and purchase of arms and ammunition, violates the Second Amendment. Doing so in times of heightened danger is especially egregious. Yet Defendants appear to do so with alarming frequency, and unless enjoined, will again place Plaintiffs under threat of criminal sanction for the exercise of core constitutional rights whenever the weather next becomes severe. Plaintiffs are entitled to summary judgment as a matter of law.

### STATEMENT OF FACTS

The facts may be familiar to the Court, having been recited in opposition to Defendants' motions to dismiss. In the interest of making a comprehensive presentation, these facts are again briefly recited in support of the instant motion, in addition to newly-developed information.

The Court may take judicial notice that North Carolina is frequently beset by hurricanes, tropical storms, and other severe weather events endangering public safety. Episodes of public disorder, too, are naturally inherent in the human condition.

To deal with such problems, North Carolina law provides Defendants with broad powers during a "state of emergency." North Carolina Gen. Stat. § 14-288.1(10) defines a "state of emergency" as

The condition that exists whenever, during times of public crisis, disaster, rioting, catastrophe, or similar public emergency, public safety authorities are unable to maintain public order or afford adequate protection for lives or property, or whenever the occurrence of any such condition is imminent.

A "state of emergency" may be declared by the Governor, or by any municipality or county. Additionally, the chairman of a county board of commissioners may extend the provisions of a state of emergency into his or her county. N.C. Gen. Stat. §§ 14-288.12-15. North Carolina Gen. Stat. § 14-288.7(a) provides, in pertinent part, "it is unlawful for any person to transport or possess off his own premises any dangerous weapon or substance in any area: (1) In which a declared state of emergency exists; or (2) Within the immediate vicinity of which a riot is occurring." Violation of this provision is a Class 1 misdemeanor. N.C. Gen. Stat. § 14-288.7(c). The term "[d]angerous weapon or substance" includes "[a]ny deadly weapon, ammunition . . ." N.C. Gen. Stat. § 14-288.1(2).

Declarations of states of emergency may contain "prohibitions and restrictions . . . (4) Upon the possession, transportation, sale, purchase, storage, and use of dangerous weapons and substances . . ." N.C. Gen. Stat. § 14-288.12(b) (municipal declarations); accord N.C. Gen. Stat. §§ 14-288.13(b) (county declarations), 14-288.15(d) (gubernatorial declarations). Violations of such prohibitions and restrictions declared by the Governor are punishable as Class 2 misdemeanors. N.C. Gen. Stat. § 14-288.15(e).Violations of such prohibitions and restrictions declared by a municipality or county are punishable as Class 3 misdemeanors. N.C. Gen. Stat. §§ 14-288.12(e), 14-288.13(d), 14-288.14(e).

States of emergency are frequently declared in North Carolina. Since September 1, 2004, the Governors of North Carolina have declared at least a dozen states of emergency, usually

2

encompassing the entire state. Executive Order 65 (Hurricane Frances, Sept. 1, 2004); Executive

Order 68 (Hurricane Ivan, Sept. 16, 2004); Executive Order 70 (Hurricane Jeanne, Sept. 27,

2004); Executive Order 71 (ice and snow, Wake County, Jan. 19, 2005); Executive Order 82

(Hurricane Katrina, Sept. 3, 2005); Executive Order 88 (Hurricane Ophelia, Sept. 10, 2005);

Executive Order 94 (Hurricanes Katrina and Ophelia, Nov. 28, 2005); Executive Order 107

(Tropical Storm Ernesto, Aug. 31, 2006); Executive Order 113 (Dare County severe weather,

Nov. 29, 2006); Executive Order 142 (Hyde, Tyrrell, Washington Counties, wildfire, June 6,

2008); Executive Order 144 (Tropical Storm Hanna, Hurricane Ike, Sept. 4, 2008); Executive

Order 47 (winter storm, January 10, 2010).

      Governors typically delegate their emergency powers under such declarations to the

Secretary of the Department of Crime Control and Public Safety. All state-level emergency

declarations are available on Defendant Perdue's website, at http://www.governor.state.nc.us/

NewsItems/ExecutiveOrderList.aspx (last visited Nov. 7, 2010), for recent declarations, and at

http://www.governor.state.nc.us/NewsItems/execOrderArchive.aspx (last visited Nov. 7, 2010)

for archived declarations.

      On September 1, Defendant Perdue declared another such emergency, causing the

carrying of firearms to be barred throughout the entire state three days before the start of the dove

hunting season. *See* Executive Order 62, *available at* http://www.governor.state.nc.us/

NewsItems/ ExecutiveOrderDetail.aspx?newsItemID=1328 (last visited Sept. 23, 2010).

However, the subsequent emergency declaration wrought by Tropical Storm Nicole disavowed

reliance on the statutory mechanism challenged in this lawsuit. *See* http://www.governor.state.

nc.us/ NewsItems/ExecutiveOrderDetail.aspx?newsItemID=1455 (last visited October 11, 2010).

On or about January 30, 2010, Defendant Perdue declared a state of emergency throughout the entire state of North Carolina for up to thirty days. Defendant Perdue delegated her emergency powers to Defendant Young. On or about February 5, 2010, Defendants City of King and Stokes County declared a state of emergency. Defendant City of King's proclamation forbade the sale or purchase of firearms and ammunition, as well as the possession of firearms and ammunition off an individual's premises. *See* Exhibits A and B.

Plaintiffs Michael Bateman and Forrest Minges, Jr., reside in Washington and New Bern, North Carolina, respectively. Bateman Decl., ¶ 1; Minges Decl., ¶ 1. These towns lie along the coast, and are thus particularly impacted by hurricanes and tropical storms. *Id.* Plaintiff Virgil Green resides in an unincorporated area of Stokes County, just outside the city limits of King. Green must frequently visit and travel through the City of King. Green Decl., ¶ 1. Bateman, Green, and Minges have repeatedly been impacted by declared states of emergency curtailing their ability to possess, buy, and sell firearms and ammunition. During declared states of emergency, Plaintiffs would carry functional handguns in public for self-defense, and would buy and sell guns and ammunition, but refrain from doing so where possible for fear of arrest, prosecution, fine, and imprisonment. Bateman Decl., ¶ 3; Green Decl., ¶ 3; Minges Decl., ¶ 3.

Plaintiffs may also be subject to criminal penalties whenever a state of emergency may be declared if at the time of such declaration Plaintiffs possess firearms outside their homes. Plaintiffs enjoy hunting, and would do so under appropriate circumstances regardless of any "state of emergency" declaration, but for the criminal penalties involved. Bateman Decl., ¶¶ 2, 3; Green Decl., ¶¶ 2, 3; Minges Decl., ¶¶ 2, 3. As noted *supra*, Defendant Perdue's September 1 emergency declaration covered the entire state, initially for a month, on the eve of dove season.

4

Plaintiffs Grass Roots North Carolina/Forum for Firearms Education ("GRNC/FFE") and Second Amendment Foundation ("SAF") have numerous members and supporters throughout North Carolina, including its coastal areas, Stokes County, and the City of King, who are likewise impacted by declared states of emergency. Versnel Decl., ¶ 3; Valone Decl., ¶ 3. Owing to their missions, the organizational resources of GRNC/FFE and SAF are taxed by inquiries into the impact of declared states of emergency upon the ability to use firearms. Versnel Decl., ¶ 4; Valone Decl., ¶ 4. The individual Plaintiffs, and the members and supporters of GRNC/FFE and SAF, will continue to be subjected to recurring states of emergency which, absent injunctive relief, will continue depriving them of the ability to buy, sell, possess, transport and carry firearms and ammunition.

## SUMMARY OF ARGUMENT

The Second Amendment secures the right to carry arms for self-defense, as well as the right to purchase guns and ammunition. The state is not without power to regulate the possession and use of firearms in the interest of public safety, but it must at all times be cognizant of the fundamental constitutional rights potentially impacted by such regulation.

The laws challenged in this lawsuit – prohibiting the exercise of Second Amendment rights during times of public emergency – are flatly unconstitutional, conflicting as they do with the right's core purpose of securing the people's means of self-defense. The laws are simply not compatible with the Supreme Court's interpretation of the Second Amendment. In the alternative, the emergency carrying ban fails the time, place, and manner analysis by which gun carrying regulations are measured, and the ban on the sale of guns and ammunition during emergencies fails strict scrutiny analysis, the standard of review reserved for fundamental

5

constitutional rights. There being no factual dispute in this case, Plaintiffs are entitled to summary judgment as a matter of law.

ARGUMENT

I.    THE SECOND AMENDMENT SECURES A RIGHT TO CARRY ARMS IN PUBLIC FOR SELF-DEFENSE AND HUNTING.

The Second Amendment applies "*most notably* for self-defense within the home,*"* *McDonald* v. *City of Chicago*, 130 S. Ct. 3020, 3044 (2010) (plurality op.) (emphasis added), "where the need for defense of self, family, and property is most acute," *District of Columbia* v. *Heller*, 128 S. Ct. 2783, 2717 (2008), but not exclusively so. For example, "Americans valued the ancient right [to keep and bear arms] . . . for self-defense *and hunting*." *Heller*, 128 S. Ct. at 2801 (emphasis added). "The settlers' dependence on game for food and economic livelihood, moreover, undoubtedly undergirded . . . state constitutional guarantees [of the right to arms]." *McDonald*, 130 S. Ct. at 3042 n.27. "*Heller* does not preclude Second Amendment challenges to laws regulating firearm possession outside of home." *Peruta* v. *County of San Diego*, 678 F. Supp. 2d 1046, 1051 (S.D. Ca. 2010).

Analysis begins with the constitutional text. The Second Amendment protects the right "to keep and bear arms." U.S. Const. amend. II. This syntax is not unique within the Bill of Rights. The Sixth Amendment guarantees the right to a "speedy and public trial," U.S. Const. amend. VI, while the Eighth Amendment secures individuals from "cruel and unusual" punishment. U.S. Const. amend. VIII. Just as the Sixth Amendment does not sanction secret, speedy trials or public, slow trials, and the Eighth Amendment does not allow the usual practice of torture, the Second Amendment's reference to "keep and bear" refers to two distinct concepts.

6

The Supreme Court confirmed as much, rejecting the argument that "keep and bear arms" was a unitary concept referring only to a right to possess weapons in the context of military duty. "At the time of the founding, as now, to 'bear' meant to 'carry.'" *Heller*, 128 S. Ct. at 2793 (citations omitted). To "bear arms," as used in the Second Amendment, is to "wear, bear, or carry . . . upon the person or in the clothing or in a pocket, for the purpose . . . of being armed and ready for offensive or defensive action in a case of conflict with another person." *Heller*, 128 S. Ct. at 2793 (quoting *Muscarello* v. *United States*, 524 U.S. 125, 143 (1998) (Ginsburg, J., dissenting)); BLACK'S LAW DICTIONARY 214 (6th Ed. 1998)); *see also Heller*, 128 S. Ct. at 2804 ("the Second Amendment right, protecting only individuals' liberty to keep *and carry* arms . . ."), at 2817 ("the right to keep *and carry* arms") (emphasis added). "[B]ear arms means . . . simply the carrying of arms . . ." *Heller*, 128 S. Ct. at 2796.

Having defined the Second Amendment's language as including a right to "carry" guns for self-defense, the Supreme Court helpfully noted several exceptions that prove the rule. Explaining that this right is "not unlimited," in that there is no right to "carry any weapon whatsoever in any manner whatsoever and for whatever purpose," *Heller*, 128 S. Ct. at 2816 (citations omitted), the Court confirmed that there is a right to carry at least some weapons, in some manner, for some purpose. The Court then listed as "presumptively lawful," *id.*, at 2817 n.26, "laws forbidding the carrying of firearms in sensitive places," *id.*, at 2817, confirming both that such "presumptions" may be overcome in appropriate circumstances, and that carrying bans are *not* presumptively lawful in non-sensitive places.

*Heller*'s dissenters acknowledged that the decision protected the public carrying of arms:

> Given the presumption that most citizens are law abiding, and the reality that the need to defend oneself may suddenly arise in a host of locations outside the home, I fear that the District's policy choice may well be just the first of an unknown number of dominoes to be knocked off the table.

*Heller*, 128 S. Ct. at 2846 (Stevens, J., dissenting); *see also Heller*, 128 S. Ct. at 2845 n.38 (Stevens, J., dissenting) (majority opinion secured a right to arms for "self-defense, *recreation, and other lawful purposes*") (emphasis added); *Heller*, 128 S. Ct. at 2869 (Breyer, J., dissenting).

In upholding the right to carry a handgun under the Second Amendment, *Heller* broke no new ground. As early as 1846, Georgia's Supreme Court, applying the Second Amendment, quashed an indictment for the carrying of a handgun that failed to allege whether the handgun was being carried in a constitutionally-protected manner. *Nunn* v. *State*, 1 Ga. 243, 251 (1846); *see also In re Brickey*, 8 Idaho 597, 70 P. 609 (1902) (Second Amendment right to carry handgun). Numerous state constitutional right to arms provisions have likewise been interpreted as securing the right to carry a gun in public, albeit often, to be sure, subject to some regulation. *See, e.g. Kellogg* v. *City of Gary*, 562 N.E.2d 685 (Ind. 1990); *State ex rel. City of Princeton* v. *Buckner*, 180 W. Va. 457, 377 S.E.2d 139 (1988); *City of Las Vegas* v. *Moberg*, 82 N.M. 626, 485 P.2d 737 (N.M. Ct. App. 1971); *State* v. *Rosenthal*, 75 Vt. 295, 55 A. 610 (1903) (striking down ban on concealed carry); *Andrews* v. *State*, 50 Tenn. 165 (1871); *see also State* v. *Delgado*, 298 Or. 395, 692 P.2d 610 (Or. 1984) (right to carry a switchblade knife).

The right to bear arms is not abrogated by precedent allowing for its regulation. To the contrary, precedent approving of the government's ability to regulate the carrying of handguns confirms the general rule to which it establishes exceptions. Traditionally, "the right of the

people to keep and bear arms (Article 2) is not infringed by laws prohibiting the carrying of

*concealed* weapons . . . ." *Robertson* v. *Baldwin*, 165 U.S. 275, 281-82 (1897) (emphasis added).

But more recently, the Supreme Court has suggested that such bans are only "presumptively"

constitutional. *Heller*, 128 S. Ct. at 2817 n.26 (emphasis added). Surveying the history of

concealed carry prohibitions, it appears time and again that such laws have always been upheld

as mere regulations of the manner in which arms are carried – with the understanding that a

complete ban on the carrying of handguns is unconstitutional.

     *Heller* discussed, with approval, four state supreme court opinions that referenced this

conditional rule. *See Heller*, 128 S. Ct. at 2818 (discussing *Nunn*, *supra*, 1 Ga. 243; *Andrews,*

*supra*, 50 Tenn. 165; and *State* v. *Reid*, 1 Ala. 612, 616-17 (1840)) and 128 S. Ct. at 2809 (citing

*State* v. *Chandler*, 5 La. Ann. 489, 490 (1850)). In *Reid*, upholding a ban on the carrying of

concealed weapons, Alabama's high court explained:

> We do not desire to be understood as maintaining, that in regulating the manner of
> bearing arms, the authority of the Legislature has no other limit than its own discretion. A
> statute which, under the pretence of regulating, amounts to a destruction of the right, or
> which requires arms to be so borne as to render them wholly useless for the purpose of
> defense, would be clearly unconstitutional. But a law which is merely intended to
> promote personal security, and to put down lawless aggression and violence, and to this
> end prohibits the wearing of certain weapons in such a manner as is calculated to exert an
> unhappy influence upon the moral feelings of the wearer, by making him less regardful of
> the personal security of others, does not come in collision with the Constitution.

*Reid*, 1 Ala. at 616-17.

     The *Nunn* court followed *Reid*, and quashed an indictment for publicly carrying a pistol

for failing to specify how the weapon was carried:

> so far as the act . . . seeks to suppress the practice of carrying certain weapons *secretly*,
> that it is valid, inasmuch as it does not deprive the citizen of his *natural* right of self-
> defence, or of his constitutional right to keep and bear arms. But that so much of it, as

contains a prohibition against bearing arms *openly*, is in conflict with the Constitution, and *void*.

*Nunn*, 1 Ga. at 251 (emphasis original).

*Andrews* presaged *Heller* by finding that a revolver was a protected arm under the state constitution's Second Amendment analog. It therefore struck down as unconstitutional the application of a ban on the carrying of weapons to a man carrying a revolver, declaring:

> If the Legislature think proper, they may by a proper law regulate the carrying of this weapon publicly, or abroad, in such a manner as may be deemed most conducive to the public peace, and the protection and safety of the community from lawless violence. We only hold that, as to this weapon, the prohibition is too broad to be sustained.

*Andrews*, 165 Tenn. at 187-88.[1]

Finally, in *Chandler,*

> the Louisiana Supreme Court held that citizens had a right to carry arms openly: "This is the right guaranteed by the Constitution of the United States, and which is calculated to incite men to a manly and noble defence of themselves, if necessary, and of their country, without any tendency to secret advantages and unmanly assassinations."

*Heller*, 128 S. Ct. at 2809 (quoting *Chandler*, 5 La. Ann. at 490).

The legal treatises relied upon by the *Heller* court explained the rule succinctly. As support for the notion that concealed carrying may be banned, *Heller* further cites to THE AMERICAN STUDENTS' BLACKSTONE, 84 n.11 (G. Chase ed. 1884). *Heller*, 128 S. Ct. at 2816. Here is what that source provides:

> [I]t is generally held that statutes prohibiting the carrying of *concealed* weapons are not in conflict with these constitutional provisions, since they merely forbid the carrying of arms in a particular manner, which is likely to lead to breaches of the peace and provoke to the

---

[1]*Andrews* appeared to abrogate in large part *Aymette* v. *State*, 21 Tenn. 154 (1840), upholding the prohibition on the concealed carry of daggers. But even *Aymette*, which found a state right to bear arms limited by a military purpose, deduced from that interpretation that the right to bear arms protected the open carrying of arms. *Aymette*, 21 Tenn. at 160-61.

commission of crime, rather than contribute to public or personal defence. In some States, however, a contrary doctrine is maintained.

AMERICAN STUDENTS' BLACKSTONE, 84 n.11 (emphasis original). This understanding survives.

*See, e.g. In re Application of McIntyre*, 552 A.2d 500, 501 n.1 (Del. Super. 1988) ("[T]he right to keep and bear arms' does not of necessity require that such arms may be kept concealed.").

It is important, then, to recall that (1) the Supreme Court's definition of "bear arms" as that language is used in the Second Amendment includes the concealed carrying of handguns: "wear, bear, or carry . . . *in the clothing or in a pocket . . .*" *Heller*, 128 S. Ct. at 2793 (citations omitted) (emphasis added); (2) the legality of bans on concealed carrying is only "presumptive," *Heller*, 128 S. Ct. at 2817 n.26; and (3) the cases supporting concealed carry prohibition explain that no abrogation of the right to carry arms is effected because open carrying is still permitted.

North Carolina requires a permit to carry a concealed handgun, but not to carry a handgun openly. *State* v. *Kerner*, 181 N.C. 574, 107 S.E. 222 (1921). Plaintiffs make no claim to a right to carry handguns in a particular manner, but seek to carry guns only consistent with state law in the absence of the unconstitutional restrictions challenged in this lawsuit. Their right to do so is secured by the Second Amendment.

II.     THE SECOND AMENDMENT SECURES A RIGHT TO PURCHASE ARMS AND AMMUNITION.

"[T]he Court has acknowledged that certain unarticulated rights are implicit in enumerated guarantees . . . fundamental rights, even though not expressly guaranteed, have been recognized by the Court as indispensable to the enjoyment of rights explicitly defined." *Richmond Newspapers v. Virginia*, 448 U.S. 555, 579-80 (1980). Accordingly, the right to have and use an article includes the right to buy, sell, trade, and display such articles. For example,

11

"[t]he setting of the bookstore or the commercial theater [are] each presumptively under the protection of the First Amendment." *Roaden* v. *Kentucky*, 413 U.S. 496, 504 (1973).

> [I]t . . . requires no elaboration that the free publication and dissemination of books and other forms of the printed word furnish very familiar applications of these constitutionally protected freedoms. It is of course no matter that the dissemination takes place under commercial auspices.

*Smith* v. *California*, 361 U.S. 147, 150 (1959) (citations omitted); *Virginia* v. *American Booksellers Ass'n,* 484 U.S. 383, 393 (1988) (Booksellers have standing to assert First Amendment rights of bookbuyers.). "When a person buys a book at a bookstore, he engages in activity protected by the First Amendment because he is exercising his right to read and receive ideas and information." *Tattered Cover* v. *City of Thornton*, 44 P.3d 1044, 1052 (Colo. 2002); *Wexler* v. *City of New Orleans*, 267 F. Supp. 2d 559 (E.D. La. 2005) (enjoining ban on sidewalk book sales); *Washington Free Community, Inc.* v. *Wilson*, 334 F. Supp. 77 (D.D.C. 1971) (enjoining ban on newspaper sales in parks).

Likewise, the sale of contraceptives is protected by the right to make family planning decisions, *Carey* v. *Population Servs. Int'l*, 431 U.S. 678 (1977); *Griswold* v. *Connecticut*, 381 U.S. 479 (1965), and even the sale of sex toys has been held protected by the recently-recognized right to engage in consensual intimate relationships. *Reliable Consultants, Inc.* v. *Earle*, 517 F.3d 738 (5th Cir. 2008); *but see Williams* v. *Morgan*, 478 F.3d 1316 (11th Cir. 2007).

It follows that the people have the right to buy and sell the arms and ammunition whose keeping and bearing is protected by the Second Amendment. "The right to keep arms, necessarily involves the right to purchase them, to keep them in a state of efficiency for use, and to purchase and provide ammunition suitable for such arms, and to keep them in repair." *Andrews*, 50 Tenn.

12

at 178. This is in keeping with longstanding tradition. "Our citizens have always been free to make, vend and export arms. It is the constant occupations and livelihood of some of them." 3 THE WRITINGS OF THOMAS JEFFERSON 230 (T.J. Randolph, ed., 1830). As the Third Circuit recently held, a complete ban on commerce in arms would run afoul of the Second Amendment. "If there were somehow a categorical exception for these restrictions [on gun sales], it would follow that there would be no constitutional defect in prohibiting the commercial sale of firearms. Such a result would be untenable under *Heller*." *United States* v. *Marzzarella*, 614 F.3d 85, 92 n.8 (3d Cir. 2010).[2]

III.   THE SECOND AMENDMENT SECURES ACCESS TO THE MEANS OF SELF-DEFENSE DURING TIMES OF PUBLIC EMERGENCY.

The interest in self-defense lies at the core of the Second Amendment right. *Heller*, 128 S. Ct. at 2818. Elucidating the roots of this fundamental right, the Supreme Court observed:

> As the most important early American edition of Blackstone's Commentaries (by the law professor and former Antifederalist St. George Tucker) made clear in the notes to the description of the arms right, Americans understood the "right of self-preservation" as permitting a citizen to "repe[l] force by force" when "the intervention of society in his behalf, may be too late to prevent an injury."

*Heller*, 128 S. Ct. at 2799 (citing St. George Tucker, 1 BLACKSTONE'S COMMENTARIES 145-146, n. 42 (1803)); *McDonald*, 130 S. Ct. at 3042 n. 27.

---

[2]Congress has also recognized a right to purchase arms and ammunition. The Protection of Lawful Commerce in Arms Act, immunizing the gun industry from abusive tort claims, was enacted "[t]o preserve a citizen's access to a supply of firearms and ammunition for all lawful purposes," pursuant to Section 5 of the Fourteenth Amendment. 15 U.S.C. § 7901(b)(2) & (3).

13

IV.	NORTH CAROLINA'S PROHIBITION OF SECOND AMENDMENT RIGHTS
	DURING TIMES OF PUBLIC EMERGENCY IS UNCONSTITUTIONAL.

A.	The Challenged Laws Are In Conflict with the Constitutional Guaranty.

North Carolina's definition of a "state of emergency" supplies an excellent example of

situations where "the intervention of society" on behalf of an individual "may be too late to

prevent an injury." An "emergency" exists under North Carolina law whenever "public safety

authorities are unable to maintain public order or afford adequate protection for lives or property,

or whenever the occurrence of any such condition is imminent." N.C. Gen. Stat. § 14-288.1(10).

North Carolina's arms carrying and purchase prohibitions during times of emergency are

simply in conflict with the constitutional guarantee. Under such circumstances, it is enough to

recall the constitutional text's basic interpretation to resolve the case. In *Heller*, for example, the

Supreme Court wasted no time striking down a District of Columbia enactment that forbade the

possession of functional firearms inside the home. That law, announced the Court, "makes it

impossible for citizens to use [firearms] for the core lawful purpose of self-defense and is hence

unconstitutional." *Heller*, 128 S. Ct. at 2818. This case is no different. The challenged laws

simply render impossible the use of firearms for self-defense at the time when they are most

urgently needed. No further analysis is required to enjoin their enforcement.

B.	The Challenged Laws Fail Constitutional Scrutiny.

Even if the challenged provisions did not literally conflict with the constitutional

guarantee, construing the Second Amendment under established standards of review leads to the

same conclusion: the laws are unconstitutional.

14

If subjected to a standard of review, the emergency carrying ban of N.C. Gen. Stat. § 14-288.7 would be analyzed under a time, place, and manner regime. As the Third Circuit observed in reviewing *Heller*'s repeated analogies to First Amendment doctrines, "the structure of First Amendment doctrine should inform our analysis of the Second Amendment." *Marzzarella*, 614 F.3d at 89 n.4. Indeed, the D.C. Circuit specifically adopted a time, place, and manner standard in its opinion affirmed in *Heller*. *See Parker* v. *District of Columbia*, 478 F.3d 370, 399 (D.C. Cir. 2007), *aff'd sub nom Heller* ("The protections of the Second Amendment are subject to the same sort of reasonable restrictions that have been recognized as limiting, for instance, the First Amendment.") (citing time, place, and manner test in *Ward* v. *Rock Against Racism*, 491 U.S. 781, 791 (1989)).

The Supreme Court all but confirmed this standard in *Heller*, with its language that the right to carry arms does not extend to "carry any weapon whatsoever in any *manner* whatsoever and for whatever purpose," *Heller*, 128 S. Ct. at 2816 (citations omitted) (emphasis added), and that arms can be barred from certain (undefined) "sensitive *places*." *Heller*, 128 S. Ct. at 2817 (emphasis added). Under this standard, the emergency carrying ban plainly fails. It is not limited to the manner of carrying weapons, or to any sensitive places, or even to a particular time. Rather, this law imposes a complete ban on all carrying of all weapons, in geographical regions frequently encompassing the entire state, for up to thirty days at a time and in any event during those times where the right would receive maximum, not minimal, protection.

The ban on the purchase of firearms and ammunition likewise fails constitutional scrutiny. Removing all doubt as to the presumptive invalidity of nontraditional gun laws, the Supreme Court confirmed that the Second Amendment secures a fundamental right. *McDonald*,

15

130 S. Ct. at 3042 (plurality opinion) & 3059 (Thomas, J., concurring). "[C]lassifications affecting fundamental rights are given the most exacting scrutiny." *Clark* v. *Jeter*, 486 U.S. 456, 461 (1988) (citation omitted). Under this analysis, the government carries the burden of proving the law "furthers a compelling interest and is narrowly tailored to achieve that interest," *Citizens United* v. *FEC*, 130 S. Ct. 876, 898 (2010) (citation omitted), a burden that cannot be met where less restrictive alternatives are available to achieve the same purpose. *Ashcroft* v. *ACLU*, 542 U.S. 656, 666 (2004); *see also United States* v. *Engstrum*, 609 F. Supp. 2d 1227, 1331-32 (D. Utah 2009) (applying strict scrutiny in Second Amendment analysis).

While the government has a compelling interest in maintaining law and order, regardless of whether an "emergency" has been declared, preventing the entire law-abiding population from purchasing firearms and ammunition cannot be a narrowly-tailored means of achieving that purpose. The law, on its face, is not directed to the theft of firearms and ammunition, activities which remain illegal regardless of any emergency conditions. Rather, the law is aimed only at peaceable, otherwise perfectly lawful conduct: the orderly purchase of consumer goods. The state still has at its disposal the various legal mechanisms designed to keep firearms out of the hands of dangerous people. But there is no reason to suppose that a law-abiding person, fully qualified to purchase guns and ammunition for self-defense, becomes an incipient felon, mental incompetent or other danger – beyond the reach of generally-applicable civil and criminal law – merely because the government has declared itself unable to provide police protection. The challenged prohibitions are superfluous when compared with the panoply of civil and criminal law to which all people are subject.

CONCLUSION

The government's inability to provide police protection does not abrogate the fundamental constitutional right to the means of self-defense. If the Second Amendment guarantees any aspect of the right to arms, it guarantees that right when individuals are at their most vulnerable.

Respectfully, Plaintiffs are entitled to summary judgment as a matter of law.

Dated: November 8, 2010                    Respectfully submitted,

/s/ Alan Gura                              /s/ Andrew Tripp
Alan Gura                                  N.C. State Bar 34254
Gura & Possessky, PLLC                     atripp@brookspierce.com
101 N. Columbus Street, Suite 405
Alexandria, VA 22314                       Andrew Tripp
703.835.9085/Fax 703.997.7665             Kearns Davis
                                           BROOKS, PIERCE, MCLENDON,
                                              HUMPHREY & LEONARD, L.L.P.
                                           1600 Wachovia Center
*Counsel for Plaintiffs*                   150 Fayetteville Street
                                           Raleigh, NC 27601
                                           Telephone: 919-839-0300
                                           Facsimile: 919-839-0304

                                           *Local Civil Rule 83.1 Counsel for Plaintiffs*

17

CERTIFICATE OF SERVICE

I hereby certify that on this the 8th day of November, 2010, I electronically filed the foregoing Memorandum with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following:

Andrew T. Tripp
Kearns Davis
Brooks, Pierce, McLendon
  Humphrey & Leonard, L.L.P.
P.O. Box 1800
Raleigh, NC 27602

Henry W. Jones, Jr.
Lori P. Jones
Jordan Price Wall Gray Jones &
  Carlton, PLLC
1951 Clark Avenue
P.O. Box 10669
Raleigh, NC 27605

Walter W. Pitt, Jr.
Kevin G. Williams
Bell, Davis & Pitt
P.O. Box 21029
Winston-Salem, NC 27120

Mark A. Davis
Special Deputy Attorney General
North Carolina Dept. of Justice
P. O. Box 629
Raleigh, NC 27602

/s/Alan Gura
Counsel for Plaintiffs