IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:10-CV-00265-H

| | |
|---|---|
| MICHAEL BATEMAN, VIRGIL GREEN, FORREST MINGES, JR., GRNC/FFE, INC., and SECOND AMENDMENT FOUNDATION, INC., <br><br> *Plaintiffs,* <br><br> v. <br><br> BEVERLY PERDUE, REUBEN F. YOUNG, STOKES COUNTY, and CITY OF KING, <br><br> *Defendants.* | **AFFIDAVIT OF STEVEN NEWTON** |

I, Steven Newton, being duly sworn, do depose as follows:

1. I am over 18 years of age, am competent to testify, and have personal knowledge of the matters referred to herein.

2. I am an Emergency Management Specialist with Wake County's Division of Emergency Management. My job duties include developing plans for preparedness, response, mitigation, and recovery to natural or technological disasters, including domestic terrorism preparedness, in order to provide for the safety and security of citizens. I plan and develop teamwork with local first responder agencies, municipalities, and state and federal partners through training, exercises, and interagency infrastructure to effectively respond to any type of emergency. My job duties also include responding to incident scenes and assisting in the coordination of emergency events, as well as providing technical support regarding health and safety strategies for the protection of first responders and the general public involving issues such as hazardous materials spills, school

violence incidents, natural weather events, missing persons, traffic or transportation accidents, and terrorism.

3. I completed my Associate of Applied Science degree in Public Safety Telecommunications from Gadsden State Community College in Alabama. I received my Bachelor of Science degree in Emergency Management with a minor in Public Safety Telecommunications and my Master of Science degree in Emergency Management from Jacksonville State University in Alabama.

4. I have participated in the response to several disasters during my career in which a state of emergency was declared. My experiences in these disasters illustrate the extremely difficult circumstances faced by emergency management workers during an emergency – circumstances that are made considerably more difficult if people go into the affected areas carrying firearms.

5. On January 27, 2000 I participated in emergency response and recovery efforts for three days in Orange County, NC after a severe winter storm with more than two feet of snow accumulation occurred early in the morning of January 25, 2000.

6. In addition to the large accumulation of snow, there were strong wind gusts during and after the storm. All of this resulted in poor visibility for emergency workers, and dangerous conditions for power company workers operating bucket trucks while trying to restore outages. On the interstates as well as secondary roads it was difficult to make out where the asphalt ended and the shoulder began, unless tops of mailboxes or street signs were visible.

7. Because the storm was not predicted to be severe, the county 911 center and Emergency Operations Center (EOC) received many requests from citizens for basic supplies very early in the event.

8. On December 4, 2002 I became engaged for five days in emergency response and recovery efforts in Orange County, NC during and after a severe ice storm with accumulation of up to 1 inch of ice in some areas.

9. This storm left thousands without power for several days while outside temperatures hovered around freezing. This resulted in a sharp increase in the number of EMS calls for Carbon Monoxide (CO) poisoning when a number of citizens tried to heat their homes by burning charcoal indoors.

10. Driving and walking was dangerous because of the ice. Response vehicle lights and sirens were used during the event to improve recognition of emergency vehicles. The roads were too icy to allow for travel at a speed even close to the posted speed limits.

11. One of my roles during the disaster was coordinating North Carolina National Guard soldiers that had been assigned to Orange County to support the local response. The soldiers were paired with County staff and sent out to check on medically fragile residents at their homes and to offer supplies or transportation to an emergency shelter. In Orange County they made more than 250 contacts with the disabled, frail and elderly.

12. National Guard teams were given general guidance on their mission, a list of individuals to check on, a street map, and a time to report back. We did not have two-way radio communications with the teams. In some instances members of the team had their own cellular phone and could contact the EOC if they encountered a problem or needed guidance. Teams that did not have their own cellular phone had to use their judgment to solve a problem, and travel to the closest fire, police or EMS station to report an emergency.

13. During this event one of the local law enforcement agencies implemented a temporary policy that required all officers to activate their flashing emergency blue-lights when pulling up to any home. This was done after a resident brandished a firearm towards a law enforcement officer pulling into their driveway.

14. On September 20, 2003 I was deployed for six days through the North Carolina Mutual Aid System to Tyrrell County, North Carolina, to assist with emergency response and recovery efforts after Hurricane Isabel.

15. Requests were made by the Tyrrell County EOC to the State of North Carolina EOC for additional law enforcement officers, firefighters, emergency medical technicians, telecommunicators, and incident management personnel. This was to offer relief to local emergency workers so that they could return home, salvage their belongings, and manage ongoing environmental damage to property.

16. Most residents and businesses in the area were without power or clean running water for several days after the storm. An emergency shelter for the public was opened in a local elementary school. The local high school gymnasium was used to shelter emergency responders.

17. The local public safety radio communications system had been damaged during the storm and was inoperable. A portable tower and two-way radio repeater had been deployed, but had a limited range and suffered multiple power failures. This temporary radio system made communications with emergency workers unpredictable. Often we were reduced to face-to-face communications or hand delivered messages.

18. Several of the local emergency workers, including law enforcement officers, wore ordinary street clothes or only partial uniforms. Their homes and belongings had been flooded or

otherwise damaged, leaving them with whatever they were already wearing or what could be scraped together.

19. The lack of uniforms contributed to confusion and delays at security road blocks that were manned by law enforcement officers from outside jurisdictions, who could not recognize the local emergency workers when not in uniform and in their personal vehicles.

20. On September 16, 2004 I was deployed for three days through the North Carolina Mutual Aid System to Haywood County, North Carolina, to assist with emergency response and recovery efforts as Hurricane Ivan tracked across North Carolina, eight days after Hurricane Frances had impacted the same area.

21. I was unfamiliar with the area, but due to the urgency indicated in the request for assistance I drove to the Haywood County EOC in Waynesville, NC as the storm was still in progress. While driving to Waynesville I encountered heavy rains, strong wind gusts, road flooding and downed trees. Visibility was limited to only a few feet ahead of the vehicle. I was forced to detour twice due to flooded roads where I could not gauge the depth of the water or the condition of the road underneath.

22. Government workers with the Town of Clyde delivered notices to all residents near the river that the Clyde Fire Department siren would be used to warn residents of flood danger. A two minute tone would be sounded if flooding was possible in the area, and residents should prepare to evacuate. Multiple two minute tones would be sounded once the water reached the Clyde Mobile Home Park, which meant flooding was imminent, and residents should immediately evacuate to higher ground.

23. After the floodwaters subsided, Urban Search & Rescue (USAR) teams made up of specially trained and equipped firefighters and paramedics searched every flooded home, business, and outbuilding to locate any potential victims or environmental hazards. I observed one above ground fuel tank that had the words "Ground bad" painted on it with an arrow pointing towards the soil underneath. I also observed a number of 150 gallon and larger liquid propane tanks that had been dislodged by the floodwater and been deposited downstream.

24. The letter "X" had been marked on the road in front of each structure by the USAR team, indicating the USAR taskforce designation, the date it was searched, any hazards found, and the number of live and deceased victims found inside. These markings are typically made on the structure, but most of the homes already had these markings on them from searches performed the week before, after Hurricane Frances. To limit confusion, the decision had been made to mark searches as a result of Hurricane Ivan on the roadway.

25. Once the communities were evacuated, law enforcement officers were posted in the business district and residential areas to prevent unauthorized access and looting.

26. One travel lane of Interstate 40 eastbound collapsed in Haywood County during this event as a result of the flooding. This created significant congestion for both directions of travel on Interstate 40. During disasters, highways and interstates are critical for governments to effectively evacuate citizens, move personnel and resources, and deliver supplies across the State.

27. On September 4, 2005 I was deployed for eleven days through the Emergency Management Assistance Compact to Saint Tammany Parish, Louisiana, to assist with emergency response and recovery efforts after Hurricane Katrina.

28. I personally observed and experienced a telecommunications system failure with telephone, Internet, and local two-way radio systems. This led to an inability to effectively communicate situation reports and resources requests to the State EOC in Baton Rouge, LA.

29. After Hurricane Katrina, as was the case in the other disasters I have responded to, there was a substantial lack of reliable situational information in the first days after the incident. For this reason, the government was forced to make life-saving protective action decisions based on incomplete and sometimes incorrect information.

30. Widespread and prolonged power outages are a common feature in each of the disasters I have responded to in which a state of emergency was declared.

31. During disasters, emergency workers have to contend with the numerous, often intertwined, and sometimes still energized, power lines downed by trees, wind or ice. These power lines can be found in roadways, across vehicles, on houses, and businesses. In one or more of the disasters discussed above, the downed lines were the source of the original request for assistance, impeding the first responder's path on the way to the request, or both. As power was restored, we frequently saw electrical fires in homes and businesses that had unnoticed damage.

32. Widespread power outages also restricted visibility, particularly in urban and suburban communities. Without power there was no light from streetlights, buildings, or urban skyglow. The only light available came from handheld flashlights, vehicle headlights and spotlights, portable light towers, and buildings with generators. This is not only an issue at night. Responding to requests for assistance inside buildings during power outages has also been a challenge during the day in structures without windows in a hallway or room.

33. Another common feature in each of the disasters I have responded to is that citizens were strongly encouraged by local officials to remain in their homes unless there was a dire need to leave. In some cases this was reinforced with a curfew included within the state of emergency declaration. This allowed roadways to be cleared of snow and other debris, utility workers to restore services without interference, and emergency workers to assist disaster victims without new incidents occurring.

34. Protective actions that emergency workers undertake in response to an impending or actual disaster require coordinating numerous personnel, in uncertain conditions, with inadequate resources, and are often performed under threat of injury to the responder, citizens, property, and the environment. These activities come to a halt when an armed person is discovered, until such time as a law enforcement officer can ensure that the person is not intent on causing violence. Only once the safety concern resulting from the person being armed has been resolved can emergency workers reassess the original situation and resume the protective action (if it is not too late).

35. The North Carolina statutes prohibiting citizens from taking weapons off their premises during a declared state of emergency are helpful to government workers because: (1) they allow government workers to focus on saving lives, protecting property, and stabilizing an incident with reduced fear of violence, whether intentional or accidental; (2) they create a safe environment in the publicly accessible areas of a community for the evacuation, relocating, and sheltering of youth, medically fragile, and other vulnerable populations; (3) they discourage armed citizens from engaging in actions that interfere with a coordinated government response and from engaging in weapon-related violence; (4) they reduce the burden on law enforcement officers to ensure that an armed citizen is not intent on causing violence; and (5) they reduce the likelihood of a delayed

emergency medical or fire response to a life threatening emergency due to crews waiting for safety assurances from law enforcement officers.

This the 10 day of December, 2010.

_____
Steven Newton

Sworn to and subscribed before
me, this the 10 day of December, 2010.

_____
Notary Public

My commission expires: July 16 2011

Respectfully submitted, this the 15th day of December 2010.

>ROY COOPER
>Attorney General
>
>/s/Mark A. Davis
>Mark A. Davis
>Special Deputy Attorney General
>Attorney for The State Defendants
>N.C. Department of Justice
>Post Office Box 629
>Raleigh, NC 27602
>E-mail: mdavis@ncdoj.gov
>Telephone: (919) 716-6900
>Facsimile: (919) 716-6763
>State Bar No. 18142

# CERTIFICATE OF SERVICE

I hereby certify that on this day, December 15, 2010, I electronically filed the foregoing **AFFIDAVIT OF STEVEN NEWTON** with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Alan Gura
Gura & Possessky, PLLC
101 N. Columbus Street, Suite 405
Alexandria, VA 22314

Andrew T. Tripp
Kearns Davis
Brooks, Pierce, McLendon
 Humphrey & Leonard, L.L.P.
P.O. Box 1800
Raleigh, NC 27602

Walter W. Pitt, Jr.
Kevin G. Williams
Bell, Davis & Pitt
P.O. Box 21029
Winston-Salem, NC 27120

Henry W. Jones, Jr.
Lori P. Jones
Jordan Price Wall Gray Jones &
 Carlton, PLLC
1951 Clark Avenue
P.O. Box 10669
Raleigh, NC 27605

/s/Mark A. Davis
Special Deputy Attorney General