# Exhibit A

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF
NORTH CAROLINA
WESTERN DIVISION

| | |
|---|---|
| _____ ) | |
| MICHAEL BATEMAN, VIRGIL GREEN, ) | |
| FORREST MINGES JR., GRNC/FFE, INC., ) | |
| AND SECOND AMENDMENT ) | |
| FOUNDATION, INC., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | No. 5:10-CV-265-H |
| ) | |
| BEVERLY PERDUE, REUBEN F. YOUNG, ) | |
| STOKES COUNTY, AND CITY OF KING, ) | |
| ) | |
| Defendants. ) | |
| ) | |
| _____ ) | |

---

**BRIEF OF *AMICI CURIAE* BRADY CENTER TO PREVENT GUN
VIOLENCE, NORTH CAROLINA MILLION MOM MARCH CHAPTERS
OF THE BRADY CAMPAIGN TO PREVENT GUN VIOLENCE, AND
RELIGIOUS COALITION FOR A NONVIOLENT DURHAM IN
SUPPORT OF DEFENDANTS**

---

## TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................................................1

ARGUMENTS......................................................................................................................3

I.     NORTH CAROLINA POSSESSES INHERENT POLICE POWER AUTHORITY TO TEMPORARILY LIMIT CONSTITUTIONAL RIGHTS DURING RIOTS AND STATES OF EMERGENCY. ..........................4

II.    NORTH CAROLINA'S RESTRICTIONS ON FIREARM POSSESSION DURING RIOTS AND DECLARED STATES OF EMERGENCY DO NOT IMPLICATE PROTECTED SECOND AMENDMENT ACTIVITY. ...............................................................7

    A.    North Carolina's Firearm Restrictions Do Not Implicate Protected Second Amendment Activity Because They Do Not Hinder The Right To Possess Firearms in The Home. ..............................7

    B.    The Second Amendment Should Not be Extended to Prevent North Carolina From Restricting Carrying Firearms in Public During Emergency Situations.................................................17

III.   THE RESTRICTIONS ON FIREARM POSSESION DURING DECLARED EMERGENCIES WOULD WITHSTAND THE APPROPRIATE LEVEL OF SCRUTINY EVEN IF THEY DID IMPLICATE PROTECTED SECOND AMENDMENT ACTIVITY................19

    A.    The Reasonable Regulation Test is The Appropriate Standard of Review................................................................................23

    B.    North Carolina's Restrictions on Firearms During Declared Emergencies Are Reasonable Regulations And Thus Constitutionally Permissible.................................................27

CONCLUSION...................................................................................................29

# TABLE OF AUTHORITIES

Page(s)

CASES

*Abernathy v. Conroy*, 429 F.2d 1170 (4th Cir. 1970) .................................................5

*Bleiler v. Chief, Dover Police Dep't*, 927 A.2d 1216 (N.H. 2007)..............................23

*Dep't of Revenue of Ky. v. Davis*, 553 U.S. 328 (2008) ..............................................25

*District of Columbia v. Heller*, 128 S. Ct. 2783 (2008)........................................ passim

*Dobbins v. State*, 277 N.C. 484, 178 S.E.2d 449 (1971) ....................................... passim

*Dorr v. Weber*, No. C 08-4093-MWB, 2010 WL 1976743 (N.D. Iowa May 18, 2010) ...............10

*Gayle v. Governor of Guam*, 414 F. Supp. 636 (D. Guam 1976) .................................28

*Glover v. District of Columbia*, 250 A.2d 556 (D.C. 1969) ...........................................5

*Gonzales v. Oregon*, 546 U.S. 243 (2006) ............................................................25, 28

*Gonzalez v. Village of West Milwaukee*, No. 09CV0394, 2010 WL 1904977 (E.D. Wis. May 11, 2010)...................................................................................................10

*Heller v. District of Columbia* ("*Heller II*"), 698 F. Supp. 2d 179 (D.D.C. 2010)............19, 20, 28

*In re Bastiani*, 881 N.Y.S.2d 591 (N.Y. Co. Ct. 2008)...................................................11

*In re Factor*, 2010 WL 1753307 (N.J. Sup. Ct. Apr. 21, 2010) ....................................11

*Jackson v. State*, 68 So. 2d 850 (Ala. Ct. App. 1953)....................................................23

*Kelley v. Johnson*, 425 U.S. 238 (1976) ......................................................................26

*Luther v. Borden*, 48 U.S. (7 How.) 1 (1849) ................................................................6

*Mack v. United States*, No. 08-CF-603, 2010 WL 4340932 (D.C. Ct. App. Nov. 4, 2010)...........9

*McDonald v. Chicago*, 130 S. Ct. 3020 (2010) ..................................................... passim

*Montana Shooting Sports Ass'n v. Holder*, No. CV-09-147-DWM-JCL, 2010 WL 3926029 (D. Mont. Aug. 31, 2010) .....................................................................16

*Moorhead v. Farrelly*, 723 F. Supp. 1109 (D.V.I. 1989)................................................5

*Muscarello v. United States*, 524 U.S. 125 (1998) .......................................................12

*Nordmann v. Fla. Dep't of Agric. & Consumer Servs.*, 473 So. 2d 278 (Fla. Dist. Ct. App. 1985) ...........................................................................................................................................6

*Nordyke v. King*, 319 F.3d 1185 (9th Cir. 2003) ..........................................................................24

*People v. Chambers*, 72 P.2d 746 (Cal. Dist. Ct. App. 1937) ........................................................6

*People v. Dawson*, 934 N.E.2d 598 (Ill. App. Ct. 2010) ................................................................9

*People v. Flores*, 86 Cal. Rptr. 3d 804 (Cal. Ct. App. 2008).......................................................29

*People v. Perkins*, 880 N.Y.S.2d 209 (N.Y. Sup. Ct. 2009).........................................................11

*People v. Williams*, No. 1-09-1667, 2010 WL 4967880 (Ill. App. Ct. Dec. 2010) .......................9

*People v. Yarbrough*, 169 Cal. App. 4th 303 (Cal. Ct. App. 2008)..............................................17

*Powers Mercantile Co. v. Olson*, 7 F. Supp. 865 (D. Minn. 1934) ...........................................2, 6

*Queenside Hills Realty Co. v. Saxl*, 328 U.S. 80 (1946)...............................................................25

*Richmond v. J.A. Croson Co.*, 488 U.S. 469 (1989) .....................................................................26

*Riddick v. United States*, 995 A.2d 212 (D.C. 2010) ...................................................................11

*Robertson v. Baldwin*, 165 U.S. 275 (1897) .......................................................................... passim

*Robertson v. City & Cnty. of Denver*, 874 P.2d 325 (Colo. 1994) ..............................................23

*Sanchez v. Peterson*, 601 F.3d 1065 (10th Cir. 2010) .................................................................22

*Sims v. United States*, 963 A.2d 147 (D.C. 2008).........................................................................11

*Smith v. Avino*, 91 F.3d 105 (11th Cir. 1996) ...............................................................2, 4, 5, 13

*State v. Chandler*, 5 La. Ann. 489 (1850)....................................................................................15

*State v. Cole*, 665 N.W.2d 328 (Wis. 2003) ...........................................................................25, 27

*State v. Comeau*, 448 N.W.2d 595 (Neb. 1989) ...........................................................................23

*State v. Dawson*, 272 N.C. 535, 159 S.E.2d 1 (1968)..................................................................21

*State v. Johnson*, 169 N.C. App. 301, 610 S.E.2d 739 (2005)......................................................21

*State v. Knight*, 241 P.3d 120 (Kan. Ct. App. 2010)...............................................................10, 13

*State v. Reid*, 1 Ala. 612 (1840)...................................................................................................15

*State v. Sieyes*, 225 P.3d 995 (Wash. 2010).................................................................................28

*State v. Sullivan*, 691 S.E.2d 417 (N.C. Ct. App. 2010) ...................................................23

*State v. Whitaker*, 689 S.E.2d 395 (N.C. Ct. App. 2009)................................................16

*Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83 (1998).............................................2

*Swait v. University of Nebraska*, No. 8:08CV404, 2008 WL 5083245 (D. Neb. Nov. 25, 2008) ...................................................................................................................................11

*Teng v. Town of Kensington*, No. 09-cv-8-JL, 2010 WL 596526................................10

*Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180 (1997)..................................................26

*United States v. Bledsoe*, No. SA-08-CR-13(2)-XR, 2008 WL 3538717 (W.D. Tex. Aug. 8, 2008) ..............................................................................................................25, 28, 29

*United States v. Chalk*, 441 F.2d 1277 (4th Cir. 1971)....................................... passim

*United States v. Emerson*, 270 F.3d 203 (5th Cir. 2001) ..............................................24

*United States v. Engstrum*, 609 F. Supp. 2d 1227 (D. Utah 2009) ..............................28

*United States v. Hart*, No. 09-10376-WGY, 2010 WL 2990001 (D. Mass. July 30, 2010)..........10

*United States v. Hayes*, 129 S. Ct. 1079 (2009)................................................................8

*United States v. Huet*, No. 08-0215, 2010 WL 4853847 (W.D. Pa. Nov. 22, 2010)....................19

*United States v. Knotts*, 460 U.S. 276 (1983) ...............................................................22

*United States v. Marzzarella*, 614 F.3d 85 (3d Cir. 2010)........................19, 20, 25, 28

*United States v. Masciandaro*, 648 F. Supp. 2d 779 (E.D. Va. 2009)..........................28

*United States v. McCane*, 573 F.3d 1037 (10th Cir. 2009).............................................28

*United States v. Miller*, 604 F. Supp. 2d 1162 (W.D. Tenn. 2009) ....................25, 26, 28

*United States v. Morsette*, 622 F.3d 1200 (9th Cir. 2010) .............................................10

*United States v. Radencich*, No. 3:08-CR-00048(01)RM, 2009 WL 127648 (N.D. Ind. Jan. 20, 2009)......................................................................................................................28

*United States v. Schultz*, No. 1:08-CR-75-TS, 2009 WL 35225 (N.D. Ind. Jan. 5, 2009) ............29

*United States v. Smith*, No. 2:10-cr-00066, 2010 WL 3743842 (S.D. W. Va. Sept. 20, 2010) ...................................................................................................................10, 13

*United States v. Tooley*, 717 F. Supp. 2d 580 (S.D. W. Va. 2010)..........................10, 11

*United States v. Walker*, 380 A.2d 1388 (D.C. 1977) ............................................................11, 17

*United States v. Yanez-Vasquez*, No. 09-40056-01-SAC, 2010 WL 411112 (D. Kan. Jan. 28, 2010) ......................................................................................................................25, 28

*Young v. American Mini Theatres, Inc.*, 427 U.S 50 (1976).......................................................26

STATUTES

18 U.S.C. § 922.........................................................................................................................25

18 U.S.C. § 922(g)(9) .................................................................................................................8

18 U.S.C. § 924(c) ....................................................................................................................12

N.C. Gen. Stat. §§ 14-288.7, 14-288.12(b), 14-288.13(b), 14-288.14(a), and 14-288.15(d) ........29

La. Rev. Stat. Ann. § 29:727(F)(8) .............................................................................................27

CONSTITUTIONAL PROVISIONS

First Amendment .......................................................................................................................21

Fourteenth Amendment ...............................................................................................................1

Fourth Amendment ...................................................................................................................22

N.C. CONST. art. I, § 30..............................................................................................................16

Second Amendment ........................................................................................................... passim

OTHER AUTHORITIES

Adam Winkler, *Scrutinizing the Second Amendment*, 105 MICH. L. REV. 683 (2007) .................23

Black's Law Dictionary ..............................................................................................................12

Charles C. Branas, *et al.*, *Investigating the Link Between Gun Possession and Gun Assault*.....................................................................................................................................17

David G. Tucker & Alfred O. Bragg, *Florida's Law of Storms: Emergency Management, Local Government, And The Police Power*, 30 STETSON L. REV. 837 (2001)........................19

Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self-Defense: An Analytical Framework and a Research Agenda*, 56 UCLA LAW REVIEW 1443 (2009)..........24

Michael Cook, *"Get Out Now or Risk Being Taken Out By Force": Judicial Review of State Government Emergency Power Following a Natural Disaster*, 57 CASE W. RES. L. REV. 265, 270 (2006)........................................................................................................27

Philip Cook, *et al.*, *Gun Control After Heller: Threats and Sideshows from a Social Welfare Perspective*, 56 UCLA L. REV. 1041, 1081 (2009)....................................................18

Press Release, Second Amendment Foundation, SAF Celebrates Patriot's Day, The Root of Second Amendment (Apr. 19, 2006), http://www.saf.org/viewpr-new.asp?id=179...........18

Violence Policy Center, *Law Enforcement and Private Citizens Killed by Concealed Handgun Permit Holders*........................................................................................................17

Case 5:10-cv-00265-H   Document 72-1   Filed 12/16/10   Page 8 of 37

# INTRODUCTION

In *District of Columbia v. Heller*, 128 S. Ct. 2783 (2008), the Supreme Court held that the Second Amendment protects a "right of law-abiding, responsible citizens to use arms in defense of hearth and home." *Id.* at 2821. The Court, however, did not extend its limited holding to include the right to carry guns outside the home, and, in fact, it expressly rejected the notion that the Second Amendment granted "a right to keep and carry any weapon whatsoever *in any manner whatsoever* and for whatever purpose." *Id.* at 2816 (emphasis added). The Court also restated the longstanding principle that "the right of the people to keep and bear arms (article 2) is not infringed by laws prohibiting the carrying of concealed weapons." *Robertson v. Baldwin*, 165 U.S. 275, 281-82 (1897); *see Heller*, 128 S. Ct. at 2801-02.[1] As the government may bar concealed carrying of weapons in public, it certainly may impose temporary restrictions on carrying and acquiring weapons during riots and states of emergency, as North Carolina has done.

To protect public order and allow the delivery of emergency relief during a riot or state of emergency, the North Carolina General Assembly enacted laws allowing for a temporary freeze on carrying firearms in the "vicinity of . . . a riot" or within the public area covered by an emergency declaration pursuant to North Carolina General Statute § 14-288.7. But these restrictions are limited. They are temporary conditions during riots or declared emergencies and leave untouched the right to keep and bear arms in one's home or on one's property. In *United States v. Chalk*, 441 F.2d 1277 (4th Cir. 1971), the Fourth Circuit upheld these restrictions against First, Fourth, and Fourteenth Amendment challenges. In *Dobbins v. State*, 277 N.C. 484, 178 S.E.2d 449 (1971), the North Carolina Supreme Court impliedly rejected a Second

---

[1] After *Heller* the Court considered Chicago's ban on handguns, incorporated the Second Amendment to the states, but refused to broaden the right recognized in *Heller*. *See McDonald v. Chicago*, 130 S. Ct. 3020 (2010).

Amendment challenge to the same. This Court should likewise uphold the restrictions against Plaintiffs' Second Amendment challenge.

Plaintiffs ask this Court to broaden the narrow right recognized in *Heller* and *McDonald* to encompass a far-reaching right to take up arms during riots or other emergencies and venture into the public. The prospect of police and emergency responders being powerless to stop bands of armed citizens from taking to the streets during emergencies, looting, or rioting poses a serious threat to the government's core function. Plaintiffs' challenge, for example, would prohibit the government from restricting squads of vigilantes from arming themselves with assault weapons and patrolling "the immediate vicinity of . . . a riot." (*See* Pls.' Mot. for Summ. J. 2.) The government could not secure public streets from armed persons in the aftermath of a hurricane or terrorist attack. Law enforcement would be unable to detect whether roaming armed individuals or gangs are would-be looters, terrorists, or vigilantes. Rescue workers seeking to distribute limited aid would have to contend with protesters carrying deadly weapons.

The argument that armed vigilantes have a constitutional right to take to the streets during riots or congregate in the vicinity of emergency responders trying to secure a downtown after terrorist attacks is not only bad policy, it is bad law. Plaintiffs have no Second Amendment right to carry loaded guns in public. And even if they did, courts have recognized that "[i]n an emergency situation," even "fundamental rights such as the right to travel and free speech may be temporarily limited or suspended." *Smith v. Avino*, 91 F.3d 105, 109 (11th Cir. 1996), *abrogated on other grounds*, *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83 (1998); s*ee also, e.g., Powers Mercantile Co. v. Olson*, 7 F. Supp. 865, 868 (D. Minn. 1934) ("[T]he deprivation of [constitutional] rights, made necessary in order to restore the community to order under the law, cannot be made the basis for injunction or redress.").

In extolling the right to venture out armed at anytime whatsoever, Plaintiffs effectively ask this Court to "cast doubt on . . . laws forbidding the carrying of firearms in sensitive places" such as in the vicinity of ongoing riots or during declared emergencies. *See Heller*, 128 S. Ct. at 2817 (sanctioning "laws forbidding the carrying of firearms in sensitive places"). Plaintiffs' sweeping constitutional arguments fail to recognize that the Second Amendment right to keep and bear arms in the home for self-defense is unique among constitutional rights in the risks it presents. Firearm possession and use subject others to a serious risk of harm and, as North Carolina law recognizes, the risk is magnified during riots and states of emergency. The Supreme Court has recognized the public safety risks posed by firearms and for that reason took pains to state that the Second Amendment right "is not unlimited" and is subject to "reasonable firearms regulations." *See McDonald*, 130 S. Ct. at 3046.

Temporary restrictions on guns in public during riots and states of emergency leave untouched Plaintiffs' right to keep and bear "arms in defense of hearth and home." Moreover, Plaintiffs have the judicial remedy of challenging the validity, continuation, or scope of any declared emergency.[2] This Court, therefore, should uphold these laws and refuse to issue a sweeping injunction that would harm the State's core police power function to maintain public order during rioting or states of emergency.

## ARGUMENTS

For at least three reasons, North Carolina's firearm restrictions in the vicinity of riots and during declared emergencies are constitutional. First, this court need not even reach the Second

---

[2] *See also McDonald*, 130 S. Ct. at 3047 (Scalia, J., concurring) ("[T]he Court's approach intrudes less upon the democratic process because the rights it acknowledges [in *Heller* and *McDonald*] are those established by a constitutional history formed by democratic decisions; and the rights it fails to acknowledge are left to be democratically adopted or rejected by the people, with assurance that their decision is not subject to judicial revision.").

Amendment question because these restrictions are valid under the State's inherent police power authority to temporarily burden or even suspend constitutional rights during riots and other emergencies. Second, these statutes do not implicate protected Second Amendment activity, as they leave completely intact the right to possess and use guns in one's home and on one's property at all times. Finally, assuming *arguendo* that these restrictions implicate Second Amendment rights, they are reasonable regulations that further North Carolina's important interests to maintain public order during riots and other emergency situations.

## I. NORTH CAROLINA POSSESSES INHERENT POLICE POWER AUTHORITY TO TEMPORARILY LIMIT CONSTITUTIONAL RIGHTS DURING RIOTS AND STATES OF EMERGENCY.

This Court can resolve this dispute without wading into the parameters of the Second Amendment by following numerous courts in holding that states have inherent police power authority to impose temporary limits on constitutional rights during emergencies. The Fourth Circuit has held that "[t]he invocation of emergency powers necessarily restricts activities that would normally be constitutionally protected." *Chalk*, 441 F.2d at 1280. In an emergency, "governing authorities must be granted the proper deference and wide latitude necessary for dealing with the emergency" and "fundamental rights such as the right of travel and free speech may be temporarily limited or suspended." *Smith*, 91 F.3d at 109.

The Fourth Circuit has analyzed the statutes at issue here and held that "[d]ealing with . . . an emergency situation requires an immediacy of action that is not possible for judges." *Chalk*, 441 F.2d at 1281. The court consequently cautioned against second-guessing government decisions to suspend constitutional rights during states of emergency. *See id.* The prospect of a court pre-emptively enjoining the government from restricting possession of firearms during a riot, terrorist attack, or other state of emergency "would destroy the 'broad discretion' necessary

for the executive to deal with an emergency situation" and strike at the most fundamental state police power to "[c]ontrol . . . civil disorders that may threaten the very existence of the State." *Id.* at 1280. Indeed, armed citizens threatening to use "[p]rivate force and violence are no less destructive of free debate than government oppression." *Id.*

The Fourth Circuit has also held that the test for whether a restriction on constitutional rights during an emergency is permissible is the broadly deferential standard that "the restrictions imposed pursuant to it must appear to have been reasonably necessary for the preservation of order." *Chalk*, 441 F.2d at 1281. Judicial review of states' emergency powers is based on a case-by-case determination of whether, in a particular emergency, government "actions were taken in good faith and whether there is some factual basis for [the] decision that the restrictions . . . imposed were necessary to maintain order." *Chalk*, 441 F.2d at 1281; *accord Smith*, 91 F.3d at 109; *Moorhead v. Farrelly*, 723 F. Supp. 1109, 1113-14 (D.V.I. 1989); *see also Glover v. District of Columbia*, 250 A.2d 556 (D.C. 1969) (upholding curfew starting at 5:30 p.m. as reasonable and usual police regulation to combat sudden rioting, looting, and burning). Thus, in *Chalk*, the court upheld the very statutes at issue here, recognizing that "it would be highly inappropriate for us, removed from the primary responsibility for maintaining order and with the benefit of time for reflection . . . to substitute our judgment of necessity for" the State's. *Id.*[3]

Both state and federal courts have long recognized the constitutionality of reasonable limitations on individual rights during emergency situations. This was the basis for upholding the convictions in *Chalk* and *Dobbins*, with both courts giving the State latitude to combat the exigent demands of emergency situations. *See Chalk*, 441 F.2d at 1280-83; *Dobbins*, 277 N.C. at 497-505 178 S.E.2d at 457-62; *see also Abernathy v. Conroy*, 429 F.2d 1170 (4th Cir. 1970)

---

[3] Plaintiffs' challenge to gun restrictions that have not yet been imposed on them are also unripe, as explained in the Brief in Support of the State's Motion to Dismiss at 13-19.

(upholding ban on parades after 8 p.m.); *Nordmann v. Fla. Dep't of Agric. & Consumer Servs.*, 473 So. 2d 278, 280 (Fla. Dist. Ct. App. 1985) (upholding against Takings Clause challenge use of police power to destroy private citrus stock during disease outbreak).

Furthermore, in *Chalk*, the Fourth Circuit held that the standard for analyzing the restrictions on constitutional rights during an emergency "is essentially the same as that which applies to the executive's inherent power to restore order through the use of the military." *Chalk*, 441 F.2d at 1280. In such cases, "[t]he executive and legislative branches of both federal and state governments are the only authorities vested with the lawful power to quell insurrections. Private persons and organizations have no such vested right." *People v. Chambers*, 72 P.2d 746, 754 (Cal. Dist. Ct. App. 1937). Courts have long-recognized that it is the state's, not the vigilante's, "power to put down an armed insurrection, too strong to be controlled by the civil authority. The power is essential to the existence of every government, essential to the preservation of order and free institutions, and is as necessary to the States of this Union as to any other government." *Luther v. Borden*, 48 U.S. (7 How.) 1, 45 (1849); *see also Olson*, 7 F. Supp. at 868 ("[W]hen there is a breakdown of law and order in a community . . . the means which are employed to restore law and order must necessarily be left largely to the discretion of the Governor . . . and that, within the range of the Governor's permitted discretion, his acts are not subject to the regulation or control of the judiciary.").

North Carolina has weighed and rejected Plaintiffs' apocalyptic view that personal defense necessitates allowing armed persons to take to the streets during riots, unrest, or states of emergency. In enacting these statutes, the legislature recognized that its "primary function" is "[t]o prevent, control and terminate [any] upheaval." *See Dobbins*, 277 N.C. at 499, 178 S.E.2d at 458. It reasoned that if a significant number of North Carolinians share Plaintiffs' view of the

right to arm themselves during states of emergency, the State's ability to restore order will be threatened and the possibility of protracted chaos will be too real. While Plaintiffs would have this Court create a gaping and dangerous firearms exception to the State's authority to maintain order during emergencies, "[t]he Constitution protects against anarchy as well as tyranny." *Chalk*, 441 F.2d at 1281 (internal quotation marks omitted). This Court should thus uphold North Carolina's restrictions on firearms in public during riots and states of emergency as reasonable measures to maintain public safety.

## II. NORTH CAROLINA'S RESTRICTIONS ON FIREARM POSSESSION DURING RIOTS AND DECLARED STATES OF EMERGENCY DO NOT IMPLICATE PROTECTED SECOND AMENDMENT ACTIVITY.

### A. North Carolina's Firearm Restrictions Do Not Implicate Protected Second Amendment Activity Because They Do Not Hinder The Right to Possess Firearms in The Home.

The Supreme Court's decision in *Heller* recognized that the Second Amendment protects "the right of law-abiding, responsible citizens to use arms in defense of hearth and home." *Heller*, 128 S. Ct. at 2821. The Court had ample opportunity to state that Mr. Heller had a right to carry guns in public, but, instead, it explicitly rejected the notion that the Second Amendment guarantees "a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Id.* at 2816. The Court limited its holding to a right "to carry [] in the home." *Id.* at 2822. The opinion focused on the historical recognition of the right of individuals "to keep and bear arms to defend their homes, families or themselves," *id.* at 2810, and the continuing need to keep and use firearms "in defense of hearth and home." *Id.* at 2821.

The Court did not embrace a broad right to carry guns in public. Rather, it made clear that a right to "bear" or carry arms did not imply carrying outside the home. It principally held that "[a]ssuming that Heller is not disqualified from the exercise of Second Amendment rights,

the District must permit him to register his handgun and must issue him a license *to carry it in the home*." 128 S. Ct. at 2822 (emphasis added).[4]  Indeed, North Carolina could restrict firearms possession far more than it currently does, as the *Heller* Court approved of cases upholding complete *bans* on carrying concealed weapons in public, and cited *Robertson*, 165 U.S. at 281-82, in which it held that the Second Amendment did not protect a right to carry concealed weapons.  *Heller*, 128 S. Ct. at 2801-02.  Making clear that the Second Amendment allows for reasonable gun laws such as North Carolina's, the Court identified a non-exhaustive list of "presumptively lawful" gun laws, including bans on guns in sensitive places.  *See id.* at 2816-17 n.26.

The Court incorporated the Second Amendment to the states in *McDonald*.  130 S. Ct. 3020.  It had the opportunity to broaden the right established in *Heller* but did not.  On the contrary, it "repeat[ed]" the "assurances" in *Heller* regarding the constitutionality of pre-existing gun laws and agreed that "[s]tate and local experimentation with *reasonable firearms regulation* will continue under the Second Amendment."  *Id.* at 3046 (internal quotation marks omitted) (emphasis added).  Notably, the Court could just have easily given its pre-emptive imprimatur to experimentations that are "narrowly tailored" to significant objectives but did not.  It reinforced its narrow holding with carefully-worded approval of "reasonable firearms regulation."

Plaintiffs, however, claim that the Second Amendment should not be limited to the Supreme Court's holdings in *Heller* and *McDonald*, but instead should be expanded to recognize a broad right to keep and bear arms "outside the home" and to carry firearms for the purpose of "hunting" during a state of emergency.  (Pls.' Mem. in Opposition to Defs.' Mot. to Dismiss 11,

---

[4] The narrow scope of the Court's ruling in *Heller* was also apparent in the Court's post-*Heller* opinion in *United States v. Hayes*, 129 S. Ct. 1079 (2009), in which the Court upheld a broad reading of 18 U.S.C. § 922(g)(9) – which prohibits possession of firearms by persons convicted of misdemeanor crimes of domestic violence – without even mentioning the Second Amendment.

Sept. 24, 2010.)  Plaintiffs ignore the Supreme Court's extensive and careful language limiting

the right to keep and bear arms in the home, and wrongly assert that the "Supreme Court's

precedent is clear: the right to bear arms is the right to carry arms in public . . . ."  (Pls.' Mem.

5.).   However, the Court said no such thing and expressly approved of cases upholding

*prohibitions* on public carrying of concealed weapons.  *See Heller*, 128 S. Ct. at 2816-17.  Courts

throughout the country have rejected similar arguments that the Second Amendment should be

expanded beyond self-defense and beyond the home, and have recognized that neither *Heller* nor

*McDonald* "endorse[d] a right to carry weapons *outside* the home."  *Mack v. United States*, No.

08-CF-603, 2010 WL 4340932, at *9 (D.C. Ct. App. Nov. 4, 2010).

In *People v. Dawson*, 934 N.E.2d 598 (Ill. App. Ct. 2010), for instance, the Illinois Court

of Appeals rejected arguments similar to Plaintiffs', concluding that "*Heller specifically limited*

*its ruling to interpreting the [second] amendment's protection of the right to possess handguns*

*in the home, not the right to possess handguns outside of the home in case of confrontation.*"  *Id.*

at 605-06 (emphasis added).  The court explained that "[t]he specific limitations in *Heller* and

*McDonald* applying only to a ban on handgun possession in a home cannot be overcome by

defendant's pointing to the *Heller* majority's discussion of the natural meaning of 'bear arms'

including wearing or carrying upon the person or in clothing."  *Id.* at 605 (internal citations

omitted).   Recognizing that "when reasonably possible, a court has the duty to uphold the

constitutionality of a statute," the *Dawson* court rejected the contention that the Second

Amendment protects a broad right to carry that would invalidate Illinois's law.  *Id.* at 605; *see*

*also People v. Williams*, No. 1-09-1667, 2010 WL 4967880 (Ill. App. Ct. Dec. 2010) ("[B]oth

*Heller* and *McDonald* made clear that the only type of firearms possession they were declaring to

be protected under the second amendment was the right to possess handguns in the home for self-defense purposes.").

The Kansas Court of Appeals has also acknowledged that "[i]t is clear that the [*Heller*] Court was drawing a narrow line regarding the violations related solely to use of a handgun in the home for self-defense purposes." *State v. Knight*, 241 P.3d 120, 133 (Kan. Ct. App. 2010). It concluded that the defendant's "argument, that *Heller* conferred on an individual the right to carry a concealed firearm, is unpersuasive." *Id.*

Other state and federal courts have similarly held that the right recognized in *Heller* and *McDonald* is confined to the home. *See, e.g.*, *United States v. Morsette*, 622 F.3d 1200, 1202 (9th Cir. 2010) ("*Heller* and *McDonald* concern the right to possess a firearm in one's home for self-defense."); *United States v. Tooley*, 717 F. Supp. 2d 580, 596 (S.D. W. Va. 2010) ("[P]ossession of a firearm outside of the home or for purposes other than self-defense in the home are not within the 'core' of the Second Amendment right as defined by *Heller*."); *Gonzalez v. Village of West Milwaukee*, No. 09CV0394, 2010 WL 1904977, at *4 (E.D. Wis. May 11, 2010) ("The Supreme Court has never held that the Second Amendment protects the carrying of guns outside the home."); *United States v. Hart*, No. 09-10376-WGY, 2010 WL 2990001, *3 (D. Mass. July 30, 2010) ("*Heller* does not hold, nor even suggest, that concealed weapons laws are unconstitutional."); *Dorr v. Weber*, No. C 08-4093-MWB, 2010 WL 1976743, at *8 (N.D. Iowa May 18, 2010) (holding that *Robertson* remains the law, and "a right to carry a concealed weapon under the Second Amendment has not been recognized to date"); *United States v. Smith*, No. 2:10-cr-00066, 2010 WL 3743842, at *10 (S.D. W. Va. Sept. 20, 2010) ("[C]ircumstances beyond the 'core' of fundamental Second Amendment protections are 'presumptively lawful.'"); *Teng v. Town of Kensington*, No. 09-cv-8-JL, 2010 WL 596526, at * 5 (D.N.H. Feb. 17, 2010)

("Given that *Heller* refers to outright prohibitions on carrying concealed weapons" as "presumptively lawful". . . far lesser restrictions of the sort imposed here (i.e., requiring that Teng complete a one-page application and meet with the police chief to discuss it) clearly do not violate the Second Amendment.") (internal citation omitted); *Swait v. University of Nebraska*, No. 8:08CV404, 2008 WL 5083245, at *3 (D. Neb. Nov. 25, 2008) ("States can prohibit the carrying of a concealed weapon without violating the Second Amendment"); *Sims v. United States*, 963 A.2d 147, 150 (D.C. 2008) (holding that Second Amendment does not "compel the District to license a resident to carry and possess a handgun outside the confines of his home, however broadly defined."); *Riddick v. United States*, 995 A.2d 212, 222 (D.C. 2010) (same); *In re Factor*, 2010 WL 1753307, at *3 (N.J. Sup. Ct. Apr. 21, 2010) (per curiam) ("[T]he United States Supreme Court has not held or even implied that the Second Amendment prohibits laws that restrict carrying of concealed weapons."); *People v. Perkins*, 880 N.Y.S.2d 209, 210 (N.Y. Sup. Ct. 2009) (holding that "defendant's [possession of gun in public] did not conform to that which is protected by the Second Amendment"); *In re Bastiani*, 881 N.Y.S.2d 591, 593 (N.Y. Co. Ct. 2008) ("Nothing in *Heller* grants the applicant more than" possession of gun at home); *see also, e.g.*, *United States v. Tooley*, 717 F. Supp. 2d 580, 596 (S.D. W. Va. 2010) ("possession of a firearm outside of the home or for purposes other than self-defense in the home are not within the 'core' of the Second Amendment right as defined by Heller."); *Walker*, 709 F. Supp. 2d at 466 (holding that defendant is far "removed from the core constitutional right of the Second Amendment" because "his stated purpose for possession of the firearm is hunting rather self-defense"). This Court should likewise reject Plaintiffs' request that it recognize a Second Amendment right to carry firearms outside the home or for the purpose of hunting during a riot or state of emergency.

Ignoring this case law, Plaintiffs rely on supposed tea leaves on which they claim the Supreme Court grounded a broad right to carry in public. (*See* Pls.' Mem. 10-16.) Plaintiffs cannot explain why the *Heller* Court did not simply state that it endorsed the right to carry loaded guns in public or for hunting, if it believed that the Second Amendment was that far-reaching. The Court opined at length about the scope of the Second Amendment, dedicated an entire section (Section III) to some of its limitations, and referenced "the home" repeatedly in both *Heller* and *McDonald*. Yet, Plaintiffs claim that the Court recognized a broad right that is apparent only to them.

Plaintiffs' broad notion hinges in part on the reference in Justice Scalia's majority opinion to Justice Ginsburg's dissent in *Muscarello v. United States*, 524 U.S. 125 (1998) (examining the meaning of "carries a firearm" in a federal criminal statute). However, Justice Scalia did not cite *Muscarello* to argue that arms could be borne outside the home, but to argue that "bear arms" "in no way connotes participation in a structured military organization." *See Heller*, 128 S. Ct. at 2793.[5] Justice Ginsburg certainly did not contend in *Muscarello* that the Second Amendment protected a right to carry guns in public places, for she concluded in *Heller* that the Second Amendment was limited to militia participation.

Plaintiffs also wrongly assert that "the Supreme Court helpfully noted several exceptions that prove the rule" that the Second Amendment includes a right to carry guns in public, and that *Heller* "confirm[s] . . . that carrying bans are not presumptively lawful in non-sensitive places." (Pls.' Mem. 12.) Their argument is contradicted by the very passage in *Heller* on which their

---

[5] Further, "[a]t issue in *Muscarello* was the proper construction of the word 'carries' in 18 U.S.C. § 924(c) (1994 ed.); the dissent in that case made passing reference to the Second Amendment only in the course of observing that both the Constitution and Black's Law Dictionary suggested that something more active than placement of a gun in a glove compartment might be meant by the phrase 'carries a firearm.'" *Heller*, 128 S. Ct. at 2829 n.8 (Stevens, J., dissenting). In sum, even if Justice Scalia concluded that "bear" means "carry" outside of a military context, that does not refute the Court's holding that the right to carry does not extend outside of the home.

argument is based – the Court's admonition that a non-exhaustive list of gun laws, including "laws forbidding the carrying of firearms in sensitive places," are "presumptively lawful." *See Heller*, 128 S. Ct. at 2816-17 n.26. Plaintiffs want this Court to believe that the Supreme Court's reference to presumptively lawful gun laws is *ipso facto* a disproval of gun laws not mentioned or, in Plaintiffs' words, that such laws are "not presumptively lawful." (*See* Pls.' Mem. 12.) This is a fanciful reading of *Heller* that one court has rejected. In *Knight*, the Kansas Court of Appeals declared that "[a]ny failure by the *Heller* Court to include prohibitions on concealed firearms does not imply that such requirements are unconstitutional." *Knight*, 241 P.3d at 133. In *Smith*, the district court added that *Heller* "indicates . . . that longstanding restrictions on firearm ownership and possession affecting individuals and circumstances *beyond the 'core' of fundamental Second Amendment protections* are 'presumptively lawful.'" *Smith*, 2010 WL 3743842, at *10 (emphasis added). Moreover, Plaintiffs' contention is undermined by the fact that the same passage in *Heller* permits gun bans in "sensitive places," which should properly include bans during riots and declared emergencies, thus rendering North Carolina's restrictions "presumptively lawful."

Recognizing that any support for their position from the *Heller* majority is tenuous at best, Plaintiffs next urge this Court to follow the dissenting justices in *Heller* who, Plaintiffs contend, understood the majority's opinion as extending to the right to carry arms in public. Plaintiffs' argument is based on Justice Stevens's "'fear that the District's policy choice may well be just the first of an unknown number of dominoes to be knocked off the table.'" (Pls.' Mem. 13 (quoting Heller, 128 S. Ct. at 2846 (Stevens, J., dissenting))). However, this statement is not a holding that other policy choices must necessarily "be knocked off the table." Justice Stevens was simply expressing a "fear" that future parties could propose an overly broad

interpretation of the Second Amendment. Nothing in Justice Stevens's dissent can be taken to justify a right that Justice Stevens believed that the Second Amendment did not provide, nor could his dissent shape the contours of the right that the majority did not "acknowledge." *See generally McDonald*, 130 S. Ct. at 3047 (Scalia, J., concurring) (noting that rights that the *Heller* and *McDonald* majorities "fail[ed] to acknowledge are left to be democratically adopted or rejected by the people, with assurance that their decision is not subject to judicial revision.").

Next, Plaintiffs quote extensively, albeit incompletely, from the passage in *Heller* listing some examples of permissible firearm laws, (Pls.' Mem. 13), but they conspicuously avoid noting that in the preceding sentence the *Heller* Court approved of decisions holding "that prohibitions on carrying concealed weapons were lawful under the Second Amendment or state analogues." 128 S. Ct. at 2817. One would think that *Heller*'s discussion of concealed carry laws would be worth mentioning to this Court while arguing that, under *Heller*, Plaintiffs have a Second Amendment right to carry weapons in public.

Plaintiffs also assert that *Heller* modified, if not overruled, the language in *Robertson* that "the right of the people to keep and bear arms (article 2) is not infringed by laws prohibiting the carrying of concealed weapons," 165 U.S. at 281-82, by suggesting "that such bans are only 'presumptively' constitutional." (Pls.' Mem. 13-14.) That, too, is incorrect. In fact, the *Heller* Court's non-exhaustive list of examples of "presumptively lawful regulatory measures" was provided after the sentence approving of bans on concealed carrying. *See Heller*, 128 S. Ct. at 2817. The Court did more than designate concealed carry bans as "presumptively lawful"; it referred approvingly to decisions holding that bans on concealed carrying were constitutional:

> For example, the majority of the 19th-century courts to consider the question held that prohibitions on carrying concealed weapons were lawful under the Second Amendment or state analogues. Although we do not undertake an exhaustive historical analysis today of the full scope of the Second Amendment, nothing in

14

our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.[FN26]

> [FN26.] We identify these presumptively lawful regulatory measures only as examples; our list does not purport to be exhaustive.

128 S. Ct. at 2816-17 (internal citations omitted). A fair reading of *Heller* simply does not support Plaintiffs' contention that the Court in any way modified *Robertson* and recognized a right to carry outside the home.

Plaintiffs also extensively quote four 19th-century state court cases cited by the *Heller* Court that, they contend, imply a recognition of a right to carry in public. (Pls.' Mem. 14-15.) But the *Heller* Court only cited those cases for the proposition that bans on concealed carrying were constitutional, or that some *state* constitutions recognized an individual right to keep and bear arms that was not limited to militia participation. *See Heller*, 128 S. Ct. at 2818. The *Heller* Court never quoted the portions of those opinions on which Plaintiffs rely, and the Court did not suggest that it was interpreting the Second Amendment as broadly as, say, the Alabama Supreme Court did in 1840 while construing its state constitution in *Reid*.[6] (Pls.' Mem. 14.) If the Supreme Court believed that concealed carry bans could only be constitutional if open carrying outside the home were permitted, it would not have referred approvingly to the constitutionality of bans on concealed carrying without stating so.

---

[6] Further, even the state cases Plaintiffs discuss not only allow for the *prohibition* of concealed carrying, but have language that support the reasonable regulation of carrying in public, as North Carolina has done. In *State v. Reid*, 1 Ala. 612 (1840), the Court found it significant that "the defendant needed no arms for his protection," and that it was the sheriff who "is the keeper of the peace within the county." While *State v. Chandler*, 5 La. Ann. 489 (1850), found a right to carry, the Louisiana Supreme Court stated that a ban on concealed carrying "became absolutely necessary to counteract a vicious state of society, growing out of the habit of carrying concealed weapons, and to prevent bloodshed and assassinations committed upon unsuspecting persons."

Plaintiffs conclude that the Second Amendment mandates a right to carry publicly because courts upholding concealed firearms ban (e.g., *Robertson*), have done so only insofar as the law regulated the "manner in which arms are carried." (Pls.' Mem. 14.) But this proposition is only tenable if one ignores *Heller*'s admonition that the Second Amendment does not protect "a right to keep and carry any weapon whatsoever *in any manner whatsoever* and for whatever purpose." *See Heller*, 128 S. Ct. at 2816 (emphasis added). In any event, it appears that Plaintiffs commit the error of reading state and federal constitutions coterminously without regard for the fact that the federal Constitution sets the lower – not upper – limits of constitutional rights. *See, e.g.*, N.C. CONST. art. I, § 30; *State v. Whitaker*, 689 S.E.2d 395, 399 (N.C. Ct. App. 2009) ("[T]he individual right to keep and bear arms under Article I, Section 30 [of the North Carolina Constitution] . . . is perhaps even a greater individual right than that as recognized under the Second Amendment.").

North Carolina's restrictions on firearm possession during declared emergencies do not implicate the right to possess firearms at home for self-defense. The authorizing provisions, which allow restricting firearm sales and purchase during emergency situations, do not even come close to the reach of the Second Amendment, especially given that "*McDonald* says nothing about extending Second Amendment protection to firearm manufacturers or dealers." *Montana Shooting Sports Ass'n v. Holder*, No. CV-09-147-DWM-JCL, 2010 WL 3926029, at *22 (D. Mont. Aug. 31, 2010). This Court should decline Plaintiffs' invitation to recognize a right that is unsupported by the Supreme Court's two comprehensive reviews of the history and text of the Second Amendment.

**B.     The Second Amendment Should Not be Extended to Prevent North Carolina From Restricting Carrying Firearms in Public During Emergency Situations.**

There are profound public safety rationales for restricting guns in public, as courts continue to recognize post-*Heller. See, e.g.*, *People v. Yarbrough*, 169 Cal. App. 4th 303, 314 (Cal. Ct. App. 2008) ("Unlike possession of a gun for protection within a residence, carrying a concealed firearm presents a recognized threat to public order, and is prohibited as a means of preventing physical harm to persons other than the offender.") (internal quotation marks and citations omitted); *see also United States v. Walker*, 380 A.2d 1388, 1390 (D.C. 1977) (recognizing an "inherent risk of harm to the public of such dangerous instrumentality being carried about the community and away from the residence or business of the possessor").  The public risks ordinarily associated with public carrying are exacerbated by emergency situations, which are typically fast-moving, unpredictable, destructive, and require broad authority by those tasked with maintaining and restoring order.  These facts weigh in favor of protecting the "broad discretion" and "wide latitude" that are indispensible to the state's discharge of its core function to preserve the general welfare.  *See Chalk*, 441 F.2d at 1280 (warning against destruction of police power "necessary . . . to deal with an emergency.").

Ordinarily, carrying firearms in public threatens the safety of the entire community, unlike the risk posed at home to firearm owners, family members, visitors, and houseguests.[7] Research has shown that carrying firearms in public is neither a useful nor effective form of self-defense.  One study found that "gun possession by urban adults was associated with a significantly increased risk of being shot in an assault" and that "guns did not protect those who

---

[7] Violence Policy Center, *Law Enforcement and Private Citizens Killed by Concealed Handgun Permit Holders*, July 2009 (finding that "[b]etween May 2007 and April 2009, concealed handgun permit holders shot and killed 7 law enforcement officers and 42 private citizens.").

possessed them from being shot in an assault." Charles C. Branas, *et al.*, *Investigating the Link Between Gun Possession and Gun Assault*, 99 AMER. J. PUB. HEALTH 1, 4 (Nov. 2009); *see also* Philip Cook, *et al.*, *Gun Control After Heller: Threats and Sideshows from a Social Welfare Perspective*, 56 UCLA L. REV. 1041, 1081 (2009) (finding that "increased gun carrying among potential victims [may] cause[] criminals to carry guns more often themselves, or become quicker to use guns to avert armed self-defense, [and] the end result could be that street crime becomes more lethal.").

The threat posed at home magnifies in public, threatening more people in more places. During emergencies, firearms threaten protracted instability while hindering the State's ability to focus on addressing the primary emergency. Under Plaintiffs' view of the Second Amendment, State officials must contend both with the emergency and the possibility of armed resistance by mobs or the resort to self-help by vigilantes.[8]  It is thus not unreasonable for North Carolina to enact laws specifically aimed at preempting mayhem and at empowering its officials to better respond to emergencies.  *See Dobbins*, 277 N.C. at 499, 178 S.E.2d at 458 ("To prevent, control and terminate [] an upheaval is the primary function of government.").

The Asheville emergency declaration that gave rise to the convictions in *Chalk* and *Dobbins* is illustrative.  The city declared emergency following a clash between 200-250 students and police officers in which school windows were broken, cars in the area and those passing by were damaged, including one overturned, and police officers and students were injured, with one

---

[8] It is worth noting that under the "insurrectionist" view of the Second Amendment, shared by many "gun rights" advocates, private gun possession is needed to take up arms against the government when citizens believe the state has become tyrannical.  For instance Plaintiff Second Amendment Foundation has expressed belief that the Second Amendment "is not about hunting or target shooting, it's about freedom and defense.  It is the great insurance policy against tyranny."  Press Release, Second Amendment Foundation, SAF Celebrates Patriot's Day, The Root of Second Amendment (Apr. 19, 2006), http://www.saf.org/viewpr-new.asp?id=179 (last visited Dec. 15, 2010). Given that Plaintiffs suggest that North Carolina unduly deprives citizens of liberties in states of emergency that are declared too frequently, it is not a stretch that some might wish to take up arms against the authorities during declared emergencies, which would be completely contrary to law enforcement objectives to secure the peace.

student seriously injured.  *Chalk*, 441 F.2d at 1282.  The tension had been seething for weeks, and, fearing that the unrest would escalate, the City of Asheville took the extraordinary measures of declaring emergency and imposing a curfew pursuant to North Carolina General Statute § 12-288.  *Id.*  Co-defendants Chalk and Dobbins were stopped for violating the curfew and arrested for possessing weapons in violation of the laws at issue in the present case.  In affirming Dobbins's convictions under the statute, the Supreme Court of North Carolina credited the city's action under law for ending the unrest.  *See Dobbins*, 277 N.C. at 496, 178 S.E.2d at 456.  The court noted "the City of Asheville was fortunate in having the effective preventive medicine [of the restrictions challenged in this case] prescribed and administered promptly."  *Id.*

Emergencies require both "preventive medicines" and coordinated responses by State, and often federal, officials.  *See* David G. Tucker & Alfred O. Bragg, *Florida's Law of Storms: Emergency Management, Local Government, And The Police Power*, 30 STETSON L. REV. 837, 838 (2001) ("Local governments must act exigently to protect their citizens from the . . . havoc" caused by emergency situations).  North Carolina has determined that carrying firearms during emergencies threatens public safety and that its prohibition will prevent wider chaos.  In light of the *Heller* and *McDonald* Court's careful limitation of the Second Amendment right to the home, this Court should not create a new Second Amendment right to venture out armed into a riot or during a state of emergency.  Nor should this Court abrogate North Carolina's core interest in enacting laws for the general welfare.

### III.    THE RESTRICTIONS ON FIREARM POSSESION DURING DECLARED EMERGENCIES WOULD WITHSTAND THE APPROPRIATE LEVEL OF SCRUTINY EVEN IF THEY DID IMPLICATE PROTECTED SECOND AMENDMENT ACTIVITY.

In the wake of *Heller* and *McDonald*, courts have used a two-pronged approach to analyze Second Amendment claims.  *See, e.g.*, *United States v. Marzzarella*, 614 F.3d 85 (3d Cir.

2010); *United States v. Huet*, No. 08-0215, 2010 WL 4853847, at *10 (W.D. Pa. Nov. 22, 2010)

(following *Marzzarella*); *Heller II*, 698 F. Supp. 2d at 188. Under this approach, courts ask: (1)

does the law or regulation at issue implicate protected Second Amendment activity, and (2) if so,

does it withstand the appropriate level of scrutiny? *See, e.g.*, *Marzzarella*, 614 F.3d at 89; *Heller*

*II*, 698 F. Supp. 2d at 188. If the challenged law or regulation does not implicate protected

Second Amendment activity (as is the case here), then the analysis ends and the law is deemed

constitutional. However, if the law implicates protected activity, it will be deemed constitutional

if it passes muster under the appropriate level of scrutiny. *Marzzarella*, 614 F.3d at 89. Under

this test, even if the statutes at issue did implicate a right recognized under the Second

Amendment, they are permissible regulations and thus constitutional.

     Neither *Heller* nor *McDonald* articulated a standard of review for Second Amendment

challenges, though the Court in *Heller* explicitly rejected the "rational basis" test and implicitly

rejected the strict scrutiny test. *See Heller*, 128 S. Ct. at 2851 (Breyer, J., dissenting) ("[T]he

majority implicitly, and appropriately, rejects [*Heller*'s suggestion to adopt a 'strict scrutiny'

test] by broadly approving a set of laws . . . whose constitutionality under a strict scrutiny

standard would be far from clear."); *Heller v. District of Columbia* ("*Heller II*"), 698 F. Supp. 2d

179, 187 (D.D.C. 2010) ("[S]trict scrutiny standard of review would not square with the [*Heller*]

majority's references to 'presumptively lawful regulatory measures' . . . ."). The Court's

reasoning also foreclosed any form of heightened scrutiny that would require the government to

ensure that firearms legislation has a tight fit between means and ends, as *Heller* recognized that

the Constitution provides legislatures with "a variety of tools for combating" the "problem of

handgun violence," 130 S. Ct. at 2822, and listed as examples a host of "presumptively lawful"

existing firearms regulations without subjecting those laws to any analysis, much less the most exacting scrutiny. *Id.* at 2816-17 & n.26.

*Heller* and *McDonald* thus left lower courts to determine an appropriate standard of review for Second Amendment claims: one that is less rigorous than strict scrutiny, "presumes" the lawfulness of a wide gamut of gun laws, allows for "reasonable firearms regulations," and permits law-abiding, responsible citizens to keep guns in the home for self-defense. The "reasonable regulation" test, overwhelmingly applied by courts throughout the country construing state right to keep and bear arms provisions, is the most appropriate standard of review for the North Carolina statutes at issue here. *See, e.g., State v. Johnson*, 169 N.C. App. 301, 610 S.E.2d 739, 746 (2005) ("[O]ur case law has 'consistently pointed out that the right of individuals to bear arms is not absolute, but is subject to regulation.' The only requirement is that *the regulation must be reasonable* and be related to the achievement of preserving public peace and safety.") (emphasis added) (quoting *State v. Dawson*, 272 N.C. 535, 546, 159 S.E.2d 1, 9 (1968)).

In determining a level of scrutiny appropriate for Second Amendment challenges, some courts have considered only the choices utilized in First Amendment jurisprudence – strict scrutiny, intermediate scrutiny, or rational basis review – and have opted for intermediate scrutiny. However, while these levels of scrutiny may seem the most obvious options, key differences between the First and Second Amendments suggest that using one of these three levels of scrutiny is *not*, in fact, appropriate. The exercise of Second Amendment rights creates unique risks that threaten the safety of the community and can be far more lethal than even the most dangerous speech. Free speech, free exercise of religion, and the exercise of other rights generally do not place others at the risk of lethal harm. Guns, on the other hand, are designed to

inflict grievous injury and death – and often do.  Given the grave risks posed by guns, requiring that the government demonstrate a tight "fit" would unduly restrict the State's broad police power authority to protect the public from harm.  If governments fail to properly protect the public from gun violence, the exercise of the Second Amendment could supplant all other constitutional rights and infringe on the most fundamental right of others – the preservation of life.  This is why states have overwhelmingly used a reasonableness test in assessing challenges to the right to keep and bear arms provisions in state constitutions.

Even assuming without conceding that heightened scrutiny is ever appropriate in Second Amendment cases, it would apply only to infringement of "core" Second Amendment right – possession of guns at home.  *See Heller*, 128 S. Ct. at 2787.  Established Fourth Amendment jurisprudence illustrates why *Heller*'s commands this conclusion.  It is a truism that the Fourth Amendment's prohibition against unreasonable searches and seizures is most robust at home and far less exacting in other places – e.g., while driving on a public road.  *Cf. Sanchez v. Peterson*, 601 F.3d 1065, 1084 (10th Cir. 2010) (recognizing "the longstanding principle that the reasonable expectation of privacy in one's home is far greater than the expectation of privacy one has in activities conducted in public.") (citing *United States v. Knotts*, 460 U.S. 276, 281 (1983) ("A person travelling in an automobile on public thoroughfares has no reasonable expectation of privacy in his movements from one place to another.")).  Similarly, the right to carry outside the home, if it exists at all, is subject to a deferential standard of review.

For all these reasons, a standard of review specific to the Second Amendment context is warranted here, particularly given the Supreme Court's recognition that an individual's right to bear arms must be evaluated in light of a state's competing interest in public safety.  To that end, *amici* respectfully suggest that this Court apply the test that state courts like North Carolina have

crafted and utilized for over a century in construing the right to keep and bear arms under state constitutions: the "reasonable regulation" test.

## A. The Reasonable Regulation Test is The Appropriate Standard of Review.

While courts are just beginning to grapple with a private right to arms under the federal Constitution, courts have construed analogous state provisions for over a century. Over forty states have constitutional right-to-keep-and-bear-arms provisions, many of which are broader than the Second Amendment. Despite significant differences in the political backdrop, timing, and texts of these provisions, the courts in these states, including North Carolina, have, with remarkable unanimity, coalesced around a single standard for reviewing limitations on the right to bear arms: the "reasonable regulation" test. *See* Adam Winkler, *Scrutinizing the Second Amendment*, 105 MICH. L. REV. 683, 686-87, n.12 (2007) (describing "hundreds of opinions" by state supreme courts with "surprisingly little variation" that have adopted the "reasonableness" standard of review for right-to-bear-arms cases).

Under the reasonable regulation test, a state "may regulate the exercise of [the] right [to bear arms] under its inherent police power so long as the exercise of that power is reasonable." *Robertson v. City & Cnty. of Denver*, 874 P.2d 325, 328, 333 n.10 (Colo. 1994).[9] More demanding than rational basis review, but more deferential than intermediate scrutiny, this "reasonable regulation" test protects Second Amendment activity without unduly restricting states from protecting the public from gun violence. The test recognizes "the state's right,

---

[9] *See also Bleiler v. Chief, Dover Police Dep't*, 927 A.2d 1216, 1223 (N.H. 2007) (noting that relevant inquiry is "whether the statute at issue is a 'reasonable' limitation upon the right to bear arms"); *Jackson v. State*, 68 So. 2d 850, 852 (Ala. Ct. App. 1953) ("It is uniformly recognized that the constitutional guarantee of the right of a citizen to bear arms, in defense of himself and the State . . . is subject to reasonable regulation by the State under its police power."); *see also State v. Sullivan*, 691 S.E.2d 417, 419 (N.C. Ct. App. 2010) (holding that right to bear arms is "subject to the authority of the General Assembly, in the exercise of the police power, to regulate, [so long as] the regulation . . . [is] reasonable and not prohibitive, and must bear a fair relation to the preservation of the public peace and safety.") (internal quotation marks omitted).

indeed its duty under its inherent police power, to make reasonable regulations for the purpose of protecting the health, safety, and welfare of the people." *State v. Comeau*, 448 N.W.2d 595, 599 (Neb. 1989). The reasonable regulation test, which was specifically designed for cases construing the right to keep and bear arms, and has been adopted by the vast majority of states with much broader gun rights than the Second Amendment protects, remains the standard of review best suited for Second Amendment cases after *Heller* and for the case at hand.

The test is also in line with the Supreme Court's statement in *McDonald* agreeing that "state and local experimentation with *reasonable firearms regulation* will continue under the Second Amendment." 130 S. Ct. at 3047 (emphasis added) (internal citation omitted). Further, even pre-*Heller* courts that recognized an individual, non-militia-based right to keep and bear arms under the Second Amendment agreed that "reasonable" firearms restrictions remained permissible. *See, e.g.*, *United States v. Emerson*, 270 F.3d 203, 261 (5th Cir. 2001) (holding that right to keep and bear arms is subject to "reasonable" restrictions if they are "not inconsistent with the right . . . to individually keep and bear . . . private arms."); *id.* at 273 (Parker, J., concurring) ("[W]hatever the nature or parameters of the Second Amendment right, be it collective or individual, it is a right subject to reasonable regulation."); *Nordyke v. King*, 319 F.3d 1185, 1193 (9th Cir. 2003) (Gould, J., specially concurring) (endorsing "an individual Second Amendment right subject to reasonable government regulation.").

The reasonable regulation test is a more heightened form of scrutiny than the rational basis test that the majority opinion in *Heller* rejected (and is more demanding than the "interest balancing" test suggested by Justice Breyer in his dissent) because it does not permit states to prohibit all firearm ownership, even if there is a rational basis to do so. *See* Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self-Defense: An Analytical Framework and*

*a Research Agenda*, 56 UCLA LAW REVIEW 1443, 1458 (2009).  Instead, it "focuses on the balance of the interests at stake, rather than merely on whether any conceivable rationale exists under which the legislature may have concluded the law could promote the public welfare." *State v. Cole*, 665 N.W.2d 328, 338 (Wis. 2003).  Laws and regulations governing the use and possession of firearms thus must meet a higher threshold under the reasonable regulation test than they would under rational basis review.

Nor would adopting the reasonable regulation test here be at odds with district courts that have elected to use intermediate scrutiny following *Heller*.  In virtually every post-*Heller* case where a district court has adopted intermediate scrutiny, the court was evaluating a particular provision of 18 U.S.C. § 922, the federal firearms statute that imposes restrictions on broad classes of individuals and types of arms.  *See, e.g.*, *Marzzarella*, 614 F.3d at 88 (evaluating § 922(k) barring possession of a handgun with an obliterated serial number); *United States v. Yanez-Vasquez*, No. 09-40056-01-SAC, 2010 WL 411112 (D. Kan. Jan. 28, 2010) (evaluating § 922(g)(5) barring undocumented aliens from possessing firearms); *United States v. Miller*, 604 F. Supp. 2d 1162, 1164 (W.D. Tenn. 2009) (evaluating § 922(g) barring felons from possessing firearms); *United States v. Bledsoe*, No. SA-08-CR-13(2)-XR, 2008 WL 3538717, at *1 (W.D. Tex. Aug. 8, 2008) (evaluating § 922(x) barring juveniles from possessing firearms).

The government has a profound interest in regulating the possession and use of firearms. States have "cardinal civil responsibilities" to protect the health, safety, and welfare of their citizens.  *Dep't of Revenue of Ky. v. Davis*, 553 U.S. 328, 342 (2008); *see also Queenside Hills Realty Co. v. Saxl*, 328 U.S. 80, 83 (1946) ("[T]he legislature may choose not to take the chance that human life will be lost . . . .").  States are thus generally afforded "great latitude" in exercising "police powers to legislate as to the protection of the lives, limbs, health, comfort, and

quiet of all persons." *Gonzales v. Oregon*, 546 U.S. 243, 270 (2006) (internal quotation marks omitted). Regulations on the carrying of firearms are an essential exercise of those powers, for the "promotion of safety of persons and property is unquestionably at the core of the State's police power." *Kelley v. Johnson*, 425 U.S. 238, 247 (1976).

While individuals and organizations may differ on the net risks posed by guns in our society, such disagreement underscores that firearm regulation is best suited for the legislative arena, not the courts. *See Miller*, 604 F. Supp. 2d at 1172 n.13 ("[D]ue to the intensity of public opinion on guns, legislation is inevitably the result of hard-fought compromise in the political branches."). Indeed, legislatures are designed to make empirical judgments about the need for and efficacy of regulation, even when that regulation affects the exercise of constitutional rights. *See, e.g., Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180, 195 (1997) (noting that state legislatures are "far better equipped than the judiciary to 'amass and evaluate the vast amounts of data' bearing upon legislative questions."); *Richmond v. J.A. Croson Co.*, 488 U.S. 469, 544 (1989) ("Local officials, by virtue of their proximity to, and their expertise with, local affairs, are exceptionally well qualified to make determinations of public good within their respective spheres of authority.") (internal quotations and citations omitted). State governments "must [thus] be allowed a reasonable opportunity to experiment with solutions to admittedly serious problems." *Young v. American Mini Theatres, Inc.*, 427 U.S 50, 71 (1976).

The risks posed by invalidating or unduly restricting legislative judgments on firearm regulations are severe, and courts should review such legislative judgments with an appropriate amount of deference. Here, too, the reasonable regulation test is better situated than either intermediate or strict scrutiny for evaluating the constitutionality of the statutes at issue.

**B.     North Carolina's Restrictions on Firearms During Declared Emergencies Are Reasonable Regulations And Thus Constitutionally Permissible.**

The Fourth Circuit has already upheld North Carolina's restrictions on gun possession during states of emergency, declaring the restrictions reasonably "subject to 'a narrow, objective, and definite standard.'" *Chalk*, 441 F.2d at 1280. The North Carolina Supreme Court impliedly rejected a Second Amendment challenge to the same restrictions in *Dobbins*, 277 N.C. 484, 178 S.E.2d 449, noting that the Second Amendment "forbid[s] only an unreasonable and arbitrary restriction by State or municipal law upon the right to keep and bear arms." *Id.* at 457.

Courts have repeatedly found that there is a "compelling state interest in protecting the public from the hazards involved with certain types of weapons, such as guns," *Cole*, 665 N.W. 2d at 344, particularly given "the danger [posed by the] widespread presence of weapons in public places and [the need for] police protection against attack in these places." *Id.* (internal quotations omitted). The Fourth Circuit has stated that it "is certainly within the police power of government" to "[c]ontrol [] civil disorders that may threaten the very existence of the State." *Chalk*, 441 F.2d at 1280 (internal quotation marks omitted). "Dealing with . . . an emergency situation requires an immediacy of action that is not possible for judges." *Id.* at 1281. It is thus imperative that states be allowed to devise reasonable firearms regulations to solve problems that are specific to emergency situations.[10]

Moreover, North Carolina's firearm restrictions during declared emergencies are not an outright ban on possession, even during states of emergency, and thus do not approach the

---

[10] Notably, North Carolina's restrictions on public carrying during declared emergencies are not an anomaly. Louisiana similarly allows ban on firearm possession during states of emergency. *See* La. Rev. Stat. Ann. § 29:727(F)(8); *see also* Michael Cook, *"Get Out Now or Risk Being Taken Out By Force": Judicial Review of State Government Emergency Power Following a Natural Disaster*, 57 Case W. Res. L. Rev. 265, 270 (2006) ("Emergencies present difficult situations. The courts generally leave the policy matters to the politically accountable branches and do not conduct a means-ends analysis.").

blanket prohibition on handgun ownership that the Supreme Court struck down in *Heller* and *McDonald*. The restrictions are not prohibitive of the core Second Amendment right to keep and bear arms in the home for self-defense. They are temporary in scope and last no longer than the triggering emergency. The restrictions self-repeal without any further action by the State or its subdivisions. They are precisely the type of reasonable exercise of police power that imposes no greater burden for no longer duration than is necessary to restore "domestic tranquillity." *See Dobbins*, 277 N.C. at 499, 178 S.E.2d at 458 (internal quotation marks omitted).

Plaintiffs complain that the emergency period is often lengthy, and they cite a recent statewide declaration lasting up to thirty days. (Pls.' Mem. 3.) If such a case occurs, Plaintiffs may seek a political or judicial remedy to invalidate an emergency declaration or to reduce its length and geographical scope. *See Chalk*, 441 F.2d at 1281 (declaring it "abundantly clear that the executive's decision that civil control has broken down to the point where emergency measures are necessary is not conclusive or free from judicial review."); *see also Gayle v. Governor of Guam*, 414 F. Supp. 636, 639 (D. Guam 1976) (invalidating curfew declaration because governor lacked statutory authority to make declaration).

In sum, North Carolina's firearm restrictions during states of emergency are both reasonable and not unduly restrictive of the Second Amendment right to keep guns in the home for self-defense. The restrictions are a valid exercise of State's "police powers to legislate as to the protection of the lives, limb, health, comfort, and quiet of all persons," *See Gonzales*, 546 U.S. at 270 (internal quotation marks omitted), and they pass the reasonable regulation test.[11]

---

[11] Sections 14-288.7, 14-288.12(b), 14-288.13(b), 14-288.14(a), and 14-288.15(d) also would survive intermediate (or even strict) scrutiny were the Court to apply that standard of review because it is substantially related to an important government interest. Not surprisingly, a number of courts have found that the protection of the public from firearm violence is an important government interest, *see, e.g.*, *Heller II*, 698 F. Supp. 2d at 186; *Miller*, 604 F. Supp. 2d at 1171; *Bledsoe*, 2008 WL 3538717, at *4, and upheld statutes that impose much broader restrictions on an individual's ability to possess and carry firearms. *See, e.g.*, *Marzzarella*, 2010 WL 2947233, at *7; *United States v. McCane*, 573 F.3d 1037, 1050 (10th Cir. 2009); *Heller II*, 698 F. Supp. 2d at 197; *State v. Sieyes*, 225 P.3d 995,

## CONCLUSION

For all the foregoing reasons, the Court should find that North Carolina General Statutes

§§ 14-288.7, 14-288.12(b), 14-288.13(b), 14-288.14(a), and 14-288.15(d) are constitutional.

Respectfully submitted the 16th of December.

s/Andrew H. Erteschik
Andrew H. Erteschik
N.C. State Bar No. 35269
POYNER SPRUILL LLP
301 Fayetteville Street, Suite 1900
Raleigh, NC  27601
Telephone:  (919) 783-2895
Facsimile:  (919) 783-1075
E-Mail:  aerteschik@poynerspruill.com

Local Civil Rule 83.1 Counsel for *Amici Curiae*

Adam K. Levin
Tracy L. Hresko
Samson O. Asiyanbi
HOGAN LOVELLS US LLP
555 13th Street, NW
Washington, DC 20004
Telephone:  (202) 637-5600
Facsimile:  (202) 637-5910
E-Mail:  adam.levin@hoganlovells.com

Jonathan E. Lowy
Daniel R. Vice
BRADY CENTER TO PREVENT GUN VIOLENCE
LEGAL ACTION PROJECT
1225 Eye Street, NW, Suite 1100
Washington, DC 20005
E-Mail:  jlowy@bradymail.org

Attorneys for *Amici Curiae*

---

995 (Wash. 2010); *United States v. Engstrum*, 609 F. Supp. 2d 1227, 1233 (D. Utah 2009); *Yanez-Vasquez*, 2010 WL 411112, at *3; *Miller*, 604 F. Supp. 2d at 1171-72; *United States v. Masciandaro*, 648 F. Supp. 2d 779, 789-91 (E.D. Va. 2009); *United States v. Radencich*, No. 3:08-CR-00048(01)RM, 2009 WL 127648 (N.D. Ind. Jan. 20, 2009); *United States v. Schultz*, No. 1:08-CR-75-TS, 2009 WL 35225 (N.D. Ind. Jan. 5, 2009); *Bledsoe*, 2008 WL 3538717, at *4; *People v. Flores*, 86 Cal. Rptr. 3d 804, 807 (Cal. Ct. App. 2008).

29