IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:10-CV-00265-H

| | |
|---|---|
| MICHAEL BATEMAN, VIRGIL GREEN, FORREST MINGES, JR., GRNC/FFE, INC., and SECOND AMENDMENT FOUNDATION, INC., <br><br> *Plaintiffs*, <br><br> v. <br><br> BEVERLY PERDUE, REUBEN F. YOUNG, STOKES COUNTY, and CITY OF KING, <br><br> *Defendants*. | **REPLY BRIEF IN SUPPORT OF THE STATE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |

## INTRODUCTION

The Fourth Circuit's decision several weeks ago in *United States v. Chester*, No. 09-4084, 2010 U.S. App. LEXIS 26508 (4th Cir. Dec. 30, 2010) sheds light on how Second Amendment challenges should be analyzed in this Circuit in the aftermath of *District of Columbia v. Heller*, 554 U.S. 570, 171 L. Ed. 2d 637 (2008) and, in doing so, provides further support for the entry of summary judgment in favor of the State Defendants. While *Chester* arises in a different factual context and does not address the substantive question currently before this Court, the Fourth Circuit's decision does (1) reiterate the fact that rights under the Second Amendment are not absolute; (2) expressly reject the notion that strict scrutiny applies to all statutory challenges under the Second Amendment; and (3) provide an analytical framework for evaluating laws restricting the

possession of firearms, setting out a test that, when applied here, mandates a ruling in favor of the State Defendants.[1]

Plaintiffs' brief in opposition to the State Defendants' Motion for Summary Judgment (hereafter "Response Brief"), like their earlier briefs, makes abundantly clear their zeal to use this lawsuit as a test case to establish a broad constitutional right to carry a gun outside of one's home *in the abstract* (i.e. under any circumstances). However, the issue currently before this Court is far narrower, involving only the question of whether there is a right to possess a gun off of one's

---

[1] While the panel majority in *Chester* advocated "looking to the First Amendment as a guide in developing a standard of review for the Second Amendment[,]" *Chester* at * 24, the majority stopped short of definitively declaring that the entire body of First Amendment jurisprudence is incorporated *in toto* into the Second Amendment. *Chester* is ambiguous on the issue of whether *United States v. Salerno*, 481 U.S. 739 (1987) continues to apply to facial challenges under the Second Amendment such as the present one. While the *Chester* opinion states that the defendant in that case was challenging the law both facially and as applied to him, it does not specifically address the differing standards generally applicable to facial challenges and as-applied challenges. In his concurrence, Judge Davis observed that the defendant in *Chester* had the legal right to challenge the effect of the statute at issue as applied to himself *or* to assert a facial challenge to the statute as a whole. Judge Davis cited *Salerno* as being applicable to the latter type of facial challenge such that the defendant would have to show "that no set of circumstances exists under which the Act would be valid." *Chester* at * 39 (Davis, J., concurring).

It should also be noted that even in the First Amendment context (where the overbreadth doctrine applies), the appropriate remedy for a statute that sweeps too broadly for constitutional purposes is a narrowing construction of the challenged law (where such a construction is possible) rather than the statute's facial invalidation. *See Virginia v. American Booksellers Ass'n*, 484 U.S. 383, 397, 98 L. Ed. 2d 782, 796 (1988) (holding that a statute being challenged facially on First Amendment grounds must be upheld if it is "readily susceptible to a narrowing construction that would make it constitutional[.]").

As a practical matter, however, the issues discussed in this footnote are of only academic interest as N.C. GEN. STAT. § 14-288.7 passes constitutional muster under the test articulated in *Chester* such that this Court does not need to reach these additional issues.

premises *during a declared state of emergency*. Thus, by seeking a broader ruling, Plaintiffs invite this Court to ignore the well established rule that courts should not decide unnecessary constitutional questions.

## ARGUMENT

**I.  N.C. GEN. STAT. § 14-288.7 IS FULLY CONSTITUTIONAL BASED ON THE PRINCIPLES SET OUT IN *CHESTER*.**

While *Chester* does not discuss the interplay between the Second Amendment and laws restricting the possession of guns off of one's own property during a state of emergency, the Fourth Circuit's analysis nevertheless fills in some of the gaps left by *Heller* as to the appropriate framework for analyzing Second Amendment challenges. In its discussion, *Chester* makes clear that "the pre-existing right guaranteed by the Second Amendment [is] not unlimited . . ." *Chester* at *13.

*Chester* articulates a two-part test for analyzing Second Amendment challenges:[2]

> The first question is whether the challenged law imposes a burden on conduct falling within the scope of the Second Amendment's guarantee. This historical inquiry seeks to determine whether the conduct at issue was understood to be within the scope of the right at the time of ratification. If it was not, then the challenged law is valid. If the challenged regulation burdens conduct that was within the scope of the Second Amendment as historically understood, then we move to the second step of applying an appropriate form of means-end scrutiny. . . . [U]nless the conduct at issue is not protected by the Second Amendment at all, the Government bears the burden of justifying the constitutional validity of the law.

*Id*. at * 18 (citation and internal quotation marks omitted).

---

[2] While *Chester* moots several of the arguments contained in the amicus curiae brief submitted by the Brady Center to Prevent Gun Violence, et al (hereafter "the Amicus Brief") relating to the appropriate standard of review for Second Amendment challenges, the remainder of the analysis contained in the Amicus Brief provides a number of keen insights that demonstrate the invalidity of the claims asserted by Plaintiffs.

-3-

It is important to emphasize the significance of what this means. Under *Chester*, if *either* of these two prongs are resolved in favor of the government, then the statute must be upheld. As a practical matter, however, for the reasons set out below, § 14-288.7 passes muster under *both* parts of this test.

**A.     PLAINTIFFS CANNOT SHOW THE EXISTENCE OF A HISTORICAL RIGHT TO CARRY FIREARMS OFF OF ONE'S PROPERTY DURING A STATE OF EMERGENCY THAT WAS IN EXISTENCE AT THE TIME THE SECOND AMENDMENT WAS RATIFIED.**

**1.     Plaintiffs Have Failed to Carry Their Burden Under *Chester* of Establishing the Existence of Such a Right.**

*Chester* states that the State bears the burden of showing that the challenged law is constitutional "*unless the conduct at issue is not protected by the Second Amendment at all*[.]" *Chester* at * 18 (emphasis added). The obvious implication of this statement is that it is *Plaintiffs*, not the State Defendants, who bear the burden of satisfying the first prong of the test set out in *Chester* – that is, proving that a recognized right to carry guns off of one's property during a state of emergency existed at the time of the Second Amendment's ratification.[3] Plaintiffs' Response Brief fails to meet this burden, offering no historical evidence of their own on this question and, instead, incorrectly implying that it is the State Defendants' burden to do so.

*Chester* establishes that the second prong of the Fourth Circuit's test need only be reached if the plaintiff first carries its burden of showing that a right to engage in the conduct at issue was, in fact, actually recognized at the time of ratification (such that the right is encompassed within the

---

[3] This allocation of burdens is logical as the law recognizes the inherent difficulty in proving a negative. *See, e.g., Elkins v. United States*, 364 U.S. 206, 218, 4 L. Ed. 2d 1669, 1678 (1960) ("Since as a practical matter it is never easy to prove a negative, it is hardly likely that conclusive factual data could ever be assembled.").

Second Amendment). *See Chester* at * 18. Therefore, on this ground alone, summary judgment should be granted in favor of the State Defendants.

The legal authorities cited in Plaintiffs' Response Brief have nothing to do with the possession of guns *during a state of emergency*, which is what this entire lawsuit is about. Instead, their Response Brief makes clear that they view this lawsuit as an invitation for this Court to reach out and decide a far broader issue than that which is actually raised by the pleadings – that is, the contours of any Second Amendment right that may exist to bring a gun outside of one's premises *in the abstract* (i.e. unconnected to a declared state of emergency).

Obviously, the unnecessary adjudication of that expansive issue would run afoul of the Supreme Court's longstanding admonition that lower courts should avoid the unnecessary adjudication of constitutional issues. *See Alabama State Fed'n of Labor v. McAdory*, 325 U.S. 450, 461, 89 L. Ed. 1725, 1734 (1945) ("It has long been [the Court's] considered practice not . . . to decide any constitutional question in advance of the necessity for its decision. . . .").

  **2.**  **Although the Burden Rests With Plaintiffs Rather Than With the State Defendants on This Issue, the State Defendants Have Nevertheless Shown That Historical Evidence Rejects the Notion That a Right to Carry Firearms Off of One's Property During a State of Emergency Existed at the Time the Second Amendment Was Ratified.**

The historical record surrounding the ratification of the Constitution makes clear that "[t]he goal of constitutional government was to constrain arbitrary power, not to hobble governmental authority." Cornell and DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 Fordham L. Rev. 487, 493 (2004). The Constitution was meant to embrace and perpetuate the concept that "[o]utside of a well regulated society governed by the rule of law, liberty

was nothing more than licentiousness and anarchy." *Id*. (citing John J. Zubly, *The Law of Liberty* 26 (Philadelphia 1775)).

If there is one thing that stands out among the evidence regarding the historical context in which the Second Amendment was ratified, it is the Framers' fear of armed disorder and rebellion and their resulting determination to make the government existing under the new Constitution strong enough to restore order and crush any such rebellion. Evidence on this subject is highly pertinent to this Court's determination, pursuant to *Chester*, as to whether § 14-288.7's prohibition on the carrying of firearms off of one's premises during a riot or other state of emergency conflicts with a recognized right to engage in such conduct that was in existence at the time of the Second Amendment's ratification.

Strong evidence exists that the Framers of the Constitution favored letting militias (the precursors to our modern State and National Guards) suppress insurrections. Cornell and DeDino, *supra* at 498. This intent is evidenced by the inclusion within the text of the Constitution of language empowering Congress to call out the militia to suppress insurrections and authorizing the federal government, on request from a state, to quell domestic violence within that state. U.S. Const. Art. I, § 8(15); Art. IV, § 4.

The Framers' fear of armed disorder is understandable based on their recent experience with an uprising known as Shays's Rebellion, which exemplified the dangers in allowing the unrestricted possession of guns by persons outside of their homes. That rebellion occurred in Massachusetts shortly before the Second Amendment's ratification when a thousand farmers and shop owners carrying muskets threatened the state's government based on their belief that the state had become tyrannical. In an action endorsed by James Madison, George Washington, Benjamin Franklin, John

Marshall, Samuel Adams, and John Jay, the Governor of Massachusetts crushed the insurrection. Bogus, *District of Columbia v. Heller: Heller and Insurrectionism*, 59 Syracuse L. Rev. 253, 254-55 (2008).

As the Framers were preparing to call for a constitutional convention to revise the Articles of Confederation, "violent resistance to traditional law enforcement – most notably Shays's Rebellion . . . – underscored the sense of crisis that many Americans felt. . . . The delegates to the Philadelphia Convention met with this event fresh in their memories and with the knowledge that the government under the Articles of Confederation would probably be helpless in a similar situation." Finkelman, *A Well Regulated Militia: The Second Amendment in Historical Perspective*, 76 Chi.-Kent L. Rev. 195, 195 (2000). Indeed, America's post-Revolutionary War leaders were "deeply frightened" by the rebellion, which "underscored the need for a stronger government." Finkelman, *supra* at 211-12. *See* Miller, *Guns as Smut: Defending the Home-Bound Second Amendment*, 109 Columbia L. Rev. 1278, 1327 (2009) ("[I]n the wake of Shays's Rebellion, it is inconceivable that the Framers would have stripped the government of power to disarm those who [were] in rebellion or might be in rebellion.") (citation and internal quotation marks omitted).

Notably, another prominent instance of domestic disorder occurred three years after the Second Amendment's ratification in the Whiskey Rebellion of 1794. Farmers in Pennsylvania and Kentucky attempted to thwart through intimidation the efforts of tax collectors to collect a federal tax on whiskey by carrying muskets and marching as a militia. Articulating his belief that such conduct, if not stopped, "would bring an end to our Constitution & laws," George Washington himself led 12,000 troops in quelling the insurrection. Bogus, *supra* at 255.

As Professor Paul Finkelman has pointed out:

> Madison and his colleagues could not have predicted the Whiskey Rebellion, the Nullification crisis, or the Civil War. But they were shrewd enough to know that the lack of national military power – *and with it the power to disarm those who are in rebellion or might be in rebellion* – would undermine any national state. Having just created a stronger national state in the wake of Shays's Rebellion and similar rebellions in other states, the Federalists in Congress, many of whom had been in the Philadelphia Convention, the state ratifying conventions, or both, took no steps to undermine the ability of the national government to protect itself from enemies without or rebels and traitors within.

Finkelman, *supra*, at 210-11 (emphasis added).

The Framers were similarly motivated by a fear of anarchy. As Alexander Hamilton put it: "It might be said that too little power is as dangerous as too much, that it leads to anarchy, and from anarchy to despotism." Finkelman, *supra* at 218. Consequently, the intent of the drafters "was to prevent anarchy, violence, and rebellions." *Id*. at 222.

The Supreme Court in *Heller* determined that the Second Amendment "codified a right inherited from our English ancestors[.]" *Heller*, 554 U.S. at 599, 171 L. Ed. 2d at 662 (internal quotation marks and citations omitted). Because the English right to carry a firearm was subject to significant regulation, the limited scope of the right existing under the Second Amendment, as ratified, is understandable.

> The right to bear arms with which our Founders were familiar was one that had always been subject to regulation. English law dating back to the twelfth century restricted where and when arms could be borne. . . . The 1689 English Bill of Rights provided that "Subjects which are Protestants may have Armies for their defense Suitable to their Condition and as allowed by Law." The mention of suitability and the allowance only of specific religious adherents to possess arms indicate that the right was not considered absolute or immune to government oversight. Blackstone's Commentaries on the Law of England, written in 1765, also noted that the people enjoyed a right to bear arms "suitable to their condition and degree, and such as are allowed by law," adding that the right was subject to "due restrictions."

Winkler, *Scrutinizing the Second Amendment*, 105 Mich. L. Rev. 683, 709 & n.146 (2007) (quoting 1 William Blackstone, Commentaries on the Laws of England 139 (Univ. of Chicago Press, 1979) (1765)). *See also* Miller, *supra* at 1324 & n.286 ("Blackstone . . . wrote without hesitation that the Laws of England restricted the public's ability to assemble with and transport arms.").

This notion that the right to bear arms was subject to governmental restriction carried over into the common law in America. As a result, American common law during the Founding Era "not only constrained when and how one might travel with arms, but it [also] defined the limits of legitimate self-defense quite narrowly." Cornell and DeDino, *supra* at 501. State legislatures were, therefore, permitted to establish the limits of self-defense and were free to pass laws restricting the right to firearms in furtherance of the governmental goal of protecting public safety. As such, "a variety of gun regulations were on the books . . . when the Second Amendment was adopted." *Id*. at 501-02. Indeed, in the aftermath of the Second Amendment's ratification, regulation of guns actually *increased*. *Id*. at 505.

As this summary of the historical context surrounding the Second Amendment's ratification reveals, Plaintiffs' attempt in the present lawsuit to characterize N.C. GEN. STAT. § 14-288.7 as a law that "directly conflicts with the core of the Second Amendment right" (Resp. Br. at. 6) is simply inconsistent with history. Not only does the ability to possess a firearm outside of one's home during a state of emergency not lie at the "core" of the Second Amendment but, in fact, it does not even reside within the Amendment's outer limits. Furthermore, § 14-288.7 implicitly recognizes, and leaves undisturbed, the right that *does* go to the core of the Second Amendment (as articulated in *Heller*) – that is, the right to possess a gun in one's home.

### 3. The Government's Right to Restrict the Possession of a Firearm Outside the Home During an Emergency is Implicit in Its Historical Ability to Impose Curfews.

The constitutionality of § 14-288.7 is also demonstrated by the longstanding acceptance by courts in this country of the establishment of curfews under appropriate emergency circumstances. As a matter of history, "[c]urfew regulations have been said to have been brought into England by William the Conqueror . . ." *Thistlewood v. Trial Magistrate for Ocean City*, 236 Md. 548, 552, 204 A.2d 688, 690 (1964). As the State Defendants' earlier briefs have shown, courts have repeatedly upheld the imposition of temporary restrictions on the exercise of constitutional rights pursuant to a curfew until the emergency has passed.

As the Fourth Circuit held in *United States v. Chalk*, 441 F.2d 1277 (4th Cir.), *cert. denied*, 404 U.S. 943, 30 L. Ed. 2d 258 (1971) in upholding a constitutional challenge arising under the same series of North Carolina statutes at issue here, "[c]ontrol of civil disorders that may threaten the very existence of the State is certainly within the police power of government." *Id*. at 1280. The Fourth Circuit further opined that "[t]he invocation of emergency powers necessarily restricts activities that would normally be constitutionally protected. Actions which citizens are normally free to engage in become subject to criminal penalty." *Id.*.

Thus, even if one were to assume that the Second Amendment confers a qualified right to carry a gun off of one's property under normal (i.e. non-emergency circumstances), such a right could lawfully be the subject of a temporary suspension during a state of emergency based on the same reasoning that allows the more draconian imposition of a curfew. Obviously, if persons do not have an absolute right to leave their premises *at all* during a state of emergency, it logically follows

that they similarly lack an absolute right to leave their premises carrying a firearm during such an emergency.

Indeed, in their Response Brief, Plaintiffs concede that the State is constitutionally permitted to restrict the rights of assembly and travel during a state of emergency. (Resp. Br. at 9) However, by taking the position that only gun rights (and not other constitutional rights) are sacrosanct in an emergency, Plaintiffs are inventing out of whole cloth a pyramid of constitutional rights and arbitrarily choosing to place the right to possess a firearm at the top. This is directly inconsistent with Supreme Court precedent. *See Valley Forge Christian College v. Americans United for Separation of Church & State*, 454 U.S. 464, 484, 70 L. Ed. 2d 700, 717 (1982) ("[W]e know of no principled basis on which to create a hierarchy of constitutional values."). It is likewise inconsistent with *Heller's* recognition that Second Amendment rights share with other constitutional rights the characteristic of being non-absolute. *See Heller*, 554 U.S. at 626, 171 L. Ed. 2d at 678 ("*Like most rights*, the right secured by the Second Amendment is not unlimited.") (emphasis added).

**B.    EVEN IF THE SECOND PRONG OF THE *CHESTER* TEST IS UTILIZED, N.C. GEN. STAT. § 14-288.7 STILL PASSES MUSTER.**

As shown above, Plaintiffs' inability to satisfy the first part of the test set out in *Chester* mandates the dismissal of this action. However, even if this Court was to go on to apply the second part of the Fourth Circuit's test, the result would still be the same.

One of the most significant aspects of *Chester* is the Fourth Circuit's rejection of the automatic application of a strict scrutiny standard for evaluating challenges based on the Second Amendment. Instead, the court agreed with the approach of using the First Amendment as a guide, noting that different standards of review are utilized in First Amendment challenges, depending on

-11-

the precise nature of the challenge. *Chester* at * 24-25. Based on the specific claim being asserted in *Chester*, the Fourth Circuit ultimately chose to employ an intermediate level of scrutiny in which the government would merely be required to show a "reasonable fit between the challenged regulation and a substantial government objective." *Id*. at * 27.

The Fourth Circuit recognized that, in the First Amendment context, content-neutral time, place, and manner restrictions are reviewed under an intermediate scrutiny standard of review. *See Id.* at * 25. North Carolina General Statute § 14-288.7 is a quintessential example of a time, place, and manner restriction. It affects the ability to possess guns in a single (and, by its very nature, temporary) context – during a declared state of emergency. It does not impact *at all* the carrying of guns off of one's property at any other time or in any other context. As such, § 14-288.7 cannot be viewed as anything other than a time, place, and manner regulation. For this reason, Plaintiffs' demand in their Response Brief for strict scrutiny review (Resp. Br. at 6) flies in the face of *Chester*.

A "reasonable fit" certainly exists between (1) the General Assembly's goal of preventing the dangers accruing to law enforcement officers, emergency rescue workers, and members of the public from armed persons roaming the streets during emergency situations; and (2) the restrictions contained in § 14-288.7. The Legislature's establishment of a clear bright-line rule both substantially reduces the likelihood of armed mayhem and allows law enforcement officers and other governmental workers to do their jobs without fear for their own safety (and without disruption to their emergency management efforts) stemming from the presence of armed intruders in their midst.

Notably, in their Response Brief, Plaintiffs *concede* that the State can lawfully "impose time, place and manner restrictions on the right [to carry guns]." (Resp. Br. at 3) However, one is left to wonder when (in their minds) such regulations would be warranted if not during an emergency.

While Plaintiffs then claim that the "time" encompassed by such a regulation cannot include occasions when people "most urgently need to exercise the right of self-defense" (*Id*. at 3 n. 2), a reading of *Heller* makes clear the Supreme Court's recognition that such a need is greatest in one's *home* – as opposed to outdoors during a declared emergency. *See Heller*, 554 U.S. at 635, 171 L. Ed. 2d at 683 (holding that the Second Amendment "surely elevates above all other interests the . . . defense of hearth and home."). Section 14-288.7 does not even address – much less prohibit – the core Second Amendment right with which *Heller* was consumed, the right to engage in self-defense of one's home.

The notion that there is an urgent need, for self-defense purposes, for persons to carry guns off their property during a state of emergency is nothing more than empty rhetoric that Plaintiffs have asserted throughout this litigation without a shred of evidentiary support. Despite being given the opportunity to submit affidavits at the summary judgment stage, Plaintiffs have failed to offer even a scrap of evidence that they (or, for that matter, anyone else) have ever actually encountered circumstances during such an emergency where a need to use a firearm for self-defense arose.

The State Defendants, conversely, have submitted affidavit testimony from individuals at both the State and county level throughout North Carolina with both expertise and personal experience in responding to states of emergency. These affidavits not only painstakingly describe the difficult circumstances with which emergency workers are faced but also explain the very real dangers inherent in allowing the taking of firearms off of one's property under these types of emergency situations. *See*, *e.g.*, Newton Aff, ¶¶ 4, 34-35; Hoell Aff, ¶¶ 8, 11-14; Sanderson Aff, ¶¶

8-9, 11, 13; Williams Aff, ¶¶ 13-17.[4] Through these affidavits, the State Defendants have presented evidence establishing the very real relationship between restricting the possession of guns outside the home during a state of emergency and furthering the achievement of the most basic duties of a government – restoring order and protecting the public. Indeed, it simply defies logic to suggest, for example, that during a riot individuals have a constitutional right to bring a gun onto the streets, thereby making an already dangerous and life-threatening situation even worse.

Plaintiffs' self-defense argument is nothing so much as an example of the emperor having no clothes. The mere incantation of the term "self-defense" is simply not enough to invalidate a law that furthers in a tangible and direct way core governmental interests.

### C. THE REMAINING ARGUMENTS IN PLAINTIFFS' RESPONSE BRIEF ARE MERITLESS.

#### 1. Plaintiffs' Vision of the Second Amendment is More Closely Related to Anarchy Than Self-Defense.

Plaintiffs' view of how the Second Amendment operates in the context of a state of emergency is a return to the state of nature where anarchy, rather than ordered liberty, is the end result. Such anarchy was precisely what our Founding Fathers sought to avoid by authorizing in our Constitution a strong government that is capable of, and responsible for, restoring order in times of disorder. *See Chalk*, 441 F.2d at 1281 ("The Constitution protects against anarchy as well as tyranny."). Indeed, a retreat to the state of nature is inimical to the social compact upon which any civilized society is based.

> It is a trite maxim, that man gives up a part of his natural liberty when he enters into civil society, as the price of the blessings of that state: and it may

---

[4] For reasons of space, this reply brief does not attempt to summarize the affidavits the State Defendants have submitted. However, the affidavits explain in detail the types of conditions faced by emergency workers and law enforcement officers "on the ground" during states of emergency.

-14-

>   be said, with truth, that this liberty is well exchanged for the advantages
>   which flow from law and justice.

*Green v. Biddle*, 21 U.S. 1, 63, 5 L. Ed. 547, 563 (1823). Under this principle, by choosing to live within a society, individuals give up certain rights during states of emergency that they would otherwise possess. This is precisely why governments can lawfully impose curfews.

In short, a state of emergency should not be permitted to turn into a state of nature. Plaintiffs' arguments are not only unsupported by the Framers' constitutional vision but are also incompatible with the basic notion of the rule of law.

### 2. There Cannot Be One Set of Laws for "Law-Abiding" Citizens and Another Set for Would-Be Criminals.

As the State Defendants have shown in their prior briefs, it is unrealistic to suggest that there can be two sets of laws during a state of emergency – one for "law abiding citizens" and one for would-be criminals. Moreover, the need for a bright-line rule regarding the possession of firearms is at its greatest during the tense, dangerous, and rapidly evolving circumstances that exist during a declared emergency. Special dangers to emergency workers and to the public at large stem from the presence of armed persons (even well-intentioned ones) that do not exist under non-emergency circumstances. Moreover, regardless of how "law-abiding" Plaintiffs profess to be, it is important to note that they have brought this action as a *facial* challenge to § 14-288.7, in which they seek the statute's total invalidation, such that it could not be enforced against anyone – whether "law abiding" or not.

In addition, while the Response Brief tries to distance Plaintiffs' arguments from those that would support the existence of armed gangs and vigilantes during declared emergencies, what they fail to grasp is that these are the inevitable consequences of their position. In addition, by failing to

-15-

Case 5:10-cv-00265-H   Document 80-1   Filed 01/31/11   Page 15 of 20

>   be said, with truth, that this liberty is well exchanged for the advantages
>   which flow from law and justice.

*Green v. Biddle*, 21 U.S. 1, 63, 5 L. Ed. 547, 563 (1823). Under this principle, by choosing to live within a society, individuals give up certain rights during states of emergency that they would otherwise possess. This is precisely why governments can lawfully impose curfews.

In short, a state of emergency should not be permitted to turn into a state of nature. Plaintiffs' arguments are not only unsupported by the Framers' constitutional vision but are also incompatible with the basic notion of the rule of law.

### 2. There Cannot Be One Set of Laws for "Law-Abiding" Citizens and Another Set for Would-Be Criminals.

As the State Defendants have shown in their prior briefs, it is unrealistic to suggest that there can be two sets of laws during a state of emergency – one for "law abiding citizens" and one for would-be criminals. Moreover, the need for a bright-line rule regarding the possession of firearms is at its greatest during the tense, dangerous, and rapidly evolving circumstances that exist during a declared emergency. Special dangers to emergency workers and to the public at large stem from the presence of armed persons (even well-intentioned ones) that do not exist under non-emergency circumstances. Moreover, regardless of how "law-abiding" Plaintiffs profess to be, it is important to note that they have brought this action as a *facial* challenge to § 14-288.7, in which they seek the statute's total invalidation, such that it could not be enforced against anyone – whether "law abiding" or not.

In addition, while the Response Brief tries to distance Plaintiffs' arguments from those that would support the existence of armed gangs and vigilantes during declared emergencies, what they fail to grasp is that these are the inevitable consequences of their position. In addition, by failing to

differentiate between the dangers posed by armed and unarmed persons during an emergency (thereby implying that one is no more potentially dangerous than the other), *see* Response Brief, p. 9, Plaintiffs' Response Brief simply ignores reality.

### 3. The State Defendants Are Not Arguing That Heller Sets Out a "Ceiling" on the Scope of the Second Amendment.

Finally, Plaintiffs mischaracterize the State Defendants' argument as an assertion that because Heller recognized only a right to possess firearms in one's home, the decision in *Heller* categorically bars future recognition by the Supreme Court of a right to carry firearms in some form or fashion outside of the home (in non-emergency circumstances). However, that is not what the State Defendants are arguing. While there is simply no way of presently knowing whether, and to what extent, the Supreme Court will expand the holding in *Heller*, the present case does not require this Court to make a prediction on that subject because § 14-288.7 only operates in one specific context – a declared state of emergency.

## II. THE DECISION IN *CHESTER* DEMONSTRATES THE CONSTITUTIONALITY OF THE AUTHORIZING STATUTES.

The validity of the "Authorizing Statutes" (N.C. GEN. STAT. §§ 14-288.12(b)(4);14-288.13(b);14-288.14(a); and 14-288.15(d)) under *Chester* is even more straightforward. In their prior briefs, the State Defendants have discussed in detail how the Authorizing Statutes do not contain any actual restrictions on the possession of guns. To the contrary, these statutes merely authorize the recipients of the statutory authority contained therein (primarily local governments) to enact restrictions or prohibitions on the statutorily enumerated subjects, which include not only firearms but also, among others, alcoholic beverages, gasoline, and the movement of people in public places. *See* N.C. GEN. STAT. § 14-288.12(b).

-16-

However, the Authorizing Statutes do not dictate what the content of those restrictions are to be. Accordingly, the only way in which the *facial* invalidation of these statutes would be necessary would be if the Second Amendment was absolute – such that no possible ordinance or proclamation restricting that right *in any manner* could ever be constitutional.

As the State Defendants have demonstrated, *Heller* holds that, to the contrary, the rights under the Second Amendment are *not* absolute. *Heller*, 554 U.S. at 626, 171 L. Ed. 2d at 678. In *Chester*, the Fourth Circuit agreed, holding that "the right to keep and bear arms, like other Constitutional rights, is limited in scope and subject to some regulation." *Chester* at * 5.

This ends the analysis as to the Authorizing Statutes. By virtue of their strategic decision to bring a *facial* challenge to the Authorizing Statutes, Plaintiffs are implicitly asking this Court to predict that every single ordinance containing a restriction on firearms passed pursuant to the authority granted in the Authorizing Statutes will exceed constitutional limits. In so arguing, Plaintiffs have it precisely backwards as the law assumes that legislative bodies will attempt to follow, rather than violate, the Constitution. *See U.S. West, Inc. v. FCC*, 182 F.3d 1224, 1231 (10th Cir. 1999) ("[W]e assume that [a legislative body] legislates with constitutional limitations in mind . . ."), *cert. denied*, 530 U.S. 1213, 147 L. Ed. 2d 248 (2000).[5]

### III. THE RESULT ADVOCATED BY THE STATE DEFENDANTS DOES NOT LEAVE FUTURE PLAINTIFFS WITHOUT MEANS TO CHALLENGE ALLEGED DENIALS OF THEIR SECOND AMENDMENT RIGHTS.

There is another aspect of the *Chester* decision that, while ignored by Plaintiffs in their Response Brief, is significant. In discussing the Supreme Court's listing in *Heller* of "presumptively

---

[5] Perhaps in recognition of the fact that no support for their challenge to the Authorizing Statutes can be found in *Chester*, Plaintiffs' Response Brief does not even purport to direct an argument specifically at the Authorizing Statutes.

-17-

lawful regulatory measures" restricting the possession of firearms, the Fourth Circuit noted that the Supreme Court's use of this phrase "suggests the possibility that one or more of these . . . regulations could be unconstitutional in the face of an *as-applied* challenge." *Chester* at * 17 (emphasis added and internal quotation marks omitted).

The concept underlying this statement is the notion that a law containing restrictions on firearms may be constitutional in some specific contexts but unconstitutional in others. Under this reasoning, an as-applied challenge (rather than a facial challenge) would be the appropriate vehicle for asserting a challenge to such a law. An as-applied challenge would avoid the draconian step of calling for the facial invalidation of the law in its entirety (as Plaintiffs seek here) and would instead involve the less drastic inquiry as to whether the application of the law operated unconstitutionally *as applied to a particular litigant based on a developed factual record*. This, then, would be the appropriate mechanism for litigating the distinction Plaintiffs so desperately seek to draw between law-abiding citizens possessing a gun for self-defense as opposed to would-be lawbreakers carrying a gun for the purpose of creating mayhem.

## **CONCLUSION**

The State Defendants have demonstrated: (1) the complete absence of any recognized historical right to carry a weapon off of one's property during a state of emergency at the time of the Second Amendment's ratification (notwithstanding the fact that it was *Plaintiffs'* burden under *Chester* to show affirmatively that such a right existed); and (2) a clear fit between the North Carolina statutes at issue and the substantial governmental purposes underlying their enactment.

In short, the statutes at issue authorize nothing more than merely a temporary restraint on conduct in one finite and extraordinary context and do not intrude on the Second Amendment's core

-18-

Case 5:10-cv-00265-H   Document 80-1   Filed 01/31/11   Page 18 of 20

right of self-defense in one's home as articulated in *Heller*. For all of these reasons, the State Defendants respectfully submit that their Motion to Dismiss and Motion for Summary Judgment should be granted and that Plaintiffs' Motion for Summary Judgment should be denied.

Respectfully submitted, this the 31st day of January, 2011.

<div style="margin-left: 50%;">

ROY COOPER
Attorney General

/s/Mark A. Davis
Mark A. Davis
Special Deputy Attorney General
Attorney for The State Defendants

N.C. Department of Justice
Post Office Box 629
Raleigh, NC 27602
E-mail: mdavis@ncdoj.gov
Telephone: (919) 716-6900
Facsimile: (919) 716-6763
State Bar No. 18142

</div>

# CERTIFICATE OF SERVICE

I hereby certify that on this day, the 31st of January, 2011, I electronically filed the foregoing **REPLY BRIEF IN SUPPORT OF THE STATE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Alan Gura
Gura & Possessky, PLLC
101 N. Columbus Street, Suite 405
Alexandria, VA 22314

Wes J. Camden
Kearns Davis
Brooks, Pierce, McLendon
  Humphrey & Leonard, L.L.P.
P.O. Box 1800
Raleigh, NC 27602

Walter W. Pitt, Jr.
Kevin G. Williams
Bell, Davis & Pitt
P.O. Box 21029
Winston-Salem, NC 27120

Henry W. Jones, Jr.
Lori P. Jones
Jordan Price Wall Gray Jones &
  Carlton, PLLC
1951 Clark Avenue
P.O. Box 10669
Raleigh, NC 27605

/s/Mark A. Davis
Special Deputy Attorney General